JUDGE ABRAMS



RECEIVED
JUL 05 2012
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEGAN BARRETT, LINDSEY HOUSER, JENNIFER JONES and JENNIFER SEARD, individually and on behalf of a class of similarly situated female employees, | 12 CV 5224 |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| -- against -- | |
| FOREST LABORATORIES, INC. and FOREST PHARMACEUTICALS, INC. | Civil No. _____ |
| Defendants. | |
| | JURY TRIAL DEMANDED |

1.     Plaintiffs Megan Barrett ("Ms. Barrett"), Lindsay Houser ("Ms. Houser"), Jennifer Jones ("Ms. Jones"), and Jennifer Seard ("Ms. Seard") (collectively "Plaintiffs" or "Class Representatives"), through their attorneys Sanford Wittels & Heisler, LLP, bring this action in their individual capacities and on behalf of the two classes ("Title VII Class" and "EPA Class") defined below to redress gender discrimination.  Upon non-confidential, non-privileged information concerning themselves and their own acts, and upon information and belief, Plaintiffs allege as follows:

## I.  INTRODUCTION

2.     Defendants Forest Laboratories and Forest Pharmaceuticals (collectively, "the Company" or "Forest") have engaged in systematic, company-wide discriminatory treatment of female employees based on their gender, their taking of federally and state-protected maternity leave, and their status as pregnant women or caregivers.

1

3.      Forest discriminates against its female employees through, *inter alia*: (a) disparate treatment; (b) discriminatory policies, practices and procedures in selection, pay, promotion, and advancement; (c) pregnancy discrimination; (d) sexual harassment; and (e) retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), 42 U.S.C. 2000e, *et. seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

4.      Forest also has known or should have known that its business practices – including but not limited to its pay, promotion, discipline, demotion, evaluation, and compensation practices – have an illegal disparate impact on female employees generally and pregnant employees in particular.  Forest has failed to take adequate measures to rectify this disparate impact.

5.      The systemic gender discrimination described in this Complaint has been and is continuing in nature.

6.      The Class Representatives seek, on behalf of themselves and the classes they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal, and punitive damages; and attorneys' fees, costs, and expenses to redress Forest's pervasive and discriminatory employment policies, practices, and procedures.

## II.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII"); 29 U.S.C. § 201, *et seq.*, the Equal Pay Act of 1963 ("EPA"); and 29 U.S.C. § 2601, *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA") to redress

and enjoin employment practices of Defendants in violation of these federal statutes.

8.      The matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

9.      Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b) & (c) and 42 U.S.C. § 2000e-5(f) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District; and Defendants maintain employment records related to this action in New York.

10.     The Title VII Class Representatives have each exhausted their administrative remedies and complied with the statutory prerequisites of Title VII by filing charges with the Equal Employment Opportunity Commission alleging gender discrimination on behalf of themselves and a class of similarly situated female employees.  Each Class Representative has perfected or is in the process of perfecting her Right to Sue.

## III.     THE PARTIES

11.     Between April 2005 and April 2011, **PLAINTIFF MEGAN BARRETT** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Clarks Summit, Pennsylvania.

12.     Between June 2003 and November 2010, **PLAINTIFF LINDSEY HOUSER** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in McKinney, Texas.

13.     Between January 2008 and September 2010, **PLAINTIFF JENNIFER JONES** was a female "employee" at Forest, as defined by Title VII and the EPA.  She currently resides in Keller, Texas.

3

14.     Between December 2003 and April 2011, **PLAINTIFF JENNIFER SEARD** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Georgetown, Texas.

15.     **DEFENDANT FOREST LABORATORIES, INC.,** is a multi-national corporation engaged in the business of developing, manufacturing, and marketing pharmaceutical products.  Defendant Forest Laboratories, Inc. is incorporated in the state of Delaware and headquartered in New York, New York.  It regularly transacts business in this District.

16.     At all times relevant to this action, **DEFENDANT FOREST PHARMACEUTICALS, INC.** is and has been a division and wholly owned subsidiary of Defendant Forest Laboratories responsible for the manufacture, distribution, and sales of prescription medicine for Defendant Forest Laboratories.  Defendant Forest Pharmaceuticals, Inc. is incorporated in the state of Delaware.  It has eight offices in New York and regularly transacts business in this district.

17.     At all times relevant to this action, Defendants Forest Laboratories and Forest Pharmaceuticals were and are "employers" as defined by Title VII, the EPA, and the FMLA.

18.     At all times relevant to this action, the Defendants Forest Laboratories and Forest Pharmaceuticals have operated as a single integrated enterprise under Title VII, the EPA, and the FMLA.  Alternatively, the Defendants are and were Plaintiffs' joint employers under Title VII, the EPA, and the FMLA.

4

## IV.   FACTUAL ALLEGATIONS

### A.   MS. BARRETT'S FACTUAL ALLEGATIONS

19.   Ms. Barrett is a former sales representative of Forest.  Forest hired her in January 2004 as a Sales Representative for Forest's New York City Division that covered counties in New York and New Jersey.  In April 2005, Forest transferred Ms. Barrett to the Keystone Division in Scranton, Pennsylvania.  Forest wrongfully terminated Ms. Barrett on April 26, 2011.

20.   Ms. Barrett consistently excelled in her work at Forest.  She received numerous awards and won Company competitions for her outstanding sales performance.

21.   Despite Ms. Barrett's skills and qualifications, Forest discriminated against her based on her gender, her pregnancy, her taking of maternity leave, and her caregiving responsibilities by disciplining and, ultimately, terminating her.

#### a.   Ms. Barrett's Employment With Forest

22.   Forest honored Ms. Barrett with several Company awards in recognition of her performance.  For example, Ms. Barrett won Sales Representative of the Quarter Awards in 2005, 2006, 2007, and 2008.  In 2007, she won the Carpenter Award, an award given to a sales representative who exemplifies superior character, effort in building relationships, product knowledge, selling skills, and territory management.  In 2008, Ms. Barrett was the regional winner of the Lexapro Contest and the regional tier-two winner of the Bystolic Contest.

23.   Ms. Barrett continued to excel in her position until Forest wrongfully terminated her employment on April 26, 2011.

### b.   Forest's Discriminatory Actions Against Ms. Barrett

#### i.   Pay and Promotion Discrimination

24.   Forest discriminated against Ms. Barrett on the basis of her gender by providing her with less compensation than similarly situated male employees performing the same or similar duties.

25.   On information and belief, Forest systematically compensates its female sales representatives at a lower rate than similarly situated male employee who perform the same or similar work.

26.   Forest also discriminated against Ms. Barrett on the basis of her gender in failing to promote her.  In 2009, Ms. Barrett became interested in applying for a Regional Sales Trainer ("RST") position.  The position would have been a promotion from her Sales Representative job and would have conferred increased compensation, increased exposure, more leadership opportunities, and represented a stepping-stone towards a management-level role.  She spoke with an RST in her division and expressed her interest about the position.

27.   However, when Ms. Barrett's expressed interest in the position to Manager Rogan, he pointedly dismissed her.  He said to her, "You're not interested in becoming an RST are you?" and rolled his eyes and shook his head.  Manager Rogan's reaction indicated to Ms. Barrett that Manager Rogan would not consider her candidacy for the job; Ms. Barrett was further discouraged from approaching him about future promotional or career-enhancing opportunities.

28.   Around this time, Manager Rogan began to give Ms. Barrett FTE ratings below 3.0, which effectively shut her out of all promotional opportunities.

29.     Although female employees make up approximately 50 percent of the sales representative work force in Ms. Barrett's territory, upon information and belief female employees make up less than 30 percent of management positions.  Indeed, around the time that Ms. Barrett was terminated, only one of the five managers in the Keystone Division was female.  Moreover, even this female manager is no longer employed at Forest.  Upon information and belief, the Keystone Division currently has no female managers.

### ii.     Pregnancy Discrimination

30.     Forest's ranking policies had a disparate impact on Ms. Barrett after she took maternity leave.

31.     Forest uses President's Club rankings – a quarterly, nationwide classification system that ranks sales representatives according to the percentage of sales quotas they meet – to determine a sales representative's eligibility for payouts, bonuses, salary increases, promotions, and transfers.  Forest uses low President's Club rankings to justify disciplinary action leading to termination.

32.     Ms. Barrett took maternity leave from November 2008 until early 2009.  Before taking leave, she ranked in the top 25 percent for one of her products and in the top 50 percent nationally.  When she returned from maternity leave, her national ranking fell to 324 out of 500.

33.     Ms. Barrett also took maternity leave from December 2009 until February 2010.  As a result of her taking leave on this occasion, her President's Club ranking fell from 324 to 484 out of 500.

34.     Under Forest's policies, each sales representative's individual President's Club ranking affects her teammates' rankings.  As a result, on information and belief, pregnant female employees face hostility from their colleagues and managers.

7

35.     Notably, Ms. Barrett's District Manager Daniel Rogan ("Manager Rogan") gave Ms. Barrett lower Field Trip Evaluation ("FTE") ratings after she returned from maternity leave. FTE ratings are subjective evaluations district managers complete in assessing their sales representatives' skills in the field.

36.     Before she took maternity leave in 2008, Ms. Barrett's FTE ratings were at 3.0 or higher on a 5.0 scale. However, after she took maternity leave, Manager Rogan began rating her below 3.0, at around 2.4 or 2.5. These ratings were lower than any score Ms. Barrett received before she took maternity leave.

37.     Manager Rogan used these lower rankings to justify mistreating Ms. Barrett.

38.     Because a sales representative must maintain an average rating of 3.0 or higher to be eligible for promotions, Manager Rogan's ratings also halted Ms. Barrett's career advancement.

39.     Forest further discriminated against Ms. Barrett by compensating her less after she went on maternity leave.

40.     For fiscal year 2009, Ms. Barrett received only a minimal salary increase of approximately 1 percent. This minimal salary increase was markedly lower than the increases Forest gave Ms. Barrett in previous years when she did not take maternity leave. For example, Ms. Barrett received a merit increase of nine percent the year before she took her first maternity leave. Upon information and belief, Forest gave Ms. Barrett smaller increases after her maternity leave as a direct result of her President's Club rankings.

41.     Forest also denied Ms. Barrett stock options in 2009 and 2010, which in previous years had amounted to approximately $10,500.00 per year.

8

42.    The reduced bonus, lower rating and lower salary increase Ms. Barrett received after returning from maternity leave was less than that provided to similarly situated employees who did not take maternity leave.

### iii.    Wrongful Termination

43.    Upon her return from maternity leave in early 2010, Ms. Barrett continued to demonstrate strong performance as a sales representative.  Nevertheless, Ms. Barrett continued to face ongoing discrimination from Forest throughout 2010.

44.    On July 19, 2010, Defendants' Human Resources department sent Ms. Barrett a disciplinary letter alleging that she was exhibiting inappropriate behavior and attitude.  The letter stated that she had been placed on formal warning status that would be in effect for at least 90 days and that she could be terminated if her employment did not improve.  These allegations were based solely on Manager Rogan's vague accusations of poor communication and sub-par behavior on sales calls.

45.    No one had previously accused Ms. Barrett of poor communication or behavior on sales calls.  In fact, physicians and former managers consistently praised Ms. Barrett for her relationship building, reliability, and professionalism, and had commended her for "always going above and beyond" the requirements of her role.  Before her maternity leave, Ms. Barrett received FTE ratings of 4.0, and Forest lauded her for demonstrating exceptional initiative in a territory that lacked organization before she arrived.

46.    Ms. Barrett contacted Forest HR Representative Karen Swift ("HR Representative Swift") to contest the allegations in the letter from HR.  Ms. Barrett told HR Representative Swift that Manager Rogan had been treating her differently since her maternity leave. HR Representative Swift suggested that Ms. Barrett document her concerns but did not indicate

whether the Company would take any action in response to Ms. Barrett's complaint. She also did not inform Ms. Barrett of a means to appeal the unfair disciplinary action.

47.     Upon information and belief, Forest did not investigate Ms. Barrett's concerns, including her complaints of pregnancy discrimination.

48.     On December 3, 2010, Manager Rogan placed Ms. Barrett on probation, requiring her to complete daily pre-call plans, complete practice voicemails three days a week, and submit weekly self-assessments.

49.     Being placed on probation has serious consequences for a sales representative's career at Forest. He or she immediately becomes ineligible for a merit increase, bonuses, awards, and career-advancement opportunities such as promotions. In many cases, probation leads to increased disciplinary measures such as termination.

50.     Ms. Barrett was the only member of her team placed on probation, even though, upon information and belief, other team members had performance numbers lower than or similar to hers.

51.     Even while Ms. Barrett was on probation, she continued to achieve all of her sales goals, advance in the rankings, and receive praise from her customers.

52.     At the same time Manager Rogan was subjecting Ms. Barrett to increased scrutiny, she observed Manager Rogan treating male sales representatives more favorably, even where doing so was clearly inconsistent with Company policy. For example, in 2010, male sales representative William Menendez ("Mr. Menendez") violated compliance standards during a field trip, a serious infraction against Forest policy. However, Manager Rogan failed to discipline him or report his infraction. Mr. Menendez informed Ms. Barrett that Manager Rogan had told Mr. Menendez: "Don't worry, I have your back," and "I'll fight for you."

53.     As a result of the extreme stress and anxiety caused by Forest's continued mistreatment, Ms. Barrett sought medical attention in early 2011. Ms. Barrett's physician determined that her work environment was unhealthy. On February 14, 2011, Ms. Barrett took short-term disability leave for anxiety and depression. On March 2, 2011, Ms. Barrett's psychiatrist diagnosed her with work-related anxiety and depression. However, as the breadwinner for her family, Ms. Barrett had no choice but to return to work on March 21, 2011, against her doctor's advice.

54.     On April 26, 2011, Forest wrongfully terminated Ms. Barrett's employment, asserting that she failed to improve in the target areas of her probation.

55.     However, Forest's reasons for terminating Ms. Barrett directly contradicted Ms. Barrett's sales performance record and client feedback. At the time of her termination, Ms. Barrett was demonstrating strong sales achievement and had raised her President's Club ranking by 80 slots since returning from maternity leave in 2010. Ms. Barrett also continued to receive praise from her customers after she returned from leave in 2010. On several occasions, Ms. Barrett's physician customers specifically expressed to Manager Rogan that they were pleased with her work.

56.     Accordingly, Ms. Barrett's exceptionally strong sales record and the positive feedback she received from customers undermine Manager Rogan's claims that Ms. Barrett underperformed after returning from maternity leave.

**B.      LINDSEY HOUSER'S FACTUAL ALLEGATIONS**

57.     Ms. Houser is a former Forest sales representative. Forest employed Ms. Houser from June 2003 to November 2010, first as a Territorial Sales Representative in San Antonio,

Texas and subsequently as a Professional Sales Representative and a Medical Sales Representative.  Manager Nathan Turner ("Manager Turner") supervised Ms. Houser.

58.     Despite Ms. Houser's strong performance, Forest halted her career through pervasive discrimination on the basis of her gender, her pregnancy, and her family responsibilities.

59.     Through its ongoing discrimination, retaliation, and hostility, Forest forced Ms. Houser to resign in November 2010.

### a.     Ms. Houser's Employment With Forest

60.     When Ms. Houser began working at Forest as a Territory Sales Representative, she performed exceedingly well.  She won Rookie of the Year and Representative of the Quarter awards.

61.     Ms. Houser became a Professional Sales Representative in June 2004.  She won additional Representative of the Quarter awards and Execution Awards in recognition of her performance.

62.     In August 2005, Ms. Houser became a Medical Sales Representative.  In this role, she won Execution Awards, Representative of the Quarter awards, the MVP Award, and an Outstanding Leadership Award.  Ms. Houser also served in leadership roles such as Field Sales Trainer and Managed Care Liaison for almost her entire tenure at Forest.

63.     Ms. Houser remained a Medical Sales Representative until Forest's discriminatory treatment forced her to resign in November 2010.

### b.     Forest's Discriminatory Actions Against Ms. Houser

#### i.     Pay Discrimination

12

64.     Upon information and belief, Forest discriminated against Ms. Houser on the basis of her gender by providing her with less compensation than similarly situated male employees performing the same or similar duties.

ii.     **Pregnancy/Caregiver Responsibilities Discrimination**

65.     Forest consistently ranked Ms. Houser as among the top sales representatives in her region.  Her numerous awards and continuous leadership in training her fellow Field Sales and Managed Care employees attest to her continued excellence in her role.

66.     In March 2009, Ms. Houser applied for a promotion into a specialty position in her territory.  Her excellent performance, coupled with her knowledge of the territory, made her an ideal candidate for the job.  In fact, Manager Karen McClung ("Manager McClung"), Ms. Houser's former supervisor, said that selecting Ms. Houser for the position was a "no-brainer."

67.     Area Director Renner, Director Wright and District Manager Jerry Witcher ("Manager Witcher") interviewed Ms. Houser for the position in early July, 2009.  At the time of the interview, Ms. Houser was and appeared eight months pregnant.  Area Director Renner, Director Wright and Manager Witcher asked her probing questions about her pregnancy.

68.     Manager Witcher later informed Ms. Houser that Forest had selected an employee from another territory for the position.  Although that employee was also pregnant, she did not appear pregnant.

69.     Upon information and belief, Forest denied Ms. Houser the promotion because of her pregnancy.  Ms. Houser's colleagues stated they were not surprised Forest did not select her for the job, saying it was "obvious" that Forest preferred women who were not pregnant or who did not have children.

70.     Ms. Houser went on maternity leave from approximately July to November 2009. As a result of Forest's policies, Forest denied Ms. Houser accommodation and benefits to which she was entitled upon her return from maternity leave.

71.     While on maternity leave, Ms. Houser experienced complications that led to the premature birth of her child.   Because her premature newborn required intensive care, Ms. Houser contacted Manager Turner to request an extension of her maternity leave with unused vacation days.

72.     Manager Turner denied her request, stating that HR's practices and policies prohibited the extension.

73.     Ms. Houser later learned from HR Representative Heather Lemon that according to Forest HR policy, employees **could** use vacation days to extend their maternity leave. However, because Manager Turner had denied Ms. Houser's request, she feared retaliation and therefore did not repeat her request.

74.     Forest also discriminated against Ms. Houser when she returned from maternity leave in November, 2009 and inquired into job-share positions. Job-shares feature alternative work schedules where two employees share the responsibilities of one full-time sales representative.   Upon information and belief, Forest offered job-share positions to other employees.

75.     However, Manager Turner told Ms. Houser that such an arrangement was "impossible" and that his superior, Director Wright, would "never approve."  Manager Turner stated that "it [had] never worked in the past" and discouraged her from mentioning her request to Director Wright.  During this conversation, he also warned, "if I call and hear your kids in the car before five, I'm going to be really pissed."

14

76.     Ms. Houser asked Manager Turner about job-share opportunities several times during December 2009 and January 2010, and each time he denied her request. Upon information and belief, Forest purposefully denied job-share positions to Ms. Houser and working mothers like her to deter them from continuing work at Forest, believing that such women were less-productive employees than their male and/or childless counterparts.

77.     In early 2010, Ms. Houser asked Director Wright for a job-share opportunity. Director Wright denied her request. Like Manager Turner, he claimed that job shares "never worked before" and that "the situation [had] to be right" for him to allow a job-share arrangement. Director Wright said he would not allow a job-share position on Manager Turner's team.

78.     During this conversation, Ms. Houser offered to be transferred to another manager under whom she could work a job-share position. Director Wright stated that all of the managers were "too busy" and to "come up with something" on her own. Around April 2010, soon after her conversation with Director Wright, Ms. Houser asked Area Director Renner whether she would be allowed a job-share position. Area Director Renner also denied her request. Ms. Houser explained that she would no longer be able to work at Forest if she could not have a job-share position

79.     The following week, in April 2010, Ms. Houser discovered that her former supervisor, Manager Karen McClung ("Manger McClung") had a job-share opening on her team. Neither Director Wright nor Area Director Renner had indicated there were job openings in the area.

80.     Because she had been discriminatorily denied a job-sharing position within her territory, Ms. Houser was forced to take a job-share position in another territory, which entailed

a six-hour commute each day. She began the role in June 2010.   The six-hour commute extended Ms. Houser's workday by 6 hours, from 6 a.m. to 9 p.m.   Forest also required Ms. Houser to attend meetings, answer phone calls, respond to emails and complete expense reports on her days off.

81.    Despite the burdens imposed by her six-hour commute, Ms. Houser achieved sales goals and exceeded all expectations.

82.    Forest's ranking policies also had a disparate impact on Ms. Houser after she returned from maternity leave.

83.    Before Ms. Houser went on maternity leave, Forest gave her FTEs ranging from 3.8 to 4.2 on a 5.0 scale.   After Ms. Houser returned from maternity leave in November 2009, Manager Turner gave her considerably lower FTE ratings, between 3.0 to 3.2 on a 5.0 scale.

84.    Before Ms. Houser went on maternity leave, Forest had typically awarded her salary increases of eight to ten percent each year, commensurate with her performance and sales achievement.   However, as a result of the President's Club rankings and FTE ratings Ms. Houser received upon returning from maternity leave, Forest increased her salary by just three percent – the lowest salary increase Ms. Houser had ever received.

85.    In addition, Ms. Houser's new President's Club rankings and FTE ratings slashed the percentage payout and number of stock options for which she was eligible.   Accordingly, Forest gave Ms. Houser approximately $5,000 less in her 2010 bonus than that to which she would otherwise have been entitled.   Ms. Houser also faced a 75 percent reduction in her stock options, and, in her final year, received none at all.

86.     The reduced compensation and ranking Ms. Houser received after returning from maternity leave was lower than that which Forest provided to similarly situated employees who did not take maternity leave.

### iii.     Constructive Discharge

87.     The pressure of meeting the expectations of a job that required six hours of travel per day caused Ms. Houser extreme stress and anxiety, and ultimately led to depression, requiring medical treatment.

88.     Although Ms. Houser continued to meet and exceed expectations, by November 2010 her working conditions had become so intolerable that she could no longer remain in her position. Ms. Houser had no choice but to leave the Company and accept another job that was significantly less desirable and had a much lower compensation scale.

89.     Upon information and belief, Forest was aware that the conditions of the position it had given Ms. Houser in Dallas would be unsustainable.

90.     Despite Ms. Houser's years of service to the Company and exemplary performance, Forest made Ms. Houser's employment situation so intolerable that she had no choice but to leave the Company in November 2010.

### C.     JENNIFER JONES' FACTUAL ALLEGATIONS

91.     Ms. Jones is a former sales representative of Forest. Forest employed her as a Sales Representative in South Fort Worth, Texas between January 2008 and September 2010.

### a.     Ms. Jones' Employment with Forest

92.     During her employment, Ms. Jones consistently showed strong performance. She won Representative of the Quarter Awards in 2008 and 2009. In 2008 Ms. Jones received a letter of achievement from Area Director Renner in recognition of her President's Club ranking.

In 2009, she received Forest Excellence points from Regional Sales Trainer Tim Linear. When Ms. Jones left Forest, she ranked 16th out of 100 sales representatives and received the highest payout in her division for the product Savella.

93.     In September 2010, Forest's action caused Ms. Jones to resign after the Company subjected her to sexual harassment, a hostile work environment, pay discrimination, and retaliation.

### b.     Pay Discrimination

94.     Forest discriminated against Ms. Jones on the basis of her gender by providing her with less compensation than similarly situated male employees performing the same or similar duties.

95.     For example, in January 2008 Forest hired Ms. Jones at a base salary of $52,000. Forest paid her male counterpart, Jaycob Gerfers ("Mr. Gerfers"), who joined Forest at the same time, in the same region, and with similar levels of experience, a base salary of $57,000. Further, because Forest tied Ms. Jones' bonus potential and merit increases to her base salary, the gap between her compensation and her male counterparts' compensation continued to grow.

### c.     Sexual Harassment and Hostile Work Environment

96.     District Manager Austin Wighaman ("Manager Wighaman") sexually harassed Ms. Jones during her employment at Forest. Ms. Jones notified Forest of Manager Wighaman's behavior, but Forest took no disciplinary measures against him in response to Ms. Jones' complaint.

97.     Upon information and belief, Forest's discriminatory and retaliatory treatment of Ms. Jones is representative of the manner in which Forest's Human Resources handles complaints of discrimination.

98.    In early 2008 Ms. Jones joined Mr. Gerfers, Manager Wighaman, and District Manager David Williams ("Manager Williams") at a social function in Fort Worth, Texas. During the evening, Manager Wighaman stood behind Ms. Jones and pointed to her while mouthing to Manager Williams, "You need to fuck her."

99.    When Ms. Jones left to use the restroom later that night, Manager Wighaman positioned a stool chair at his waist and made thrusting motions and other sexual gestures. While doing so, he told Mr. Gerfers that he would "fuck the shit out of her," referring to Ms. Jones.  He then asked Mr. Gerfers why no one had "fucked" her yet.  The situation made Mr. Gerfers, also a new sales representative at Forest, uncomfortable.  He ignored the comment and changed the subject.

100.   After Mr. Gerfers and Manager Williams had already left, Manager Wighaman walked Ms. Jones to her condominium.

101.   After reaching her condominium, they sat outside on the patio and had a work-related conversation.  Manager Wighaman then stated that he wanted to see the view from her condominium unit.  Ms. Jones felt uncomfortable with the request.  However, because of his persistence and his supervisory position, she relented.

102.   Once inside her condominium, Manager Wighaman said, "You don't even know what I want to do to you."  Ms. Jones grew visibly upset.  She directed him to the door and reminded him of his wife and kids.  Manager Wighaman became distraught and, before he left, aggressively urged her not to say anything to anyone, especially to a mutual friend who knew his wife well.

103.   The following morning at work, Mr. Gerfers informed Ms. Jones about Manager Wighman's offensive behavior and comments the previous night.

104.   That same day, Manager Wighaman confronted Ms. Jones and told her not to tell anyone about his behavior.  Afraid of jeopardizing her new career, Ms. Jones agreed.  Manager Wighaman continued to confirm with Ms. Jones that she had not reported his harassment.

105.   Several other female Forest sales representatives have advised Ms. Jones that they have experienced similar incidents of sexual harassment by mangers.

**d.   Retaliation and Constructive Discharge**

106.   In 2009, Manager Wighaman became Ms. Jones' team manager and as a result she was forced to regularly interact with him at meetings and other work-related events.

107.   In addition, Ms. Jones' colleagues informed her that Manager Wighaman would frequently ask the other members of the team questions about Ms. Jones' personal life, including questions about her relationship status and dates.

108.   Manager Wighaman's presence and role as her team manager made Ms. Jones extremely uncomfortable.

109.   On June 16, 2010, Manager McClung approached Ms. Jones and noted that Ms. Jones would not speak up at meetings when Manager Wighaman attended.

110.   Even though she still feared retaliation from Manager Wighaman, Ms. Jones told Manager McClung about Manager Wighaman's sexual harassment. Ms. Jones hoped that Manager McClung would contact HR to take disciplinary measures against Manager Wighaman.

111.   Manager McClung told Ms. Jones that she wanted to address the matter, but that she did not want to harm Manager Wighaman.  She then stated that she needed to "sleep on it" to find a solution that would address the incident "with both [Ms. Jones' and Manager Wighaman's] best interests in mind."

112.    The next day, Manager McClung told Ms. Jones that she (Manager McClung) had handled the matter by speaking to Manager Wighaman.  During the next few days, Manager Wighaman called and texted Ms. Jones; this made her extremely nervous and upset.  She did not return his call or reply to his messages.

113.    Frustrated by Manager McClung's failure to appropriately address the situation, Ms. Jones filed a written complaint with Forest the following day, June 18, 2010.

114.    On June 22, 2010, Forest Human Resources Representative Brian McKenna ("Mr. McKenna") called Ms. Jones.  Ms. Jones described the incident with Manager Wighaman, as well as her report of the problem to her direct supervisor, Manager McClung.  At the end of the conversation, Mr. McKenna told Ms. Jones that he would get back to her.  However, he did not do so, nor did he respond when Ms. Jones followed-up with him a week later.

115.    Forest's inaction after Ms. Jones had escalated her sexual harassment complaint to both her manager and HR upset Ms. Jones.  Accordingly, she contacted Forest's third-party hotline number to submit her claim a third time.  During the call, Ms. Jones specifically requested that someone from Forest contact her directly.

116.    Forest's HR Department did not contact Ms. Jones until several weeks later. Finally, in late July 2010, HR Director Bonnie McDonald ("HR Director McDonald") contacted Ms. Jones to set up a conference call with HR Manager Mimi Robertson ("HR Manager Robertson").

117.    Upon information and belief, HR Director McDonald and HR Manager Robertson are employees of Defendant Forest Laboratories and work at the Company's headquarters in New York.

118.   The conference call took place on July 28, 2010.  During the call, Ms. Jones stated that she did not want Manager Wighaman as her team leader and that she did not feel comfortable having Manager McClung as her manager because of the way Manager McClung handled her complaint.  At the end of the call, HR Director McDonald and HR Manager Robertson told Ms. Jones that Forest would investigate.

119.   However, even after Ms. Jones made additional witnesses and evidence available to Forest demonstrating the pervasive sexual harassment by management at the Company, the Company chose to ignore it in order to protect management.

120.   On September 22, 2010, Forest's HR held a meeting with Ms. Jones.  Rather than respond to Ms. Jones' inquiry about what action Forest had taken against Manager Wighaman, , Forest's HR spent the majority of the meeting addressing Ms. Jones' work performance. Specifically, Director McDonald stated that Ms. Jones' performance was an "issue that need[ed] to be resolved" and that Forest was placing her on probation.

121.   At the time Forest placed her on probation, Ms. Jones was ranked 16th in her region out of 100 sales representatives.

122.   Further, during this meeting, Forest did not provide Ms. Jones with any documentation describing the basis for or outlining the terms of her probation.

123.   Ms. Jones later learned that HR called Mr. Gerfers, who had acted as a witness on her behalf during the investigation, into a meeting around the same time. As in Ms. Jones' case, Mr. Gerfers' meeting with HR began with a brief discussion about the investigation and then turned towards alleged performance deficiencies. Forest also placed Mr. Gerfers on probation, again without providing official papers documenting or outlining the terms of the probation.

124.   Forest's decision to place Ms. Jones and Mr. Gerfers on probation was not due to their sales achievements -- which surpassed the sales performance of many of their colleagues who were not disciplined -- but was a retaliatory measure intended to punish them for complaining about the Company and to discourage others from cooperating or bringing their own complaints.

125.   By contrast, upon information and belief, Forest took no disciplinary action against Manager Wighaman for his behavior.  Indeed, Manager Wighaman remained employed at Forest with the same authority and privileges, and Forest forced Ms. Jones to see and interact with him up until her last days with the Company.

126.   For example, in September 2010, Ms. Jones was required to attend a company meeting led by Managers Wighaman and McClung.  As part of the training, the sales representatives had to interact directly with Manager Wighaman in front of the room.  However, the situation made Ms. Jones so uncomfortable that she could not participate and thus was unable to complete that portion of the session.

127.   Ms. Jones experienced extreme stress and anxiety about her probation, the terms of which she did not know how to fulfill as they were never provided to her.

128.   No longer able to tolerate Forest's mistreatment her and its failure to discipline Manager Wighaman, Ms. Jones was forced to resign on September 27, 2010.

### D.   JENNIFER SEARD'S FACTUAL ALLEGATIONS

#### a.   Ms. Seard's Employment With Forest

129.   Jennifer Seard worked as a Sales Representative for Forest in the Waco, Texas area from 2003 until 2011.  Ms. Seard ranked in the top 20 percent in the country based on her sales performance and won Representative of the Quarter awards, the Career Pathway Award,

the Waco Team Award, and the MVP Award. In 2008, Ms. Seard was promoted to Specialty Representative, including Waco and North Austin Territories. In February 2010, Ms. Seard requested to return to her former Territory Sales Representative position and remained in that position until she left Forest in April 2011. By the time she left the Company, Ms. Seard ranked ninth in the country.

130. Through its ongoing discrimination, retaliation, and hostility, Forest forced Ms. Seard to resign in the summer of 2010.

### a.    Pay Discrimination

131. Forest discriminated against Ms. Seard on the basis of her gender by providing her with less compensation than similarly situated male employees performing the same or similar duties.

### b.    Caregiver Responsibilities Discrimination

132. Forest further discriminated against Ms. Seard on the basis of her gender by refusing to accommodate her caregiver status and by giving her negative ratings.

133. In February 2010, Ms. Seard requested to return to her prior position as Territory Sales Representative. At that time Ms. Seard also asked Forest to move her to a job-share position so she could spend more time with her young son, who had been diagnosed with medical conditions that required Ms. Seard to attend numerous doctors' appointments and administer medication several times a day.

134. In March 2010 Ms. Seard again asked Regional Sales Manager Wighaman how she could become eligible for a job-share position. Manager Wighaman said Ms. Seard needed to find a sales representative who had achieved President's Club status, ranked in the top 20 percent of the nation that year, and had worked her Texas territory. However, the job-share

postings Ms. Seard saw on Forest's website did not mention any of the conditions Manager Wighaman had listed to her.

135.   Manager Wighaman also said that Director Wright did not allow job-sharing in his region.  Ms. Seard made an anonymous call to HR and asked if a regional director or manager could override corporate policies and deny opportunities offered to other Forest employees.  The HR representative answered "Yes."

136.   Manager Wighaman communicated his disappointment in Ms. Seard's career choice.  On May 18, 2010, Ms. Seard and Manager Wighaman travelled together to make a sales pitch, and Manager Wighaman told Ms. Seard her decision to step down  from her position as a Specialty Representative was "a kick to the stomach."  Manager Wighaman pressured Ms. Seard to leave Forest, telling her that her time at the Company was limited.  He suggested she take up a hobby as a full-time job and told her that she "w[ould] not last another year" if she remained "unmotivated."  For the remainder of the ride, Manager Wighaman continued to repeat that Ms. Seard was unmotivated and had no place at Forest.

137.   Manager Wighaman also began reviewing Ms. Seard's assignments with unusual detail.  He insisted on seeing Ms. Seard's calendar of appointments several times in a month and asked for physical printouts of all her precall plans, records and rankings, refusing to review these matters electronically as he did with other sales representatives.

138.   Manager Wighaman also gave Ms. Seard an FTE rating of 2.69, which was the lowest FTE she received at Forest since her first year as a sales representative.  Although her FTE scores had previously ranged from 3.21 to 3.52, under Manager Wighaman they dropped to an average of 2.89.

139.   These lower ratings were unjustified based on Ms. Seard's performance, as Ms.

Seard in fact placed in the top 20 percent of Forest sales representatives nationwide based on the number of sales she completed, and she ranked first on Manager Wighaman's team.

140.   Ms. Seard's FTE score, however, meant that she could not receive promotions, transfers, merit increases, bonus payouts, and awards.

### c.   Retaliation and Constructive Discharge

141.   On July 21, 2010, Ms. Seard called Human Resources to express concerns about Manager Wighaman's behavior.  Two and one-half weeks later, Ms. Seard received a call from HR Manager Robertson.

142.   Ms. Seard told HR Manager Robertson that she did not want to file a formal complaint with HR because she feared Forest would treat her the way they treated other sales representatives who raised complaints.

143.   HR Manager Robertson changed the subject of the call from allegations of discrimination to a critique of Ms. Seard's performance.  Ms. Seard felt threatened by the shift of focus from her HR complaint to her performance.  She repeatedly told HR Manager Robertson she did not intend to file a formal complaint, and she only wanted advice on how to address Manager Wighaman's aggression.  HR Manager Robertson advised Ms. Seard to speak to Manager Wighaman.

144.   Although Ms. Seard specifically asked HR to keep the conversation confidential, upon information and belief, Forest informed Manager Wighaman of Ms. Seard's report to HR Manager Robertson.

145.   On August 18, 2010, Ms. Seard met with Manager Wighaman as HR had recommended.  During this meeting, Ms. Seard explained she felt Manager Wighaman was trying to manage her out of the job, and noted that this treatment only began after she voiced

26

interest in a job-share position.  During the conversation he asked, "Are you going to call HR again?  I thought we were over that," indicating that Forest told Manager Wighaman about her complaints.

146.  Manager Wighaman attempted to turn the topic of conversation to Ms. Seard's work performance.  Ms. Seard was uncomfortable reviewing her work in this hostile context and requested they discuss the matter at a later date.

147.  Manager Wighaman demanded they continue the conversation and lost his temper when Ms. Jones to speak on her performance any further.  He slammed the table and said, "While you're at it, why don't you just copy HR on it?"  He flung his phone at Ms. Seard.  "In fact, why don't you just call HR and tell them right now," he asked.

148.  Ms. Seard reported the incident to HR Manager Robertson.  She explained what had transpired, stating she found Manager Wighaman hostile and intimidating.

149.  Manager Wighaman continued to find reasons to criticize Ms. Jones' work.  He scheduled many trips to "analyze" her performance.  Though a manager accompanying a sales representative would normally give the representative FTE ratings for each trip, Manager Wighaman did not give Ms. Seard FTE ratings for many of these trips, leaving Ms. Seard unsure of the purpose of the trips.  Upon information and belief, Manager Wighaman did not ride with Ms. Seard to evaluate her performance but to harass and intimidate her.

150.  In early December 2010, Manager Wighaman accused Ms. Seard of not meeting minimum call averages to clients.  He also claimed she used too many hardcopy resources instead of computer-based resources.  Ms. Seard reviewed her records, which showed that her call averages and use of paper resources were not unusual compared to her peers.  Ms. Seard asked Manager Wighaman if they could discuss these concerns, but he never replied.

151. On December 15, 2010, Ms. Seard called HR again for guidance on how to improve her relationship with Manager Wighaman. HR Manager Robertson told her that the next time she called HR, she would have to file a complaint. HR Manager Robertson told Ms. Seard that Manager Wighaman's comments on the FTE reports justified the low ratings, even if Ms. Seard's sales indicated successful performance. When Ms. Seard asked why her FTE rating mattered more than her sales record, HR Manager Robertson said "We're getting off track here."

152. HR Manager Robertson also signaled to Ms. Seard that Forest would question the quality of her work if Ms. Seard continued to contact HR, by stating that HR could pull Ms. Seard's time stamps to further investigate the quality of her performance. Even though Ms. Seard was confident in her performance, she feared risking her job at Forest. As a result, Ms. Seard no longer sought assistance from HR.

153. On January 5, 2011, Manager Wighaman emailed Ms. Seard stating that she violated Company expense policies and copied Director Wright in his email. Ms. Seard immediately reviewed Forest's expense policies and contacted the Expense Department to ensure she understood the policies. She emailed Manager Wighaman to state that she had investigated the issue and concluded that she had not violated Forest policies. Manager Wighaman asked her with whom she spoke in the Expense Department and failed to follow up on the accusation or indicate that the matter would be included in her personnel file.

154. The intolerable work environment Forest created forced Ms. Seard to resign on April 8, 2011.

## V.    CLASS ACTION ALLEGATIONS

155.   Class Representatives bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and (c)(4), seeking injunctive and monetary relief for the systemic pattern and practice of gender discrimination to which Defendants have subjected them throughout their employment.

156.   Forest cultivates a work environment that discriminates against female sales representatives in general, as well as pregnant employees and female employees who have child-rearing responsibilities in particular.

157.   Upon information and belief, Forest compensates its female sales representatives at a lower rate than similarly situated male employee who perform the same or similar work.

158.   Forest also maintains policies and/or practices for compensating and promoting employees that, while facially neutral, have a disparate impact on female employees, such that female Sales Representatives are disproportionately kept in lower job classifications and compensated at lower levels than similarly situated male employees.

159.   This pattern and practice of gender discrimination includes: being denied compensation equal to that of similarly situated male sales representatives; being denied promotions or promotional opportunities in favor of equally or less qualified male sales representatives; receiving lower evaluations for performing the same work at the same level as male sales representatives; and being disciplined more frequently and more severely than male sales representatives, including but not limited to, being disciplined for engaging in behaviors for which male employees are not disciplined; and being subjected to retaliation.

160.   These discriminatory policies and/or practices include, but are not limited to, Forest's promotion, advancement, discipline and performance evaluation policies, practices, and

procedures.

161.    Forest's application of employment policies, practices, and procedures incorporate the following discriminatory practices: (a) discouraging applications and expressions of interest by females related to promotions and job positions; (b) subjecting pregnant employees and female employees with children to adverse treatment and denying them opportunities to advance their careers; (c) relying on gender-discriminatory criteria, policies, and practices in promotion, discipline and compensation decisions; (d) refusing or failing to provide equal employment opportunities to female employees; (e) ignoring, disregarding, minimizing, covering-up, mishandling, or otherwise failing to properly respond to evidence of gender discrimination in the workplace; (f) refusing or failing to establish and follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and intentional gender bias; and (g) relying on subjective judgments, procedures, and criteria that permit and encourage the incorporation of gender stereotypes and bias by Forest's predominately male managerial and supervisory staff in making promotion, performance evaluation, discipline, and compensation decisions.

162.    Forest's discriminatory policies, practices, and procedures are not valid, job-related, or justified by business necessity.  There are alternative, objective, and more valid evaluation procedures available to Forest that are more closely related to the actual responsibilities of the positions and that would have less of a disparate impact on its female sales employees.  Forest has failed or refused to use such alternative procedures.

163.    Upon information and belief, the discriminatory employment policies, practices, and procedures to which the Class Representatives and the Class Members are subject are established at Forest's corporate level, which is headquartered in and directed from New York.

164.   These employment policies, practices, and procedures are not unique or limited to any department; rather, they apply uniformly and systematically to Forest sales representatives throughout the country, occurring as a pattern and practice throughout all levels and divisions of Forest.

165.   Gender discrimination is Forest's standard operating procedure rather than a sporadic occurrence.

166.   Forest's management is disproportionately male dominated. Throughout the liability period, a disproportionately large percentage of the managers and supervisors at Forest have been male.

167.   Selection and advancement opportunities at Forest are driven by personal familiarity, subjective decision-making, preselection, and interaction among male managers, supervisors, and subordinates, rather than by merit or equality of opportunity.

168.   Forest managers regularly express gender-based bias against female sales representatives.  For example, in November 2010 Manager Turner informed a female sales representative that he did not want to hire any more female representatives because they "always get pregnant and go on leave."

169.   As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than female employees.

170.   Forest's ranking policies do not account for a sales representative's leave of absence for maternity when evaluating her performance.  Furthermore, managers are held accountable for the days, weeks, or months during which a sales representative is on leave. Thus, these policies not only have a disparate, discriminatory impact on the rankings, career advancement and compensation of women who take maternity leave, but also promote hostility

and retaliation by managers against females who are pregnant or avail themselves of maternity leave.

171.   Because Forest's personnel management systems do not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female employees suffering from discrimination at Forest are without recourse.   In addition, the absence of a check on discrimination extends to retaliatory actions, leaving victims of discrimination further vulnerable. As such, discrimination is fostered and tacitly condoned by Forest.

172.   Because of Forest's systemic pattern and practice of gender discrimination, the Class Representatives and members of the proposed Class have suffered harm including lost compensation, wages, back pay, and employment benefits.

173.   The Class Representatives and Class Members have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief.   The Class Representatives and Class Members are now suffering irreparable injury from Forest's unlawful policies, practices, and procedures as set forth herein, and will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

**A.     Class Definition**

174.   The proposed Rule 23 Class consist of:

> (1) Title VII Gender Class: All female Sales Representatives who are, have been, or will be employed by Forest in the United States from 2008 to the date of judgment.   Upon information and belief, there are approximately 1500 of such employees currently in the proposed class;

a.  Title VII Pregnancy Sub-class: All female Sales Representatives who are, have been, or will be pregnant while employed by Forest in the United States from 2008 to the date of judgment.  Upon information and belief, there are approximately 150-300 of such employees currently in the proposed class.

175.   All Class representatives are members of the Class they seek to represent. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

176.   Plaintiffs reserve the right to amend the class definition based on discovery or legal developments.

**B.     Efficiency of Class Prosecution of Common Claims**

177.   Certification of a class of female employees situated similarly to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representatives and the proposed Class.

178.   The individual claims of the Class Representatives require resolution of the common question of whether Forest has engaged in a systemic pattern and practice of gender discrimination against female employees.  The Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions, to eliminate the adverse effects of gender discrimination in the lives, careers, and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.

179.   The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female employees

generally.  Forest caused Plaintiff's injuries through its discriminatory practices, policies, and procedures, and disparate treatment of employees who are female.  These injuries are redressable through systemic relief, such as injunction, and other appropriate class-wide and individual remedies sought in this action.

180.  In addition, proper relief for Plaintiffs' individual constructive discharge and wrongful termination claims can include reinstatement.  As such, each Plaintiff has a personal interest in the policies, practices, and procedures implemented at Forest.

181.  To obtain relief for themselves and the Class Members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.  Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

182.  The Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

183.  Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the Class Members, and Forest.

### C.    Numerosity and Impracticability of Joinder

184.  The Title VII Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable.  Upon information and belief, the members of the proposed Class currently number approximately 1500.

185. Additionally, Forest's pattern and practice of discrimination makes joinder impracticable by discouraging females from applying for or pursuing promotional opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of Forest's class-wide liability.

**D.    Common Questions of Law and Fact**

186. The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

187. The common issues of law include, *inter alia*: (a) the proper standards for proving a pattern and practice of discrimination by Forest against its female employees; (b) whether Forest has engaged in unlawful, systemic gender discrimination in its compensation, selection, promotion, advancement, and discipline policies, practices, and procedures, and in the general terms and conditions of work and employment; (c) whether Forest has unlawfully discriminated against female employees based on their pregnancies; (d) whether Forest is liable for a continuing, systemic violation of Title VII and other statutes; and (e) whether senior management and HR's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and other statutes.

188. Common questions of fact include, *inter alia*, whether Forest, through its policies, practices, and procedures: (a) compensated female employees less than similarly situated male employees through salary, bonuses, and other benefits; (b) precluded or delayed the selection and/or promotion of female sales representatives for job positions; (c) engaged in a pattern or practice of failing to take prompt and effective corrective action to remedy gender in its workplace; (d) subjected female sales representatives to disparate treatment based on

pregnancy; and (e) has policies and procedures that have had a disparate impact on pregnant female employees.

189.   The employment policies, practices, and procedures to which the Class Representative and the class members are subjected are set at Defendants' corporate level and apply universally to all Class Members. These employment policies, practices and procedures are not unique or limited to any department; rather they apply to all departments and, thus, affect the Class Representative and Class Members in the same ways no matter the facility, department, or position in which they work.

190.   Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all departments at Forest.

### E.     Typicality of Claims and Relief Sought

191.   The Class Representatives' claims are typical of the claims of the proposed Class. The Class Representatives assert claims in each of the categories of claims that they assert on behalf of the proposed Class.  The relief they seek for themselves is also typical of the relief sought on behalf of the proposed Class.

192.   Like the members of the proposed Class, the Class Representatives are female employees who have worked for Forest during the liability period.

193.   Discrimination in selection, advancement, and performance evaluation affects the compensation of the Class Representatives and all of the Class Members in the same or similar ways.

194.   Differential treatment between male and female employees occurs as a pattern and practice throughout all levels and departments of Forest.  Forest's predominantly male managers hold female employees, including the Class Representatives and Class Members, to

stricter standards than male employees, and thus, female employees often receive lower performance appraisals than males for performing at the same level. This differential treatment has affected the Class Representatives in the same or similar ways.

195. Discrimination in the form of hostility towards pregnant female employees occurs as a pattern and practice throughout all levels and departments of Forest and affects the Class Representatives and the Class Members in the same ways. Male supervisors have denied promotions and promotional opportunities to female sales representatives, including pregnant sales representatives and female sales representatives with caregiving needs; denied equal compensation to female sales representatives and to pregnant sales representatives; and subjected female employees to adverse employment actions after they return from maternity leave.

196. Company investigations into complaints of gender discrimination have been inadequate and superficial. The Class Representatives and the Class Members have been affected in the same or similar ways by Forest's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

197. Forest has failed to create adequate incentives for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices, and procedures referenced in this Complaint, and it has failed to adequately discipline its managers and other employees when they violate the antidiscrimination laws. These failures have affected the Class Representatives and the Class Members in the same or similar ways.

198. Forest has further failed to adequately or appropriately respond to evidence of discrimination and harassment or to complaints or concerns raised about said discrimination and

harassment. These failures have affected the Class Representatives and the Class members in the same or similar ways.

199.  The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the proposed Class Members.

200.  The Class Representatives seek the following relief for their individual claims and for those of the members of the proposed Class: (a) a declaratory judgment that Forest has engaged in systemic gender discrimination against female employees by (1) paying female employees less than their male counterparts, (2) denying female employees promotions into better and higher paying positions, (3) failing to investigate or respond to evidence of discrimination or harassment in the workplace discriminating against pregnant women and women with child-rearing responsibilities, or (4) otherwise exposing female employees to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief which effects a restructuring of Forest's transfer, performance evaluation, compensation, work environment, and discipline policies, practices, and procedures so that female employees will be able to compete fairly in the future for promotions and assignments to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) equitable relief that effects a restructuring of the Forest workforce so that female employees are advanced into higher and better paying classifications that they would have held in the absence of Forest's gender discrimination; (e) back pay, front pay, reinstatement, and other equitable remedies necessary to make female employees whole from the Forest's past discrimination; (f) compensatory damages; (g) punitive and nominal damages to deter Forest from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs, and expenses.

### F.   Adequacy of Representation

201.   The Class Representatives' interests are coextensive with those of the members of the proposed Class.   The Class Representatives seek to remedy Forest's discriminatory employment policies, practices, and procedures so female employees will not receive disparate pay and differential treatment.

202.   The Class Representatives are willing and able to represent the proposed class fairly and vigorously as they pursue their similar individual claims in this action.

203.   The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.   The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.   Requirements of Rule 23(b)(2)

204.   Forest has acted or refused to act on grounds generally applicable to the Class Representatives and the proposed Class.

205.   Forest has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and procedures that are discriminatory on the basis of gender.   Gender discrimination is Forest's standard operating procedure rather than a sporadic occurrence.

206.   Forest has also refused to act on grounds generally applicable to the Class Representatives and the proposed Class by, *inter alia*: (a) failing to pay female employees on par with similarly situated male employees; (b) refusing to adopt and apply selection,

39

performance, evaluation, compensation, Human Resources, management, and discipline policies, practices, and procedures that do not have a disparate impact on, or otherwise systemically discriminate against females; and (c) refusing to provide equal terms and conditions of employment for female employees.

207. The systemic means of accomplishing such gender-based stratification include, but are not limited to, Forest's assignment, development, promotion, advancement, compensation, and performance evaluation policies, practices, and procedures. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; upper management/HR review; and opportunities for redress or challenge. As a result, employees are assigned, evaluated, compensated, developed, and promoted within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably, or fairly manage or reward employees.

208. Forest's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

209. Injunctive and declaratory relief are the predominant relief sought in this case. Entitlement to declaratory and injunctive relief flows directly and automatically from proof of systemic gender discrimination by Forest. In turn, entitlement to declaratory and injunctive relief forms the factual and legal predicate for recovery by the Class Representatives and Class Members of monetary and nonmonetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

## H.    Requirements of Rule 23(b)(3)

210. The common issues of fact and law affecting the claims of the Class Representatives and proposed Class Members - including, but not limited to, the common issues

40

identified in paragraphs 186-190 above - predominate over any issues affecting only individual claims. These issues include whether Forest has engaged in gender discrimination against female employees by (a) paying female employees less than their male counterparts, (b) denying female employees promotion and advancement opportunities in favor of male employees, (c) treating pregnant employees and mothers differently from non-pregnant employees, male employees, and non-caregivers, (d) failing to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver discrimination in the workplace.

211. A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed Class. The cost of proving Forest's pattern and practice of discrimination makes it impracticable for the Class Representative and members of the proposed Class to pursue their claims individually.

212. By virtue of the pattern and practice of discrimination at Forest, Class Representatives and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including backpay, frontpay, reinstatement, compensatory damages, and other nominal and punitive damages.

**I.     Requirements of Rule 23(c)(4)**

213. This action may be certified as a class pursuant to Rule 23(c)(4) because the Class Issues apply to all class members ant to all Forest locations nationwide.

214. Class Representatives alternatively seek to maintain this action as a class pursuant to 23(c)(4), seeking partial certification of the common questions of law and fact.

## VI.    COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT

215.    Plaintiffs bring collective claims under the Equal Pay Act ("EPA") pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of: all current, former, and future female Sales Representatives of Forest Laboratories and Forest Pharmaceuticals during the applicable liability period, including until the date of judgment, who (a) were not compensated equally to male employees who had substantially similar job classifications, functions, titles, and/or duties, and/or (b) were not compensated equally to male employees who performed substantially similar work, and/or (c) were denied equal compensation to similarly situated male employees by being hired into positions at lesser grades than male employees who performed substantially similar work, and/or (d) were denied promotion and advancement opportunities that would result in greater compensation in favor of lesser qualified males.

216.    Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following:

(a)    Whether Defendants unlawfully failed and continues to fail to compensate female employees at a level commensurate with similarly situated male employees;

(b)    Whether Defendants unlawfully assigned and continues to assign female employees into positions graded at a lower pay and compensation scale to similarly qualified males;

(c)    Whether Defendants' policy and practice of failing to compensate female employees on a par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and

(d)    Whether Defendants' failure to compensate female employees on a par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

217.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective

Action Plaintiffs who opt-in to this action because the claims of the Plaintiffs are similar to the claims of the EPA Collective Action Class.

218.    Plaintiffs Ms. Barrett, Ms. Houser, Ms. Jones, and Ms. Seard and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles, and duties; and (c) are subject to Defendants' common policy and practice of gender discrimination in (i) failing to compensate female employees on par with male employees who perform substantially equal work and/or hold equivalent levels and positions; (ii) failing to provide female employees with job classifications, grades, and titles commensurate with male employees who perform substantially equal work and/or have similar duties and responsibilities; (iii) hiring and assigning female employees into lower-level positions than male employees who perform substantially equal work and/or have similar or lesser experience and qualifications; and (iv) failing to provide female employees equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to male employees who perform substantially equal work.

## VII.    COUNTS

## CLASS AND COLLECTIVE ACTION COUNTS

### COUNT I

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),
42 U.S.C. § 2000e, *ET SEQ.*
PAY DISCRIMINATION
(On Behalf of All Class Members Against Defendants)**

219.    The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

220.    This Count is brought on behalf of the Class Representatives and all members of the Class.

221.   Defendants have discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly situated male employees and subjecting them to discriminatory pay, discriminatory denials of pay raises, and other differential treatment on the basis of their gender affecting their compensation, in violation of Title VII.

222.   Defendants' policies, practices, and/or procedures have had a disparate impact on Plaintiffs and the members of the Class with respect to the terms and conditions of their employment.

223.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and/or conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

224.   By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Plaintiffs and the members of the Class, Plaintiffs and the members of the Class are entitled to the application of the continuing violations doctrine to all violations alleged herein.

225.   As a result of Defendants' conduct alleged in this Complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, with including but not limited to: lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost interest and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

226.   As a further result of Defendants' unlawful conduct, the Class Representatives and the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.  Plaintiffs are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT II

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"), 42 U.S.C. § 2000e, *ET SEQ.***
**PROMOTON DISCRIMINATION**
**(On Behalf of Class Representatives Ms. Barrett, Ms. Houser, and all members of the Class Against Defendants)**

227.   The Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

228.   This Count is brought on behalf of Class Representatives Ms. Barrett, Ms. Houser, and all members of the Class.

229.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII because of or on the basis of their gender.

230.   Defendants have discriminated against the Class Representatives and all members of the Class by treating them differently from and less preferably than similarly situated male employees, and by subjecting them to discriminatory denials of promotions, discriminatory denials of developmental opportunities, and discriminatory performance evaluations that affect promotions in violation of Title VII.

231.   Forest's policies, practices and/or procedures have produced a disparate impact against the Class Representatives and the class members with respect to their opportunities for promotion.

232.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

233.   By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Plaintiffs and the members of the Class, Plaintiffs and the members of the Class are entitled to the application of the continuing violations doctrine to all violations alleged herein.

234.   As a direct and proximate result of Defendants' conduct alleged in this Complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, with including but not limited to: lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost interest and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

235.   As a further direct and proximate result of Defendants' unlawful conduct, the Class Representatives and the members of the Class have suffered and continue to suffer, among other items, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Plaintiffs are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT III

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-5(f), *ET SEQ.* PREGNANCY DISCRIMINATION (On Behalf of Class Representatives Ms. Barrett, Ms. Houser, and all members of the Class Against Defendants)

236.   The Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

237.   This Count is brought on behalf of the Class Representatives Ms. Barrett, Ms. Houser, and all members of the Class.

238.   Defendants have discriminated against the Class Representatives and all members of the Class in violation of Title VII because of or on the basis of pregnancy, childbirth, or related medical conditions.

239.   The Class Representatives and the members of the proposed class were not treated the same for all employment-related purposes, including compensation, opportunities for promotion, discipline and other terms and conditions of employment as other similarly-situated employees with similar ability or inability to work who were either non-pregnant or not known to be pregnant.

240.   Forest's policies, practices and/or procedures have produced a disparate impact against the Class Representatives and the class members with respect to their opportunities for promotion.

241.   By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of the Class Representatives and all members of the class,

the Class Representatives and the members of the class are entitled to application of the continuing violations doctrine to all of the violations alleged herein.

242. Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and the members of the proposed class, entitling the Class Representatives and the members of the Class to punitive damages.

243. As a direct and proximate result of Defendants' conduct alleged in this Complaint, the Class Representatives and the members of the Class have suffered and continue to suffer harm, with including but not limited to: lost wages, lost back pay and front pay, lost bonuses, lost benefits, lost interest and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

244. As a further direct and proximate result of Defendants' unlawful conduct, the Class Representatives and the members of the Class have suffered and continue to suffer, among other items, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Plaintiffs are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT IV

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"), 29 U.S.C. §§ 206, *ET SEQ.* (On Behalf of All Plaintiffs and EPA Collective Action Plaintiffs Against Defendants)**

245. Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

246. This Count is brought on behalf of the Plaintiffs and all EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

247. Defendants have discriminated against the Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act of 1963 ("EPA") in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq*., as amended by the EPA, by providing them with lower pay than similarly situated male colleagues on the basis of their gender, female, even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

248. Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male employees all perform similar job duties and functions as Forest sales representatives. Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated males all performed jobs that required equal skill, effort, and responsibility, and are or were performing under similar working conditions.

249. Defendants discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denial of promotions, and other forms of discrimination in compensation in violation of the Equal Pay Act.

250. The differential in pay between male and female employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

251. Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

252. The foregoing conduct constitutes a willful violation of the EPA within the

meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

253.   As a result of Defendants' conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

254.   By reason of Defendants' discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

255.   Attorneys' fees should be awarded under 29 U.S.C. §216(b).

### INDIVIDUAL COUNTS

### COUNT V

**VIOLATION OF FAMILY MEDICAL LEAVE ACT ("FMLA")**
**29 U.S.C. § 2601, *ET SEQ.***
**(On Behalf of Ms. Barrett and Ms. Houser Against Defendants)**

256.   Ms. Barrett and Ms. Houser re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

257.   Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions

such as hiring, promotions, or disciplinary actions.  Ms. Barrett and Ms. Houser took approved FMLA leave for maternity leave.

258.   Forest interfered with Ms. Barrett and Ms. Houser's taking of protected maternity leave, and discriminated against them for the taking of such leave, in violation of the Family Medical Leave Act ("FMLA").

259.   Defendants interfered with Ms. Barrett and Ms. Houser's taking of FMLA-protected maternity leave and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, denying them career-advancement opportunities, making inaccurate statements harmful to their professional careers,  creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave, and ultimately wrongfully terminating Ms. Barrett and constructively discharging Ms. Houser.

260.   Defendants acted willfully, intentionally, and with reckless disregard for Ms. Barrett and Ms. Houser's rights under the FMLA.

261.   As a direct and proximate result of Defendants' actions, Ms. Barrett and Ms. Houser suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses and costs, and are entitled to all legal and equitable remedies available.

262.   By reason of Defendants' discrimination, Ms. Barrett and Ms. Houser are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

**COUNT VI**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-5(f), *ET SEQ.***
**RETALIATION**
**(On Behalf of Ms. Jones, and Ms. Seard Against Defendants)**

263.   Ms. Jones and Ms. Seard re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

264.   Ms. Jones and Ms. Seard engaged in protected activity by filing EEOC Charges and otherwise complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male employees, derogatory remarks, and sexual harassment—to people in management positions and in Human Resources.

265.   Defendants engaged in adverse employment actions against Ms. Jones and Ms. Seard for engaging in protected activity.   Such adverse employment actions taken have been in the form of subjecting Ms. Jones and Ms. Seard to unfavorable terms and conditions of employment, including *inter alia*, denials of promotions, negative performance reviews, hostile working environments, and ultimately constructively discharging Ms. Jones and Ms. Seard. The adverse employment actions have materially and adversely changed the plaintiffs' overall terms and conditions of employment.

266.   A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

267.   Defendants' retaliatory acts against Ms. Jones and Ms. Seard were a direct, proximate, and pretextual result of the plaintiffs' protected activities.

268.  Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Ms. Jones and Ms. Seard, entitling these plaintiffs to punitive damages.

269.  As a result of Defendants' conduct alleged in this Complaint, these plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

270.  By reason of Defendants' discrimination, these plaintiffs are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

271.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT VII**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e-5(f), *ET SEQ*.
SEXUAL HARASSMENT
(On Behalf of Ms. Jones Against Defendants)**

272.  Ms. Jones re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

273.  Forest has discriminated against Ms. Jones by permitting an ongoing, severe, or pervasive pattern and practice of sexual harassment against her by creating and maintaining a sexually hostile work environment in violation of Title VII.

274.  Forest's sexual harassment detrimentally affected Ms. Jones and altered her condition of employment by creating a hostile working environment for her.

275.   Forest's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Ms. Jones' rights, entitling her to punitive damages.

276.   As a direct and proximate result of Forest's aforementioned conduct, Ms. Jones suffered economic losses, mental and emotional harm, anguish, and humiliation.

277.   By reason of the continuous nature of Forest's discriminatory conduct, persistent throughout the employment of Ms. Jones, she is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

278.   By reason of the sexual harassment she suffered at Forest, Ms. Jones is entitled to all legal and equitable remedies available under Title VII, including an award of punitive damages.

## *PRAYER FOR RELIEF ON CLASS CLAIMS*

WHEREFORE, the Class Representatives, on their own behalf and on behalf of the Class, pray that this Court:

A.   Certify this case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), or alternatively, under (c)(4), on behalf of the proposed Plaintiff Class; designate the proposed Class Representatives as representative of this Class; and designate of Plaintiffs' counsel of record as Class Counsel;

B.   Designate this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

(i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

(ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C.      Designate Plaintiffs Barrett, Houser, Jones and Seard as representatives of the EPA Collective Action;

D.      Declare and adjudge that the Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and Class members under Title VII of the Civil Rights Act of 1964, as amended, the Equal Pay Act, and the Family and Medical Leave Act;

E.      Issue a permanent injunction against the Defendants and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of Plaintiffs, class members, and collective action plaintiffs, and those similarly situated as secured by 42 U.S.C. §§ 2000e *et seq.*, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and protect others similarly situated;

F.      Issue a permanent injunction against Forest Laboratories and its partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

G.      Order Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of the Defendants' past

and present unlawful employment policies, practices and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above; and

      H.     Order Defendants to initiate and implement systems of assigning, transferring, compensating, and promoting female employees in a non-discriminatory manner; and

      I.     Order Defendants to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in G through H above; and

      G.     Order Defendants to adjust the wage rates and benefits for the Class Representatives and the Class members to the level that they would be enjoying but for the Defendants' discriminatory policies, practices, and procedures; and

      H.     Order Defendants to place or restore the Class Representatives and the Class members into those jobs they would now be occupying but for Defendants' discriminatory policies, practices, and procedures; and

      I.     Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law; and

      J.     Award nominal, compensatory, and punitive damages to the Class Representatives and the Class members, in excess of one hundred million dollars; and

      K.     Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Class Representatives and Class members; and

L.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives and the Class members to be determined at trial; and

M.      Order Defendants to make whole the Class Representatives and Class members by providing them with appropriate lost earnings and benefits, reinstatement opportunities, and other affirmative relief; and

N.      Award any other appropriate equitable relief to the Class Representatives and Class members; and

O.      Award any additional and further relief as this Court may deem just and proper.

## VIII.   <u>JURY DEMAND</u>

The Class Representatives demand a trial by jury on all issues triable of right by jury.

Dated: New York, New York

July 5, 2012                                SANFORD, WITTELS & HEISLER, LLP

By:      _____

David Sanford, D.C. Bar No. 457933
Stefanie Roemer, D.C. Bar No. 450464
Lubna Alam, D. C. Bar No. 982169
Kate Mueting, D.C. Bar No. 988177
**SANFORD WITTELS & HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5201
Facsimile:  (202) 499-5119
dsanford@swhlegal.com
sroemer@swhlegal.com
lalam@swhlegal.com
kmueting@swhlegal.com


Jeremy Heisler (JH-0145)
Steven L. Wittels (SLW-8110)
Deborah Marcuse (DKM-0611)

**SANFORD WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5650
swittels@swhlegal.com
jheisler@swhlegal.com
dmarcuse@swhlegal.com

*Counsel for Plaintiffs Megan Barrett, Lindsay Houser, Jennifer Jones, Jennifer Seard, and the Class*