UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MEGAN BARRETT, LINDSEY HOUSER, JENNIFER JONES, JENNIFER SEARD, KIMBERLY CLINTON, ERIN ECKENRODE, JULIE SMYTH, MARIE AVILA, ANDREA HARLEY, CHRISTY LOWDER and TRACY LE** individually and on behalf of a class of similarly situated female employees,<br><br>**Plaintiffs,**<br><br>-- against --<br><br>**FOREST LABORATORIES, INC.  and FOREST PHARMACEUTICALS, INC.**<br><br>**Defendants.** | **SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>Civil No. 1:12-cv-05224-RA<br><br><br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiffs Megan Barrett ("Ms. Barrett"), Lindsey Houser ("Ms. Houser"), Jennifer Jones ("Ms. Jones"), Jennifer Seard ("Ms. Seard"), Kimberly Clinton ("Ms. Clinton"), Erin Eckenrode ("Ms. Eckenrode"), Julie Smyth ("Ms. Smyth"), Marie Avila ("Ms. Avila"), Andrea Harley ("Ms. Harley"), and Christy Lowder ("Ms. Lowder"), Tracy Le ("Ms. Le") (collectively "Plaintiffs" or "Class Representatives"), through their attorneys Sanford Heisler, LLP, bring this action to redress gender discrimination in their individual capacities and on behalf of the two classes ("Title VII Class" and "EPA Class") defined below.  Upon non-confidential, non-privileged information concerning themselves and their own acts, and upon information and belief, Plaintiffs allege as follows:

I.   **INTRODUCTION**

2.      Defendants Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc. (collectively, "the Company" or "Forest") have engaged in systematic, company-wide

discriminatory treatment of female employees because of their gender, because they took federally and state-protected maternity leave, and because they became pregnant or served as caregivers.

3.      Forest discriminates against its female employees through, *inter alia*: (a) disparate treatment; (b) discriminatory policies, practices, and procedures in selection, pay, promotion, and advancement; (c) pregnancy discrimination; (d) sexual harassment; and (e) retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"),  42 U.S.C. 2000e, *et. seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

4.      Forest also has known or should have known that its business practices – including but not limited to its pay, promotion, discipline, demotion, evaluation, and compensation practices – have an illegal disparate impact on female employees generally and pregnant employees in particular.  Forest has failed to take adequate measures to rectify this disparate impact.

5.      The systemic gender discrimination described in this Amended Complaint has been and is continuing in nature.

6.      The Class Representatives seek, on behalf of themselves and the classes they seek to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal, and punitive damages; and attorneys' fees, costs, and expenses to redress Forest's pervasive and discriminatory employment policies, practices, and procedures.

## II.      **JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C.

§§ 1331 and 1332(a)(1); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII"); 29 U.S.C. § 201, *et seq.*, the Equal Pay Act of 1963 ("EPA"); and 29 U.S.C. § 2601, *et seq.*; and the Family and Medical Leave Act of 1993 ("FMLA") to redress and enjoin employment practices of Defendants in violation of these federal statutes.

8.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

9.     Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b) & (c) and 42 U.S.C. § 2000e-5(f) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District; and Defendants maintain employment records related to this action in New York.

10.     Plaintiffs have standing to bring this suit as Ms. Barrett, Ms. Houser, Ms. Jones, and Ms. Seard have exhausted administrative remedies by duly filing administrative charges before the Equal Employment Opportunity Commission and have perfected their Rights to Sue.  These administrative charges gave notice to Forest of class-wide allegations of sex discrimination, including those alleged by other Named Plaintiffs. Ms. Jones was the first to file an Equal Employment Opportunity Commission administrative charge which she timely filed on December 3, 2010 regarding continuing discrimination that occurred beginning in early 2008.

III.     **THE PARTIES**

11.     Between January 2004 and April 2011, **PLAINTIFF MEGAN BARRETT** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Clarks Summit, Pennsylvania.

3

12.     Between June 2003 and November 2010, **PLAINTIFF LINDSEY HOUSER** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in McKinney, Texas.

13.     Between January 2008 and September 2010, **PLAINTIFF JENNIFER JONES** was a female "employee" at Forest, as defined by Title VII and the EPA.  She currently resides in Keller, Texas.

14.     Between December 2003 and April 2011, **PLAINTIFF JENNIFER SEARD** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Georgetown, Texas.

15.     Between May 2011 and November 2012, **PLAINTIFF KIMBERLY CLINTON** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Los Angeles, California.

16.     Between October 2003 and May 2012, **PLAINTIFF ERIN ECKENRODE** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in York, Pennsylvania.

17.     Between May 2005 and September 2012, **PLAINTIFF JULIE SMYTH** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Lebanon, Pennsylvania.

18.     Between June 2010 and August 2011, **PLAINTIFF MARIE AVILA** was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Los Angeles, California.

19.     Between March 2011 and January 2013, **PLAINTIFF ANDREA HARLEY** has was a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA.  She currently resides in Louisville, Kentucky.

20.     From September 2010 to present, **PLAINTIFF CHRISTY LOWDER** has been a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA. She currently resides in Girard, Illinois.

21.     From March 2012 to present, **PLAINTIFF TRACY LE** has been a female "employee" at Forest, as defined by Title VII, the EPA, and the FMLA. She currently resides in San Gabriel, California.

22.     **DEFENDANT FOREST LABORATORIES, INC.** is a multi-national corporation engaged in the business of developing, manufacturing, and marketing pharmaceutical products.  Defendant Forest Laboratories, Inc. is incorporated in the state of Delaware and headquartered in New York, New York.  It regularly transacts business in this District.

23.     At all times relevant to this action, **DEFENDANT FOREST PHARMACEUTICALS, INC.** is and has been a division and wholly owned subsidiary of Defendant Forest Laboratories responsible for the manufacture, distribution, and sales of prescription medicine for Defendant Forest Laboratories.  Defendant Forest Pharmaceuticals, Inc. is incorporated in the state of Delaware.  It has eight offices in New York and regularly transacts business in this district.

24.     At all times relevant to this action, Defendants Forest Laboratories and Forest Pharmaceuticals were and are "employers" as defined by Title VII, the EPA, and the FMLA. At all times relevant to this action, Defendants Forest Laboratories and Forest Pharmaceuticals

5

have operated as a single integrated enterprise under Title VII, the EPA, and the FMLA. Alternatively, the Defendants are and were Plaintiffs' joint employers under Title VII, the EPA, and the FMLA.

## IV.   FACTUAL ALLEGATIONS

### A.   MS. BARRETT'S FACTUAL ALLEGATIONS

25.     Plaintiff Megan Barrett was hired by Forest in January 2004 as a Territory Representative for Forest's New York City Division, which covered counties in New York and New Jersey.  In April 2005, Forest transferred Ms. Barrett to the Keystone Division in Scranton, Pennsylvania.  Forest wrongfully terminated Ms. Barrett on April 26, 2011.

26.     Prior to her return from maternity leave in 2009, Ms. Barrett received numerous awards for her impressive performance at Forest. For example, Ms. Barrett won Sales Representative of the Quarter awards in 2005, 2006, 2007, and 2008.  The Sales Representative of the Quarter award is given by a Divisional Manager and recognizes an outstanding team member based on her sales performance.

27.     In 2007, Ms. Barrett won the Carpenter Award, an award given to sales representatives who exemplify superior character, effort in building relationships, product knowledge, selling skills, and territory management.

28.     In 2008, Ms. Barrett was the regional winner of the Lexapro Contest, which recognized her as the top seller of Lexapro in her region. Further, in 2008 Ms. Barrett helped lead her sales team to second place in the region's Bystolic Contest.

29.     Despite Ms. Barrett's impressive sales performance, however, her pay lagged behind that of her equally or less qualified male colleagues from the start of her career at Forest.

30.     For example, when Ms. Barrett was hired by Forest, her base salary was approximately $42,000. Upon information and belief, Ms. Barrett's male colleague, Enrique Emerich, was paid a higher base salary than Ms. Barrett, even though he did not have superior qualifications, and even though Ms. Barrett and he held jobs requiring the same skills, efforts and responsibilities, which they performed under similar working conditions.

31.     The salary disparity between Ms. Barrett and her male colleagues was perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary. Under this policy, female representatives like Ms. Barrett, even if they were awarded the same percentage merit increase as their male counterparts, would receive less money than their male colleagues with larger base salaries.

32.     From 2004 until her transfer to Scranton in 2005, Ms. Barrett's Divisional Manager was John Wiszneski.  In the Scranton region, Ms. Barrett's Divisional Manager was Dan Bransfield until approximately 2008 or 2009, when Daniel Rogan ("Mgr. Rogan") assumed that position.

33.     Ms. Barrett took her second maternity leave from November 2008 through February 2009. She took her third maternity leave from November 2009 through February 2010.

34.     When Ms. Barrett went out on leave in November 2008, she ranked in the top 25 percent regionally for Bystolic, one of her key products, and in the top 50 percent nationally. Immediately upon Ms. Barrett's return from leave in February 2009, however, her ranking plunged.

35.     Forest uses President's Club rankings — a quarterly, nationwide classification system that ranks sales representatives according to the percentage of sales quotas they meet — to determine a sales representative's eligibility for pay-outs, bonuses, salary increases,

7

promotions, and transfers. Forest uses low President's Club rankings to justify disciplinary action leading to termination.

36.    In accordance with Forest policy, Ms. Barrett's President's Club ranking was not adjusted to account for her three months of maternity leave when she was not in the field. Accordingly, when Ms. Barrett returned from leave in February 2009, her President's Club ranking had plunged to 384 out of 500.

37.    Subsequently, Ms. Barrett took maternity leave from December 2009 until February 2010.  Once again, Ms. Barrett's President's Club ranking was not adjusted to account for her three months on maternity leave when she was not in the field. Accordingly, upon Ms. Barrett's return from leave in February 2010, her President's Club ranking had plunged again, this time from 324 to 484 out of 500.

38.    The lowering of Ms. Barrett's President's Club ranking due to her maternity leaves resulted in the denial of stock options and resulted in smaller pay increases. For example, while Ms. Barrett had in previous years received approximately $10,500 per year in stock options, Forest denied Ms. Barrett stock options in both 2009 and 2010. Further, while Ms. Barrett received a merit increase of nine percent (9%) the year before her second pregnancy and leave, she received a salary increase of only one percent (1%) in 2009 after her return from her second maternity leave

39.    Prior to Ms. Barrett's second pregnancy and leave, her exemplary sales performance and high ranking were accompanied by strong scores on her Field Trip Evaluations ("FTEs").

40.    FTEs are manager-supplied performance assessments through which divisional managers rate their sales representatives.  Before Ms. Barrett took maternity leave in late 2008,

her FTE ratings were at 3.0 or higher on a 5.0 scale.  However, after Ms. Barrett returned from her second pregnancy and maternity leave in February 2009, Mgr. Rogan began rating her below 3.0, at around 2.4 or 2.5.  These ratings were lower than any score Ms. Barrett received prior to her second pregnancy and maternity leave.

41.     Under Forest policy, low FTE scores contribute significantly to a sales representative's annual review, which in turn is a basis for determining a sales representative's bonus compensation. In Ms. Barrett's case, the low FTE scores she received from Mgr. Rogan upon her return from maternity leave served to lower her annual review score, resulting in a reduction in her bonus compensation.

42.     In addition, according to Forest policy, FTE and annual review scores below a minimum threshold also render sales representatives ineligible to enter the formal bidding process for promotions. Accordingly, Mgr. Rogan's lowering of Ms. Barrett's FTE scores below 3.0 after her maternity leave and the corresponding lowering of her annual review score rendered her ineligible to apply for promotions at Forest.

43.     Ms. Barrett knew from her experience at Forest that a sales representative needs the approval and support of his or her manager to be considered as a candidate for promotion. This has led to a practice of "tap on the shoulder" promotions, where managers identify and approach the sales representatives they wish to support and provide them with information and other advantages in obtaining promotions. Because of this, in many cases, even where a formal interview process takes place, the outcome of that process is known to be preordained in favor of the candidate who has been tapped.

44.     For example, in approximately 2010, Ms. Barrett learned from a former colleague in Scranton, Territory Representative Jay Saunders, that his manager had affirmatively approached him about a promotion.

45.     By contrast, when a Regional Sales Trainer ("RST") who rode with Ms. Barrett after Ms. Barrett's return from maternity leave told Ms. Barrett's Mgr. Rogan that Ms. Barrett would do the RST job well, Mgr. Rogan went out of his way to express to Ms. Barrett that he would *not* support her advancement at the Company. Specifically, Mgr. Rogan at his next opportunity to speak with Ms. Barrett asked her, while rolling his eyes and shaking his head, "You're not interested in becoming an RST, are you?" By his words and actions, Mgr. Rogan clearly expressed to Ms. Barrett that he would not approve nor support her in seeking a promotion at Forest.

46.     The RST position is often a steppingstone to management positions for Forest sales representatives, and confers increased compensation, increased exposure, and more leadership opportunities. Although female employees make up approximately fifty percent (50%) of the sales representatives in Ms. Barrett's territory, women occupy fewer than twenty-five percent (25%) of management positions in that territory. Indeed, around the time of Ms. Barrett's termination, only one of the five divisional managers in the Keystone Division was female, and that one female manager has since left the Company.

47.     The discrimination Ms. Barrett faced from Forest management immediately upon her return from her second pregnancy and maternity leave only escalated after Ms. Barrett's return from her third pregnancy and maternity leave in February 2010, when, having already lowered her FTE and annual review scores, Mgr. Rogan took disciplinary action against Ms. Barrett.

48.     Specifically, on July 19, 2010, Defendants' Human Resources department ("HR") sent Ms. Barrett a disciplinary letter alleging that, according to Mgr. Rogan, Ms. Barrett was exhibiting inappropriate behavior and attitude during sales calls. The letter stated that she had been placed on a formal warning status that would be in effect for at least 90 days and that she could be terminated if her performance did not improve.

49.     In fact, however, physicians and former managers consistently praised Ms. Barrett throughout her time at Forest for her skilled relationship building, reliability, and professionalism, and had commended her for "always going above and beyond" the requirements of her role. Indeed, prior to her second pregnancy and maternity leave, Ms. Barrett was lauded by her manager for demonstrating exceptional initiative in a territory that lacked organization before she arrived.

50.     Upon receipt of the July 2010 disciplinary letter, Ms. Barrett contacted Forest Human Resources Representative Karen Swift ("HR Representative Swift") to contest Mgr. Rogan's allegations. At this time, Ms. Barrett complained to HR Representative Swift that Mgr. Rogan had been treating her differently since her maternity leave. HR Representative Swift suggested that Ms. Barrett document her concerns but did not indicate whether the Company would take any action in response to Ms. Barrett's complaint.  HR Representative Swift also did not inform Ms. Barrett of a means to challenge or have the disciplinary action reviewed.

51.     Ms. Barrett was not contacted again by anyone from HR or Forest management about her complaint, and as far as she is aware, Forest never initiated any investigation in response to her complaint of discrimination to HR.

52.     Instead, Forest management's discrimination against Ms. Barrett only increased. On December 3, 2010, Mgr. Rogan placed Ms. Barrett on probation, requiring her to complete

11

daily pre-call plans, complete practice voicemails three days a week, and submit weekly self-assessments.

53.     Being placed on probation immediately rendered Ms. Barrett ineligible for merit increases, bonuses, awards, and career-advancement opportunities such as promotions. As Ms. Barrett knew from her years at Forest, probation in many cases leads to increased disciplinary measures such as termination.

54.     Ms. Barrett was the only member of her team placed on probation, even though, upon information and belief, other team members had performance numbers lower than or similar to hers.

55.     Nevertheless, even while Ms. Barrett was on probation, she continued to achieve her sales goals, advance in the rankings, and receive praise from her customers.

56.     At the same time Mgr. Rogan was subjecting Ms. Barrett to increased scrutiny and unwarranted discipline, Ms. Barrett observed Mgr. Rogan treating male sales representatives more favorably, even where doing so was clearly inconsistent with Company policy.  For example, in 2010, male Territory Representative William Menendez ("Mr. Menendez") violated compliance standards during a field trip, a serious infraction against Forest policy.  However, Mgr. Rogan failed to discipline him or report his infraction. Mr. Menendez informed Ms. Barrett that Mgr. Rogan had told Mr. Menendez: "Don't worry, I have your back" and "I'll fight for you."

57.     As a result of the extreme stress and anxiety caused by Forest's continued mistreatment, Ms. Barrett sought medical attention in early 2011. Ms. Barrett's physician determined that her work environment was unhealthy. On February 14, 2011, Ms. Barrett took short-term disability leave for anxiety and depression. On March 2, 2011, Ms. Barrett's

psychiatrist diagnosed her with work-related anxiety and depression. However, as the breadwinner for her family, Ms. Barrett had no choice but to return to work on March 21, 2011, against her doctor's advice.

58.     Even in this negative environment, Ms. Barrett continued to demonstrate strong sales achievement, raising her President's Club ranking by 80 slots after her return from her third pregnancy and maternity leave in 2010. Ms. Barrett also continued to receive praise from her customers after she returned from leave in 2010.  On several occasions, Ms. Barrett's physician customers specifically expressed to Mgr. Rogan that they were pleased with her work.

59.     Nevertheless, despite the continued objective evidence of Ms. Barrett's impressive performance, Forest wrongfully terminated Ms. Barrett on April 26, 2011. The Company asserted that she had failed to improve in the target areas of her probation.

### B.     LINDSEY HOUSER'S FACTUAL ALLEGATIONS

60.     Forest employed Lindsey Houser as a Territory Representative from June 2003 until November 2010.  From approximately June 2003 until early 2007, Ms. Houser served as a Territory Representative based in San Antonio, Texas, and was supervised by Manager Karen McClung ("Mgr. McClung").   From 2007 until 2010, she served as a Territory Representative in Dallas, Texas and was supervised by Manager Nathan Turner ("Mgr. Turner").  From June to November 2010, she was a Sales Representative in South Dallas, when she left the Company because she was denied job sharing in the Dallas territory.

61.     Prior to her return from maternity leave in November 2009, Ms. Houser received numerous awards for her impressive performance at Forest, which never fell below the top quartile of all sales representatives nationwide.  In her first year at the Company, she won the Rookie of the Year award for 2003. Subsequently, she won the Execution Award for the second

quarter of Fiscal Year ("FY") 2004 (July – September 2003), and for the fourth quarter of FY 2004 (January – March 2004), the second quarter of FY 2005 (July – September 2004), and the first quarter of FY 2006 (April – June 2005). In addition, she won Representative of the Quarter awards in the third quarter of FY 2005 (October – December 2004), the second quarter of FY 2008 (July – September 2007), the third quarter of FY 2008 (October – December 2007), and the fourth quarter of FY 2009 (January – March 2009).   In addition, Ms. Houser won the Team Leadership Award in the third quarter of FY 2005 (October – December 2004) and the MVP award in the fourth quarter of FY 2006 (January – March 2006).

62.     Despite Ms. Houser's impressive sales performance, however, her pay lagged behind that of her equally or less qualified male colleagues from the start of her career at Forest.

63.     For example, when Ms. Houser was hired by Forest in 2003, her base salary was approximately $43,000 or $44,000. Upon information and belief, Ms. Houser's male colleagues Territory Representatives Chad Brightman, Justin Burgess, and Jason Osuna were paid a higher base salary than Ms. Houser, even though they did not have superior qualifications, and even though Ms. Houser and they held jobs requiring the same skills, efforts and responsibilities which they performed under similar working conditions.

64.     The salary disparity between Ms. Houser and her male colleagues was perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary. Under this policy, female representatives like Ms. Houser, even if they were awarded the same percentage merit increase as their male counterparts, would receive less money than their male colleagues with larger base salaries.

65.     After Ms. Houser's initial success at Forest, she maintained her strong performance record.

66.     Based on Ms. Houser's strong performance, in approximately 2003, Mgr. McClung selected her for leadership roles such as Field Sales Trainer and Managed Care Liaison. As a Field Sales Trainer Ms. Houser trained other sales representatives by performing all-day ride-alongs with them. Ms. Houser was not compensated for this work, and in fact sacrificed approximately two to three full days per quarter in her own territory during her work as a Field Sales Trainer.

67.     In 2004, she assumed the title of Professional Sales Representative, a title given to all Territory Representatives who have served for at least one year and meet performance targets.

68.     In 2005, she assumed the title of Medical Sales Representative, a title given to Professional Sales Representatives who meet further performance targets. Ms. Houser retained the title of Medical Sales Representative until Forest's discriminatory treatment forced her to resign in November 2010.

69.     In 2007, Ms. Houser moved from her territory in San Antonio, Texas to a new territory in Dallas, Texas and was supervised by Mgr. Nathan Turner.

70.     In Dallas, she continued to excel in her sales performance and maintained her ranking in the top quartile of all sales representatives nationwide. Further, in approximately 2007, Mgr. Turner selected Ms. Houser for a leadership role, the Field Sales Trainer position, although she still was not compensated for the time spent in that role and was required to maintain her own sales.  However, when evaluated by Mgr. Turner, she received lower scores on her Field Trip Evaluations ("FTEs"). Field Trip Evaluations, or FTEs, are manager-supplied performance assessments through which divisional managers rate their sales representatives.

71.     Prior to reporting to Mgr. Turner, Ms. Houser received FTEs ranging from approximately 3.8 to 4.2 on a 5.0 scale. For example, on May 9, 2006, Mgr. McClung rated Ms. Houser with an FTE score of 4.06. Subsequently, Mgr. Turner lowered her FTE ratings to approximately below 3.8, and in the range of 3.6 to 3.7.

72.     In August 2008 Mgr. Turner made comments to male management colleagues about Ms. Houser's breasts after she had augmentation surgery, which were repeated to her by male sales representative colleagues.

73.     In March 2009, when Ms. Houser was eight months pregnant, she applied for a promotion into a specialty position in her territory.  Her excellent performance, coupled with her knowledge of the territory, made her an ideal candidate.  In fact, upon learning that Ms. Houser had applied for the position, Ms. Houser's former supervisor, Mgr. McClung, told her that management would be "crazy" if they did not give her the job.

74.     In early July 2009, Area Director Renner, Director Wright, and District Manager Jerry Witcher ("Mgr. Witcher") interviewed Ms. Houser for the position.  At the time of the interview, Ms. Houser was and appeared eight months pregnant.

75.     As all candidates for the position, Ms. Houser came to her interview ready to present a written business plan she had prepared. However, prior to her presentation, Director Renner, Director Wright and Mgr. Witcher asked her a number of probing questions regarding her pregnancy, including how she was feeling, how the pregnancy was going, and how her husband felt about having a boy.

76.     Following these questions, Ms. Houser presented her business plan. Following her presentation, the managers did not ask her any questions about her presentation or business strategy.

77.    Mgr. Witcher later informed Ms. Houser that Forest had selected an employee from another territory, Jennifer Harris, for the position. Although that employee was also pregnant, she did not appear to be pregnant at the time of the interview.

78.    In contrast to Ms. Houser, who if she had received the Specialty Representative position would have called on the same doctors she had been working with since 2007, Ms. Harris  had worked outside the territory in Plano, Texas and had no prior relationships with those doctors.

79.    In September 2009, Mgr. Turner sent a card to Houser's home after her birthday and the birth of her child which depicted an older man in his underwear and, when opened, played a song "I'm too sexy for my pants."  He wrote in the card: "I thought about getting you one of those sweet baby cards … but I thought this guy would turn you on instead," and added "Please do not tell [my wife] … she will be mad at me."   The card and message made Ms. Houser very uncomfortable.

80.    From approximately July 2009 to November 2009 Ms. Houser went on maternity leave.

81.    While on maternity leave, Ms. Houser experienced complications that led to the premature birth of her child.  Because her premature newborn required intensive care, Ms. Houser contacted Mgr. Turner to request an extension of her maternity leave with unused vacation days.

82.    Mgr. Turner denied her request, stating that HR's practices and policies prohibited the extension. Ms. Houser later learned from HR Representative Heather Lemon that according to Forest HR policy, employees could use vacation days to extend their maternity

leave. However, because Mgr. Turner had denied Ms. Houser's request, she feared retaliation and therefore did not repeat her request.

83.     In late 2009, Ms. Houser was informed by a colleague, Territory Representative Mary Graff, who also was supervised by Mgr. Turner and had taken maternity leave, that Mgr. Turner had told Ms. Graff during a ride-along that he was not going to hire women anymore because they all get pregnant and go on maternity leave, like Ms. Houser and Ms. Graff.

84.     According to Forest's pay policies, representatives who are on leave for a period of more than six weeks are not entitled to collect bonuses distributed during the leave period even though bonuses are paid out based on performance during the preceding quarter. As a result of this policy, Ms. Houser was not eligible to receive bonus payments when she went out on maternity leave. In general, Ms. Houser's quarterly bonus payments ranged from $5,000 to $13,000.

85.     When Ms. Houser went out on leave in July 2009, she ranked in the top 25 percent of all sales representatives nationwide, with a President's Club ranking of 84 out of approximately 500 sales representatives as of June 23, 2009.  Immediately upon Ms. Houser's return from leave in November 2009, however, her ranking plunged.

86.     Forest uses President's Club rankings — a quarterly, nationwide classification system that ranks sales representatives according to the percentage of sales quotas they meet — to determine a sales representative's eligibility for payouts, bonuses, salary increases, promotions, and transfers. Forest uses low President's Club rankings to justify disciplinary action leading to termination.

87.     In accordance with Forest policy, Ms. Houser's President's Club ranking was not adjusted to account for her period of maternity leave when she was not in the field.

18

Accordingly, when Ms. Houser returned from leave in February 2009, her President's Club ranking had plunged to 297 out of 501.   Previously, she had never had a President's Club ranking below 200.

88.    Due to the drop in the President's Club rankings, Ms. Houser received a far smaller annual merit increase at the end of 2009 than she had ever received. Whereas she commonly received yearly merit increases of eight percent (8%) and greater, at the end of 2009, Ms. Houser received an increase of just two to three percent (2-3%). In addition, Ms. Houser received fewer stock options.

89.    In or around December 2009, shortly after she returned from maternity leave, Ms. Houser asked Mgr. Turner about job share positions. Job shares feature alternative work schedules where two employees share the responsibilities of one full-time sales representative. Upon information and belief, Forest offered job share positions to other employees.

90.    In response to Ms. Houser's inquiry, Mgr. Turner told Ms. Houser that such an arrangement was "impossible" and one that his superior, Director Wright, would "never approve."  Mgr. Turner stated that "it [had] never worked in the past" and discouraged her from mentioning her request to Director Wright.  During this conversation, he also warned, "If I call and hear your kids in the car before five, I'm going to be really pissed."

91.    Following Ms. Houser's return from maternity leave, Mgr. Turner also began to subject her to hostile comments that caused her anxiety.  In reference to Mr. Houser's job performance, Mgr. Turner began to tell her that she needed to "work harder" to "get back up to speed," even though she maintained her high level of performance.  In addition, during a visit to Baylor-Garland Medical Center, Mgr. Turner pointed out to a doctor who they were calling on what he suggested was breast milk on Ms. Houser's jacket.

92.     Mgr. Turner's denial of her request for job-sharing, continuing stereotypical remarks about women and about her body, his baseless criticisms of her performance and threats associated with his perceptions of her caring for her children aggravated depression she was experiencing following her pregnancy.  In late 2009 and early 2010 Ms. Houser sought and received medical treatment from a psychiatrist for depression and anxiety and was prescribed Lexapro, which continued for the duration of her employment at Forest.

93.     Despite the challenges Ms. Houser faced upon her return from maternity leave, she maintained her strong sales performance. On April 20, 2010, Area Director Renner sent a letter informing Ms. Houser that in the first quarter of 2010 alone, she had raised her President's Club ranking 179 spots, from 297 to 118 out of 501 sales representatives.

94.     Regardless of her strong performance, Mgr. Turner further lowered Ms. Houser's FTE scores after she returned from maternity leave, to generally between 3.0 to 3.2 on a 5.0 scale.  Prior to her leave, Manger Turner had given Ms. Houser FTE scores generally in the range of 3.6 to 3.7.

95.     As a result of the lower FTE ratings, which were a component of her annual score, Forest cut Ms. Houser's annual merit increase following her return from maternity leave. Prior to Ms. Houser's leave, Forest had typically awarded her salary increases of approximately eight to ten percent (8-10%) each year, commensurate with her performance and sales achievement.  However, because of Ms. Houser's President's Club rankings and FTE ratings upon returning from maternity leave, Forest gave her a merit increase of approximately three percent — the lowest salary increase Ms. Houser ever had received.

96.     Ms. Houser's lowered FTE ratings also reduced the percentage payout and number of stock options for which she was eligible.  Accordingly, Forest paid Ms. Houser

20

approximately $5,000 less in her 2010 bonus than that to which she would otherwise have been entitled.  Ms. Houser also faced a 75 percent reduction in her stock options, and, in her final year, received none at all.

97.    Ms. Houser asked Mgr. Turner about job share opportunities several times during December 2009 and January 2010, and each time he denied her request.

98.    In or about March or April 2010, Ms. Houser asked Director Wright for a job share opportunity.  Director Wright denied her request.  Like Mgr. Turner, he claimed that job shares "never worked before" and that "the situation [had] to be right" for him to allow a job share arrangement.  Director Wright said he would not allow a job share position on Mgr. Turner's team.

99.    During this conversation, Ms. Houser offered to be transferred to another manager under whom she could work a job share position.  Director Wright stated that all the managers were "too busy" and to "come up with something" on her own.  Around April 2010, soon after her conversation with Director Wright, Ms. Houser asked Area Director Renner whether she would be allowed a job share position.  Area Director Renner also denied her request.  Ms. Houser explained that she would no longer be able to work at Forest if she could not have a job share position

100.   The following week, in April 2010, Ms. Houser discovered that a male representative on Mgr. McClung's team had been promoted, vacating a position in the territory that could be occupied by a job share.  Neither Director Wright nor Area Director Renner had indicated there were job openings in the area.

101.   Subsequently, in June 2010, Ms. Houser sought and obtained the job share position in Manger McClung's territory, which was considerably farther from her home.

Because she had been denied a job sharing position within her territory, Ms. Houser was forced to take a sixty percent (60%), three days per week, job share position in another territory, in South Dallas, which often entailed a six-hour, round-trip commute.  This commute dramatically extended Ms. Houser's workday, which often stretched from 6 a.m. to 9 p.m.  Forest also required Ms. Houser to attend meetings, answer phone calls, respond to emails, and complete expense reports on her days off.  In practice, Ms. Houser had to work the equivalent of a five-day week and weekends for sixty percent (60%) pay.

102.   Even though she took on the burdens of working a job share in a remote territory, Ms. Houser achieved her sales goals.  On July 7, 2010, Area Director Renner sent Ms. Houser a letter congratulating her for ranking in the top twenty-five percent (25%) nationally.

103.   However, the fact that she was denied job sharing in her territory and could obtain it only by assuming the very substantial burdens and pressures of working outside of her territory added to Ms. Houser's stress and anxiety.  Thus, although Ms. Houser continued to meet and exceed expectations, by November 2010 she realized that  those working conditions were not tolerable or sustainable and left Forest to assume a part-time position that was significantly less desirable and that offered lower compensation.

### C.   Jennifer Jones' Factual Allegations

104.   Plaintiff Jennifer Jones was hired as a Territory Sales Representative located in south Fort Worth, Texas in January 2008, and worked at the Company until Forest management's discriminatory and retaliatory conduct forced her to resign on September 27, 2010. Throughout Ms. Jones' tenure, her Divisional Manager was Karen McClung ("Mgr. McClung"). In or about late 2009 or early 2010, Austin Wighaman ("Mgr. Wighaman") became Ms. Jones' Team Manager. As the Team Manager, Mgr. Wighaman offered additional oversight

and training to approximately the five representatives in Ms. Jones' division who worked in the south Fort Worth area, and provided feedback on these team members to Mgr. McClung.

105. Throughout her tenure, Ms. Jones demonstrated strong performance. In her first year of employment, Ms. Jones exceeded Company expectations for new employees, and received a Letter of Achievement from Area Director Cary Renner in recognition of her President's Club ranking. She also won Representative of the Quarter Awards in Fiscal Years 2008 and 2009. In 2009, Ms. Jones also won Forest Excellence points awarded by Regional Sales Trainer Tim Linear in recognition of her leadership skills and sales performance.

106. Although Ms. Jones' performance was exceptionally strong from the beginning of her employment at Forest, she was paid less than male colleagues with equal or inferior qualifications. Forest hired Ms. Jones at $52,000, which is same base salary paid to another female representative, Liz Duarte, in the Fort Worth, Texas territory. However, Forest hired male employee Jaycob Gerfers ("Mr. Gerfers") at $57,000. Mr. Gerfers was hired into the Fort Worth territory on the same date as Ms. Jones, and Mr. Gerfers and Ms. Jones had comparable work experience in the sales industry. Their jobs required the same skills, efforts and responsibilities, and they worked under similar conditions.

107. Because Forest determines merit increases as a percentage of base salary, Ms. Jones continued to receive less pay for equal or even superior work throughout her tenure at Forest compared to her male counterparts as a result of her lower initial base pay.

108. Shortly after Ms. Jones began working at Forest, she and Mr. Gerfers joined Manager Wighaman and David Williams ("Mgr. Williams") at a social function at the Worthington Hotel in Fort Worth, Texas. During the evening, Mgr. Wighaman stood behind Ms.

Jones and pointed to her while mouthing to Mgr. Williams, "You need to fuck her." Mr. Gerfers witnessed Mgr. Wighaman mouth the comment to Mgr. Williams.

109.    At one point when Ms. Jones excused herself to use the restroom, Mgr. Wighaman positioned a stool chair at his waist and made thrusting motions and other sexual gestures. While doing so, he told Mr. Gerfers that he would "fuck the shit out of her," referring to Ms. Jones. He then asked Mr. Gerfers why no one had "fucked" her yet. The situation made Mr. Gerfers, also a new territory representative at Forest, uncomfortable. He ignored the comment and changed the subject.

110.    After Mr. Gerfers and Mgr. Williams had already left, Mgr. Wighaman walked Ms. Jones to her condominium. Upon reaching Ms. Jones' condominium, Ms. Jones and Mgr. Wighaman sat outside on the patio and had a work-related conversation. Mgr. Wighaman then stated that he wanted to see the view from her condominium unit. Ms. Jones felt uncomfortable with the request. However, because of Mgr. Wighaman's persistence and his superior position as a manager, she relented. Once inside her condominium, Mgr. Wighaman said, "You don't even know what I want to do to you." Ms. Jones grew visibly upset. She directed him to leave and reminded him of his wife and kids. Mgr. Wighaman became distraught and, before he left, aggressively urged her not to say anything to anyone.

111.    The following morning at work, Mr. Gerfers informed Ms. Jones about Mgr. Wighaman's offensive behavior and comments the previous night. That same day, Mgr. Wighaman confronted Ms. Jones and told her not to tell anyone about his behavior. Afraid of jeopardizing her new career, Ms. Jones agreed. Over the next few months, Mgr. Wighaman continued to confirm with Ms. Jones that she had not reported his harassment. In one instance in mid-2008, at a regional meeting in San Antonio, Texas, Mgr. Wighaman told Ms. Jones to

"pretend that that never happened." Intimidated, Ms. Jones followed her manager's instructions and did not report the harassment.

112.    Ms. Jones learned that Mgr. Wighaman had a reputation for harassing female representatives. Ms. Jones heard of at least three sales representatives who were subjected to Mgr. Wighaman's unwelcome attention. In one particularly egregious case, Ms. Jones heard that Mgr. Wighaman would wait outside of another female sales representative's house at night, unannounced, and call her to solicit sex. Ms. Jones also understood that at least one of these women had filed a complaint against Mgr. Wighman with Forest's Human Resoures ("HR") department. Mgr. Wighaman's harassment of female representatives was also well-known among male representatives who worked with him. Mgr. Wighaman would confide to the men, "I love girls who expose their cleavage," or "what would I do to that girl." Indeed, one male representative submitted a letter to HR about Mgr. Wighaman's unprofessional behavior with female Forest employees, while another anonymously called the Company's Compliance hotline number to report him. Upon information and belief, HR did not follow up on either of the male employees' reports.

113.    Ms. Jones' colleagues informed her that Mgr. Wighaman frequently asked the other members of the team questions about Ms. Jones' personal life, including questions about her relationship status and dates. He also paid inappropriate attention to Ms. Jones' body in ways that made Ms. Jones and even her male colleagues uncomfortable. For example, in the spring of 2009, at a work meeting in San Antonio, one of Ms. Jones' male counterparts saw Mgr. Wighaman leering at Ms. Jones so noticeably that he drew Ms. Jones' attention to the problem.

114.    In 2009, Mgr. Wighaman became Ms. Jones' Team Manager. She was forced to regularly interact with him at meetings and other work-related events. Mgr. Wighaman's

increased presence and his new role as Ms. Jones' direct supervisor made Ms. Jones extremely anxious. She did not speak as frequently in meetings when he was present. Ms. Jones withdrew in group interactions to avoid drawing Mgr. Wighaman's attention to herself. Mgr. Wighaman noticed Ms. Jones' reluctance to participate in group events and commented to her colleagues and to Mgr. McClung that Ms. Jones was not a valuable member of the team and had little to contribute.

115.     On June 16, 2010, Mgr. McClung approached Ms. Jones and asked her about Mgr. Wighaman's negative assessment of her value. Shocked at this unfair statement, Ms. Jones overcame the fear of retaliation that had led her to keep silent for more than two years and disclosed to Mgr. McClung that she had been sexually harassed by Mgr. Wighaman. Ms. Jones hoped that Mgr. McClung would contact HR to take disciplinary measures against Mgr. Wighaman, and made mention to Mgr. McClung of the other women Ms. Jones understood to have been harassed by Mgr. Wighaman. In response, however, Mgr. McClung dismissed these other women, stating that their complaints were in bad faith and motivated by their own poor performance. Implicit in this statement, Ms. Jones felt, was the implication that, as she had feared, she, too, would face dismissal and negative scrutiny in response to her complaint of harassment and discriminatory treatment.

116.     Mgr. McClung told Ms. Jones that she wanted to address the matter but did not want to harm Mgr. Wighaman. She stated that she needed to "sleep on it" to find a solution that would address the incident "with both [Ms. Jones' and Mgr. Wighaman's] best interests in mind." The next day, Mgr. McClung told Ms. Jones that she (Mgr. McClung) had handled the matter by speaking to Mgr. Wighaman. During the next few days, Mgr. Wighaman called and

texted Ms. Jones and repeatedly asked Ms. Jones to call him, making her extremely nervous and upset. Ms. Jones did not return Mgr. Wighaman's calls or reply to his messages.

117.    On June 18, 2010, Ms. Jones filed a written complaint with Forest's Human Resources department. On June 22, 2010, Forest HR Representative Brian McKenna ("HR Rep McKenna") called Ms. Jones. Ms. Jones again recounted her harassment by Mgr. Wighaman, and also recounted her reporting of the problem to Mgr. McClung. At the end of the conversation, HR Rep McKenna told Ms. Jones that he would get back to her. However, HR Representative McKenna did not follow up with Ms. Jones, nor did he respond when Ms. Jones followed up with him one week later.

118.    When she received no answer from HR Rep McKenna, Ms. Jones reported Mgr. Wighaman's harassment yet again, this time to Forest's Compliance Hotline. This was Ms. Jones' third report of the incident to the Company. During the call, Ms. Jones specifically requested that someone from Forest contact her directly. Forest's HR Department did not contact Ms. Jones until late July 2010, when HR Director Bonnie McDonald ("HR Director McDonald") set up a conference call with HR Manager Mimi Robinson ("HR Mgr. Robinson") and Ms. Jones.

119.    The conference call took place on July 28, 2010. During the call, Ms. Jones again explained Mgr. Wighaman's harassment and informed HR that certain female representatives would be willing to testify to Mgr. Wighaman's behavior. Ms. Jones also stated that she did not want Mgr. Wighaman as her team leader and that she would not feel comfortable returning to Mgr. McClung's supervision because of the way Mgr. McClung failed to properly escalate her complaint through the Company's management. At the end of the call, HR Director McDonald and HR Mgr. Robinson told Ms. Jones that Forest would investigate.

120.    HR did not contact Ms. Jones for approximately two months after the conference call, forcing Ms. Jones to continue reporting to Mgr. Wighama to the detriment of her job performance. For example, in September 2010, Ms. Jones was required to attend a Company meeting led by Mgrs. Wighaman and McClung. As part of the training, the sales representatives were expected to interact directly with Mgr. Wighaman by simulating doctor calls in front of the room. Ms. Jones was embarrassed to work with Mgr. Wighaman in front of her peers, several of whom were aware that Mgr. Wighaman had harassed Ms. Jones. The situation made Ms. Jones so uncomfortable that she could not participate and failed to complete that portion of the session.

121.    On September 22, 2010, HR met with Ms. Jones, and the fear of retaliation that had prevented her from reporting the first instance of harassment for more than two years were realized. Instead of responding to Ms. Jones' inquiry about what action Forest had taken against Mgr. Wighaman, Forest HR spent the majority of the meeting discussing Ms. Jones' work performance. Specifically, HR Director McDonald stated that Ms. Jones' performance, which had never heretofore been questioned, was an "issue that need[ed] to be resolved." That same day, Forest placed Ms. Jones on probation, but did not provide Ms. Jones with any basis for or terms of the probation. At the time Forest placed her on probation, Ms. Jones was ranked sixteenth (16th) in her region out of 100 sales representatives. As a result of her placement on probation, Ms. Jones became ineligible for merit increases, bonuses, awards, and career-advancement opportunities such as promotions, which she would have otherwise been likely to receive due to her excellent sales performance.

122.    HR also met with Mr. Gerfers, who had acted as a witness on Ms. Jones' behalf during the investigation, around this same time. Mr. Gerfers' meeting with HR similarly began with a brief discussion about the investigation and then turned towards Mr. Gerfers' own alleged

performance deficiencies. Forest placed Mr. Gerfers on probation as it had Ms. Jones, again without providing official papers documenting or outlining the terms of the probation. By contrast, Mgr. Wighaman remained employed at Forest with the same authority and privileges.

123.    Forest forced Ms. Jones to see and interact with Mgr. Wighaman until she left the Company. Ms. Jones also experienced extreme stress and anxiety because her probation threatened her job security, yet she had no way of knowing what she had to do to improve sufficiently. Fearing for her job and unable to tolerate Forest's discrimination and retaliation any longer, Ms. Jones resigned from Forest on September 27, 2010.

### D.    JENNIFER SEARD'S FACTUAL ALLEGATIONS

124.    Jennifer Seard worked as a Territory and Specialty Sales Representative for Forest in the Waco, Texas area from December 2003 until April 2011.  In 2008, Ms. Seard assumed the position of Specialty Representative working in Forest's Waco and North Austin Territories.  In February 2010, Ms. Seard returned to her former Territory Sales Representative position and remained in that position until her intolerable working conditions forced her to resign in April 2011.  Ms. Seard was consistently a top performer for Forest, and at the time she left the Company she ranked among the top twenty five percent (25%) of sales representatives nationwide.

125.    From the beginning of her career at Forest, Ms. Seard excelled. For example, in 2005 and 2006, Ms. Seard won the Career Pathway Award, the Waco Team Award, the MVP Award, and multiple Representative of the Quarter awards.   On the basis of her strong performance, Ms. Seard was promoted to Specialty Representative in February 2008, and continued to excel in her new position.

29

126.  Nevertheless, Ms. Seard was denied bonus compensation during her two maternity leaves — from March to June 2007 and from March to June 2009 — based on Forest's policy of denying bonuses to representatives on leave, even for commissions earned before the period of leave.

127.  In December 2009, Todd Allenbrand ("Mgr. Allenbrand") became Ms. Seard's Specialty Divisional Manager.  Shortly after assuming his position, Mgr. Allenbrand demanded that his representatives submit performance reports on a weekly basis, often within 24 hours of receiving weekly performance numbers from Forest.  During a conference call with his team in December 2009, Mgr. Allenbrand told his sales representatives that if they could not work three extra hours every single night then they should not be on his team.

128.  On January 5, 2010, Plaintiff Seard had her first and only ride-along with Mgr. Allenbrand.  Before the ride-along, Ms. Seard met her manager in the lobby of his hotel for a meeting in which he reviewed his "team expectations."  During this meeting, Mgr. Allenbrand asked Ms. Seard if there was any reason she could not be in the field from 8 a.m. to 5 p.m. daily.  Ms. Seard replied that there was no reason she could not be in the field during those hours.  However, she noted that her husband, a state trooper, works the night shift, and on a very rare occasion, he might be unable to return home by 7 a.m. in order to care for their children.  Ms. Seard noted that this had happened only one time in the seven years she had worked for Forest.  In response, Mgr. Allenbrand told Ms. Seard that this was "completely unacceptable" and that he would speak to Regional Director David Wright about her response.

129.  After the meeting, Mgr. Allenbrand accompanied Ms. Seard on a single sales call, which was merely a ten-minute lunch conversation with a physician.  On the basis of this one call, Mgr. Allenbrand gave Ms. Seard a Field Trip Evaluation ("FTE") rating of 2.97.  This

rating was lower than any rating Ms. Seard had received from her previous Specialty Manager, Mgr. Witcher, including her baseline score of 2.99 when she first started in the Specialty Representative position.

130.   The day after their ride-along, Mgr. Allenbrand told Ms. Seard that he had spoken with Regional Director Wright, who confirmed that it was "completely unacceptable" for her to not be the field from 8 a.m. to 5 p.m. every day of the year.  In response, Ms. Seard stressed that she had only had a conflict one time in seven years; however, Mgr. Allenbrand persisted in the conversation.  Finally, Ms. Seard asked Mgr. Allenbrand, "Are you trying to get me to step down?"  In response, Mgr. Allenbrand replied that that was something she would need to speak to her husband about.

131.   Following her January 2010 ride-along with Mgr. Allenbrand, Ms. Seard experienced a great amount of stress and anxiety due to her Manager's hostility.

132.   In February 2010, Ms. Seard requested, and was granted, a return to her prior position as Territory Representative, a position in which she again reported to Divisional Manager Austin Wighaman ("Mgr. Wighaman"), who had also been her Divisional Manager in 2007 and 2008.

133.   In February 2010, during a ride-along, Ms. Seard asked Mgr. Wighaman whether she could pursue job share so that she could spend more time with her young son, who had been diagnosed with medical conditions that required Ms. Seard to attend numerous doctors' appointments and administer medication twice a day.  In response to Ms. Seard's inquiry, Mgr. Wighaman told her "That's not going to happen" and said that Regional Director Wright would not allow it.

134.   In March 2010, Ms. Seard again asked Mgr. Wighaman how she could become

eligible for a job share position.  In response, Mgr. Wighaman reiterated that Director Wright did not allow job sharing in his region.

135.   Shortly after her second conversation regarding job share opportunities with Mgr. Wighaman in March 2010, Ms. Seard made an anonymous call to HR and asked if a regional director or manager could override corporate policies and deny opportunities offered to other Forest employees.  The HR representative answered "Yes."

136.   Despite Mgr. Wighaman's insistence that Director Wright would not allow job sharing in his region, Ms. Seard later learned that Director Wright approved a job share in another territory he supervised.

137.   From March to October 2010, Mgr. Wighaman completed an unusual number of ride-alongs with Ms. Seard and gave her FTE ratings that were significantly lower than the ratings he had given her prior to her request for a job share.

138.   On May 18, 2010, Ms. Seard and Mgr. Wighaman traveled together to make a sales pitch as part of a ride-along evaluation.  Mgr. Wighaman told Ms. Seard her decision to step down from her position as a Specialty Representative was "a kick to the stomach."  Mgr. Wighaman pressured Ms. Seard to leave Forest, including by telling her that her time at the Company was limited.  Most chillingly, he suggested Ms. Seard take up a hobby as a full-time job and told her that she "w[ould] not last another year" if she remained "unmotivated."  For the remainder of the ride, Mgr. Wighaman continued to repeat that Ms. Seard was unmotivated and had no place at Forest.

139.   Following this outburst, Mgr. Wighaman began reviewing Ms. Seard's assignments with unusual detail.  He insisted on seeing Ms. Seard's calendar of appointments several times in a month and asked for physical printouts of all her precall plans, records, and

rankings, refusing to review these matters electronically as he typically did, and had done on all previous ride-alongs with Ms. Seard.

140.   On June 20, 2010, Mgr. Wighaman completed another ride-along with Plaintiff Seard. During this call, he insisted on comparing her calendar of sales calls — which she submitted to the team on the first of every month — to the computer record of her sales calls that she made subsequently, and then questioned her intensively on every possible discrepancy. Following the June 20 field ride, Mgr. Wighaman required Ms. Seard to send her calendar to him in the middle of every month.  In addition, Mgr. Wighaman also continued to lower Ms. Seard's FTE ratings, and gave her the lowest FTE rating she had received at Forest since her first year as a brand new sales representative.

141.   Such low ratings were unjustified based on Ms. Seard's objective sales performance, as Ms. Seard not only placed in the top twenty-five percent (25%) of Forest sales representatives nationwide based on the number of sales she completed, but also ranked first in sales on Mgr. Wighaman's team. Notwithstanding Ms. Seard's high performance, the low FTE scores she received from Mgr. Wighaman served to lower her annual review score, resulting in a reduced annual salary increase as compared to her male colleagues who worked the same territory, including her territory partner Doug McLean.

142.   Under the strain of Mgr. Wighaman's discriminatory treatment, Ms. Seard began seeing her therapist more frequently and went on anti-depressants.  She also began to experience other stress-related physical symptoms for which she was forced to seek additional medical attention.

143.   On July 21, 2010, Ms. Seard called HR to express concerns about Mgr. Wighaman's behavior.  Two and a half weeks later, Ms. Seard received a call from Human

Resources Manager Mimi Robinson ("HR Mgr. Robinson").  During the call, Ms. Seard told HR Mgr. Robinson that she did not want to file a formal complaint with HR because she feared Forest would treat her the way they treated other sales representatives who raised complaints.

144.   In response, HR Mgr. Robinson changed the subject of the call from allegations of discrimination to an inquiry into Ms. Seard's performance, and demand to know what her numbers were like.  Ms. Seard felt threatened by the shift of focus from her HR complaint to her performance.  She repeatedly told HR Mgr. Robinson she did not intend to file a formal complaint and only wanted advice on how to address Mgr. Wighaman's aggression. HR Mgr. Robinson advised Ms. Seard to speak to Mgr. Wighaman.  Although Ms. Seard specifically asked HR to keep the conversation confidential, upon information and belief, Forest informed Mgr. Wighaman of Ms. Seard's report to HR Mgr. Robinson.

145.   On August 18, 2010, Ms. Seard met with Mgr. Wighaman as HR Mgr. Robinson had recommended.   During this meeting, Ms. Seard explained she felt Mgr. Wighaman was trying to manage her out of the job, and noted that this treatment only began after she voiced interest in a job-share position.  During the conversation he asked, "Are you going to call HR again?  I thought we were over that," indicating that Mgr. Wighaman had been informed about Ms. Seard's complaints.

146.   Mgr. Wighaman attempted to turn the topic of conversation to Ms. Seard's work performance.  Ms. Seard was uncomfortable reviewing her work in this hostile context and requested they discuss the matter at a later date.   However, Mgr. Wighaman demanded they continue the conversation and lost his temper when Ms. Seard refused to speak on her performance any further.  He slammed the table and said, "While you're at it, why don't you just copy HR on it?"  He flung his phone at Ms. Seard.  "In fact, why don't you just call HR and

tell them right now?" he asked before abruptly storming out of the meeting. On September 16, 2010, Ms. Seard reported this incident to HR Mgr. Robinson. She explained what had transpired, stating she found Mgr. Wighaman hostile and intimidating.

147. Mgr. Wighaman continued to criticize Ms. Seard's work without justification. He scheduled many trips to "analyze" her performance. Though a manager accompanying a sales representative would normally give a sales representative FTE ratings for every ride-along, Mgr. Wighaman did not give Ms. Seard FTE ratings for many of these trips. This left Ms. Seard with the impression that Mgr. Wighaman did not ride with Ms. Seard to evaluate her performance but to harass and intimidate her.

148. In early December 2010, Mgr. Wighaman accused Ms. Seard of not meeting minimum call averages to clients. In addition, he claimed she used too many hardcopy resources instead of computer-based resources. Ms. Seard reviewed her records, which showed that her call averages and use of paper resources were in fact not unusual compared to her peers, contrary to Mgr. Wighaman's ill-founded accusations. Ms. Seard emailed Mgr. Wighaman to ask if they could discuss these concerns, but he never replied.

149. On December 15, 2010, Ms. Seard called HR again for guidance on how to improve her relationship with Mgr. Wighaman. HR Mgr. Robinson told her that the next time she called HR, she would have to file a complaint. Further, HR Mgr. Robinson told Ms. Seard that Mgr. Wighaman's comments on the FTE reports justified the low ratings, even if Ms. Seard's sales indicated successful performance. When Ms. Seard asked why her FTE rating mattered more than her sales record, HR Mgr. Robinson said, "We're getting off track here."

150. HR Mgr. Robinson also signaled to Ms. Seard that Forest would question the quality of her work if Ms. Seard continued to contact HR by stating that HR could pull Ms.

Seard's time stamps to further investigate the quality of her performance.  Even though Ms. Seard was confident in her performance, she feared risking her job at Forest.  As a result, Ms. Seard no longer sought assistance from HR. Following Ms. Seard's December 15, 2010 conversation with HR Mgr. Robinson, HR never followed up with Ms. Seard.

151.   On January 5, 2011, Mgr. Wighaman emailed Ms. Seard, while copying Director Wright, and asserted that Ms. Seard had violated Company expense policies.  Ms. Seard immediately reviewed Forest's expense policies and contacted the Expense Department to ensure she understood the policies.  She then emailed Mgr. Wighaman to state that she had investigated the issue and concluded that she had not violated Forest policies.  Mgr. Wighaman asked her with whom she spoke in the Expense Department and failed to follow up on the accusation or indicate whether the matter would be included in her personnel file.

152.   On January 12, 2011, Mgr. Wighaman resigned suddenly from Forest. Approximately two months later, he was replaced as Division Manager by Kristi Kemp, whom Ms. Seard knew to be a close friend of Mgr. Wighaman's. Unable to tolerate further discrimination, Ms. Seard resigned in April 2011.  At the time Ms. Seard left the Company, she ranked among the top twenty-five percent of Forest sales representatives nationwide.

### E.   KIMBERLY CLINTON'S FACTUAL ALLEGATIONS

153.   Plaintiff Kimberly Clinton was hired by Forest as a Territory Sales Representative for Forest's Norwich, Connecticut territory in May 2011, and worked in that role until the discriminatory and retaliatory conduct of her male colleagues and management forced her to resign on November 30, 2012.

154.   Ms. Clinton was a strong performer throughout her employment at Forest.  In the third quarter of Fiscal Year 2012 (October-December 2011), Ms. Clinton won the Two-To-Go

Contest for being ranked third in her team for total product growth.  In the same quarter, Ms. Clinton received the highest bonus payout of any member of her team and ranked eleventh (11th) among all sales representatives in the Northeast region.   In June 2012, Ms. Clinton won the Incentive Compensation Plan ("ICP") Enhancement Competition, a six-month long competition to get the most new doctors to write prescriptions for a newly-launched medication.  Ms. Clinton also ranked in the top fifteen percent (15%) of sales representatives nationwide for the fiscal year of 2012 (April 1, 2011 – March 31, 2012).

155.   Despite Ms. Clinton's impressive sales performance, her pay lagged behind that of her male colleagues with equal or inferior qualifications from the start of her career at Forest.

156.   When Ms. Clinton was hired by Forest, her base salary was $55,000.   Upon information and belief, Ms. Clinton's male colleague, Eric Bevins, was paid a higher base salary than Ms. Clinton, even though he did not have superior qualifications, and even though Ms. Clinton and he held jobs requiring the same skills, efforts and responsibilities which they performed under similar working conditions.

157.   The salary disparity between Ms. Clinton and her male colleagues persisted throughout Ms. Clinton's time at Forest at least in part because of the Company's policy of awarding merit increases as a percentage of salary.   Under this policy, female representatives like Ms. Clinton would receive less money than their male colleagues with larger base salaries even if they were awarded the same percentage merit increase as their male counterparts.

158.   One month into her employment with Forest, Ms. Clinton attended a conference for the launch of a new product, Viibryd.   Ms. Clinton met her Divisional Manager, Steve Varellas ("Mgr. Varellas") and colleagues to discuss their progress in managed care.  Mgr. Varellas remarked that Ms. Clinton was doing well in the field and Ms. Clinton, believing that

he was referring to her previous experience in pharmaceutical sales, said, "Well, that's why you hired me!" Mgr. Varellas was drunk and replied, "That's not the only reason I hired you, honey." Ms. Clinton was disturbed by her manager's inappropriate comment and left the group.

159. Shortly thereafter, Carlos Delgado ("Mgr. Delgado") became Ms. Clinton's divisional manager.

160. In September 2011, a Connecticut/Massachusetts Field Sales Trainer role opened up in Ms. Clinton's territory. A Field Sales Trainer educates new representatives on best practices while continuing to fulfill her responsibilities as a sales representative. The position is awarded to representatives who demonstrate management potential, and is generally viewed as a stepping stone to advancement at Forest.

161. Before joining Forest, Ms. Clinton had worked as a sales representative for Shire Pharmaceuticals in Massachusetts for two-and-a-half years. When Ms. Clinton joined Forest she did so with the intention of using her past experience in the industry to advance into management. Accordingly, Ms. Clinton expressed interest in the Field Sales Trainer position to Mgr. Delgado. In response, Mgr. Delgado warned Ms. Clinton that she was competing against two very qualified candidates. Both of these candidates were male. Mr. Delgado warned Ms. Clinton that if she interviewed for the position and was viewed as insufficiently qualified, this could tarnish her reputation and standing at Forest, and saddle her with a negative perception that could follow her throughout her career. Ms. Clinton understood that Mgr. Delgado was clearly advising her not to apply. As a result of her manager's warning, Ms. Clinton did not enter the bidding process for the Field Sales Trainer position.

162. In early 2012, Ms. Clinton, a single mother, learned that her young daughter would require surgery to correct skeletal growth problems. In February 2012, she notified Mgr.

Delgado as well as the other four territory representatives who comprised her local "pod" — as Forest refers to small, local teams of representatives — about the surgery and stated that she would need to time off from work to care for her daughter.  At the time, since her daughter had not yet had surgery, Ms. Clinton did not know, and thus could not specify, exactly when or for how many days she would need to take off.

163.    Shortly after Ms. Clinton made this announcement, three male colleagues — Sales Representative Eric Bevins, Specialty Representative Jonathan Fenstad, and Sales Representative Todd Aiken (Ms. Clinton's territory "counter-part," as Forest refers to the pairs of representatives who work together and target the same physicians) — separately approached Ms. Clinton and accused her of call falsifications.

164.    Over an approximately month-long period, each one of these male representatives individually called Ms. Clinton and proceeded to interrogate her about her work performance. Each accused Ms. Clinton of falsifying calls to doctors and forging doctors' signatures on the computer system. Each time a physician accepts pharmaceutical samples from a representative, physicians must sign for those samples on a tablet computer carried by the representative. According to the representatives, Ms. Clinton had falsified the signature of several physicians, including Dr. Saul Neuman of New London, Connecticut, who was notoriously reluctant to accept pharmaceutical sales visits but who had accepted a visit from Ms. Clinton due to her effective sales strategies.

165.    In addition, Mr. Aiken and Mr. Fenstad, using extremely similar wording, both said to Ms. Clinton that "it must be very hard getting into the field on time every day as a single parent," clearly insinuating that Ms. Clinton's caregiver status rendered her a less effective

employee.   During each phone call, Ms. Clinton denied the false allegations of her male colleagues.

166.    In March 2012, Mr. Aiken and Mr. Fenstad invited Ms. Clinton to meet at the Panera Bread Company restaurant in New Lisbon, Connecticut to discuss their plans for dinner programming for the upcoming quarter.  However, when Ms. Clinton arrived for the meeting, only Mr. Fenstad was present and he informed Ms. Clinton that they were not there to discuss programming, but "something much more serious."  Mr. Fenstad then, once again, accused Ms. Clinton of falsifying sales calls and records.  He then threatened to report Ms. Clinton to management if she did not email the team with an apology that acknowledged that she had falsified her records.  Mr. Fenstad's accusations were fully audible to the other patrons in the restaurant. In response, Ms. Clinton again affirmed that she had not falsified any of her records.

167.    The following day, Ms. Clinton telephoned Mgr. Delgado and informed him of her meeting with Mr. Fenstad. In response, during a follow-up phone call held a few days later, Mgr. Delgado suggested to Ms. Clinton that she organize a team meeting to discuss the allegations.  Although Ms. Clinton said she was very uncomfortable confronting her multiple male accusers with no support from management and in front of her entire team, Mgr. Delgado refused to approach her co-workers on Ms. Clinton's behalf. However, when none of her co-workers responded to Ms. Clinton's overture, Mgr. Delgado intervened to notify the team that the meeting was mandatory.

168.    Subsequently, within a couple of weeks, Ms. Clinton's pod had a team meeting. Regional Director Tom Whitwell attended the meeting briefly, but departed after opening the meeting with a discussion of the importance of transparency, honesty and communication on a team.

169.    During the course of the meeting, Ms. Clinton's peers again accused her of misrepresenting the number of calls she made to physicians, and also criticized her for being "aggressive" with doctors.  Ms. Clinton assured her colleagues that she had not falsified any calls. Further, to demonstrate her willingness to cooperate, Ms. Clinton agreed to take action to mend relationships with any doctors she might have offended.  Everyone in attendance appeared satisfied with the outcome of the meeting.

170.    On March 26, 2012, Mgr. Delgado sent an email to his division which notified the representatives that third quarter bonus payments had ranged $1,679 to $11,576.  Ms. Clinton, who had been the top-performing representative in Mgr. Delgado's division, was the individual who had earned the top pay-out.  Despite Ms. Clinton's superlative performance, Mgr. Delgado awarded her counterpart, Representative Aiken, the Representative of the Quarter award and Regional Director Whitwell awarded Representative Aiken the Regional Representative of the Quarter award.

171.    One month later, in April 2012, Ms. Clinton received a call from Forest's Compliance Department and was notified that one of her team members had filed a complaint against her for allegedly falsifying calls to physicians.  Ms. Clinton again affirmed that she had never falsified any calls.  During her phone call with the Compliance Department, Ms. Clinton told the Compliance representative that her colleagues harassed her because she was a single mother of a sick child and they did not believe she could honestly have earned her status as a top performer.  At the time, Ms. Clinton noted that she had secured several appointments with key physicians her teammates had contacted without success, including Dr. Neuman.   Further, Ms. Clinton reported the remarks her male colleagues had made questioning her ability to manage her responsibilities as a mother and as a Forest employee.

172.    The Compliance representative made note of Ms. Clinton's complaint after she asked him for written confirmation that her complaint was on file, and told her to expect a follow-up.    However, Ms. Clinton never received a follow-up call from the Compliance Department.

173.    In May 2012, Ms. Clinton took four vacation days off to coincide with her daughter's surgery.    Ms. Clinton sought and received permission to take these days off from Mgr. Delgado, and she noted her off days on the schedule in accordance with Company policy.

174.    Ms. Clinton continued her strong sales performance despite her colleagues' discriminatory acts. Notwithstanding her impressive performance, however, on a ride along in August 2012, several times after visits with male doctors Mgr. Delgado told Ms. Clinton that she should be more "positive" and "enthusiastic" on sales appointments.    Each time, he punctuated his statement by cupping his hands underneath his chest and miming the action of a woman showing her cleavage to doctors. Ms. Clinton reported this incident to HR.

175.    On August 28, 2012, Mgr. Delgado presented Ms. Clinton with a Formal Warning Letter, explaining that it was the result of the Compliance Department's investigation.    Upon information and belief, Forest's protocol is to issue a Letter of Concern before issuing a Formal Warning Letter.    Mgr. Delgado informed Ms. Clinton that he did not know why Forest did not follow this protocol in her case. Under the terms of the Formal Warning Letter, Ms. Clinton was placed on a ninety-day probation.

176.    A Formal Warning Letter has severe consequences for a Forest employee.    The Letter becomes a part of an employee's personnel record and can be accessed when she applies for a promotion within the Company.    High-level management is also copied on the letter,

thereby negatively affecting the employee's reputation among supervisors who have authority to advance or halt her career.

177.   The Formal Warning Letter falsely alleged that Ms. Clinton had forged client signatures on calls and had acted unprofessionally during a visit to the office of Dr. Baksh.  The visit to the office of Dr. Baksh to which the Letter referred had occurred during the previous summer, when Ms. Clinton had made a sales call along with Mgr. Delgado as part of a ride-along evaluation.  When they visited the office, Dr. Baksh's secretary told them that the doctor was unavailable.  In response, Ms. Clinton left some literature and fruit for the office, and she and Mgr. Delgado departed.

178.   When Mgr. Delgado presented Ms. Clinton with the Formal Warning Letter, she asked him why it accused her of being "unprofessional" during their uneventful visit to Dr. Baksh's office.  In response, Mgr. Delgado said that the Compliance Department had instructed him to find "something" that showed Ms. Clinton had acted in an unprofessional manner, and that was what he could find.

179.   Further, Mgr. Delgado told Ms. Clinton there were four more matters for which she was under investigation, and warned her that the cumulative effect of these investigations could end in her termination.  Although the Formal Warning Letter stated that the manager and representative would develop a plan together moving forward to address specific issues, Mgr. Delgado never developed or administered a plan to rectify the issues mentioned in the letter.

180.   On August 28, 2012, Ms. Clinton filed a complaint with the Human Resources department tht alleged her co-workers had fabricated charges in an effort to bring about her termination by Forest management.  Ms. Clinton reported that her co-workers and manager discriminated against her because she was a high-performing female representative and because

she was a single working mother of a child with a medical condition, a status that her male co-workers and manager appeared to believe rendered her unable to effectively do her job.

181.    In response to Ms. Clinton's complaint, HR Associate Director Derek Jackson ("HR Associate Director Jackson") scheduled a call to follow up with Ms. Clinton two months in the future, on October 29, 2012.  Prior to the meeting, Ms. Clinton requested that HR Associate Director Jackson provide her with specific dates and times of the alleged falsified calls so that she could provide an accurate response to each one.  However, HR Associate Director Jackson replied that he could not do so.

182.    In the meantime, rumors swiftly began to spread regarding Ms. Clinton's imminent termination from Forest.  For example, on August 30, 2012, one of Ms. Clinton's physician clients expressed surprise to see her because someone had told him that she was no longer with the Company.

183.    On September 13, 2012, Ms. Clinton visited the office of Dr. Saul Neuman, who had accepted pharmaceutical samples from her on one occasion.  Dr. Neuman signed a letter stating that he recalled seeing Ms. Clinton in the past concerning Viibryd and signing for samples, though he could not recall the exact date.  After obtaining the letter from Dr. Neuman, Ms. Clinton sent an email to several managers, including Mgr. Delgado, informing them of the letter and Dr. Neuman's attestation therein.

184.    In the meantime, as Ms. Clinton awaited a response from HR, her manager and teammates retaliated against her for lodging a complaint, including by ignoring Ms. Clinton's business communications.   For example, on October 16, 2012, Ms. Clinton sent a text message to Mgr. Delgado about attending an upcoming Con Med Committee's formulary review meeting, a meeting which could have impacted the standing of the team's products.  Ms. Clinton never

received a response from Mgr. Delgado.  Also on October 16, 2012, Mr. Aiken ignored a text message from Ms. Clinton alerting him of a meeting with a high prescriber.  On October 23, 2012, Ms. Clinton emailed Mr. Aiken, Mr. Fensted and Mgr. Delgado about an opportunity to access prescribers who could possibly expand the market for Forest's products.  None of the three men responded.

185.    On October 29, 2012, Ms. Clinton spoke to HR Associate Director Jackson by phone about her Formal Warning Letter and her complaint of discrimination.  During the call, HR Associate Director Jackson admitted that according to the Compliance Department's own investigation — which was conducted before the issuance of the Formal Warning Letter on August 28, 2012 — there was **no factual basis** for the allegation that Ms. Clinton had falsified signatures from doctors.  HR Associate Director Jackson further admitted that although it was his job, he had not reviewed the Formal Warning Letter for accuracy before he released it.  Accordingly, he agreed to remove the forgery accusation from the Formal Warning Letter.  Despite this glaring error and HR Associate Director Jackson's admission, however, Ms. Clinton remained on probation.  HR Associate Director Jackson told her that she remained on probation because of the other accusations in the letter that she was unprofessional and had falsified sales calls.

186.    During her call with HR Associate Director Jackson, Ms. Clinton expressed her concern over the breakdown in communication between her and the team.  HR Associate Director Jackson suggested that the breakdown of trust was due to the rumors of falsified calls.  However, Associate Director Jackson failed to propose ways of correcting this damaging misperception among Ms. Clinton's teammates.

187.    Ms. Clinton also told HR Associate Director Jackson that she was uncomfortable traveling alone with Mgr. Delgado ever since he made the sexually suggestive breast-cupping gesture.  HR Associate Director Jackson informed Ms. Clinton that while she could request to ride separately from Mgr. Delgado, there might be repercussions to her FTE score for doing so. He claimed that Forest had investigated the matter and could find no sign that Mgr. Delgado had behaved as she had reported.  HR Associate Director Jackson assured Ms. Clinton that he had personally spoken to Mgr. Delgado and instructed him to limit non-essential business communication with her.

188.    On November 1, 2012, Ms. Clinton had a mid-year ride-along with Mgr. Delgado. Mgr. Delgado gave Ms. Clinton a Field Trip Evalation ("FTE") rating of 2.87, the second-lowest FTE score Ms. Clinton received since she complained of discrimination and harassment to HR. Before Ms. Clinton filed the complaint, Mgr. Delgado had rated her at 2.94, 2.96, and 3.02, which were approximately average scores within her team.

189.    These low FTE scores from Mgr. Delgado, combined with her Formal Warning Letter, placed Ms. Clinton at risk for further disciplinary action.   While on probation, a representative must receive ratings no lower than "Meets Standards" (3.0) or risk termination. Even worse, Ms. Clinton noticed glaring inconsistencies in the written FTE.  In one section, Mgr. Delgado reported that her daily call average was below expectation, at six calls per day. However, in another section of the same report, he reported that that her daily call average was 10.4 calls per day.  Further, Mgr. Delgado stated that Ms. Clinton's "closing" in sales pitches was weak and needed improvement.   However, this critique directly contradicted Mgr. Delgado's comments on past FTEs, in which he noted that "closing" sales was a strength of hers.

46

190.    Nonetheless, rather than capitulate to the pervasive negativity she faced at Forest, Ms. Clinton continued to take initiative to improve her team's performance with the goal of lifting her probation.  In about October 2012, Ms. Clinton completed a highly successful eleven-week contest, which she designed and implemented, to help grow the field for Bystolic. Although Mgr. Delgado had told Ms. Clinton she would earn 100 FRX points and a higher FTE score upon successful completion of the contest, he did not provide these promised benefits.

191.    Further, during this same period, Ms. Clinton worked doggedly to get Viibyrd, for which she ranked second on her team, accepted into Connecticut's Medicaid program. Subsequently, Management allowed Mr. Fenstad to run a contest for Viibryd that mirrored Ms. Clinton's previous program with Bystolic and gave him credit for the contest without giving Ms. Clinton any credit for her work in growing Viibryd.

192.    Despite objective evidence of Ms. Clinton's strong performance, including her development of innovative programs that improved sales in her territory, Forest kept Ms. Clinton on probation.  On the afternoon of November 30, 2012, Mgr. Delgado called Ms. Clinton to request a meeting for the following morning in order to give Ms. Clinton a Final Written Warning.  Ms. Clinton knew based on Forest policy and Mgr. Delgado's prior representation that the Final Written Warning was in effect a notice of impending termination. Unwilling to endure the very face-to-face meeting with her hostile manager that she had told HR Associate Director Jackson that she wished to avoid, and with no possible positive outcome remaining for her at Forest, Ms. Clinton resigned that same evening.

F.    ERIN ECKENRODE'S FACTUAL ALLEGATIONS

193.   Plaintiff Erin Eckenrode was a Territory Representative for Forest's Harrisburg, Pennsylvania Territory from October 2003 to January 2004.  Forest moved Ms. Eckenrode to the York, Pennsylvania Territory from January 2004 to August 2011, during which she was a Field Sales Trainer between 2005 and 2006.  Ms. Eckenrode was promoted to Specialty Sales Representative for the Harrisburg, Pennsylvania Territory in August 2011 and remained in that role until May 2012, when, seven-and-a-half-months pregnant, she left the Company to take a position with the flexible working schedule she had been unable to obtain at Forest.

194.   During her first two years at the Company, Ms. Eckenrode grew the market for one of her drugs by seven percent (7%), far exceeding the typical successful growth rates of one to two percent (1-2%).

195.   Prior to Ms. Eckenrode's return from maternity leave in 2010, she won numerous awards for her impressive performance at Forest.  Ms. Eckenrode received the prestigious President's Club award for Fiscal Year ("FY") 2006 (April 1, 2005 – March 31, 2006) for placing in the top five percent (5%) of sales representatives nationwide, and also won Representative of the Quarter awards in the first quarter of FY 2006 (April – June 2005), the second quarter of FY 2006 (July – September 2005), the first quarter of FY 2009 (April – June 2008), and the second quarter of FY 2010 (July – September 2009).

196.   In recognition of Ms. Eckenrode's impressive achievements, Forest management selected Ms. Eckenrode to participate in development committees, including the Mid-Atlantic Committee Board and the Field Advisory Board, a committee tasked with improving field sales tactics throughout the Company.

197.    Even though Ms. Eckenrode's sales performance was excellent, her pay lagged behind that of her equally or less qualified male colleagues from the start of her career at Forest.

198.    For example, when Ms. Eckenrode was hired by Forest as a Territory Representative in York, Pennsylvania, her base salary was $42,000.   Upon information and belief, Ms. Eckenrode's male colleagues Aaron Maguill, a Territory Representative in York, Pennsylvania, Edward Smith, a Territory Representative in York, Pennsylvania, and Randy Otte, a Territory Representative in Johnstown, Pennsylvania, were paid higher base salaries than Ms. Eckenrode, even though they did not have superior qualifications, and they worked under similar conditions in positions that required the same skills, efforts and responsibilities as Ms. Eckenrode's.

199.    The salary disparity between Ms. Eckenrode and her male colleagues was perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary.   Under this policy, female representatives like Ms. Eckenrode, even if they were awarded the same percentage merit increase as their male counterparts, would receive less money than their male colleagues with larger base salaries.

200.    Despite Ms. Eckenrode's track record of success, Forest failed to promote her for nearly a decade while promoting less qualified men in her stead.

201.    For example, Ms. Eckenrode was initially hired to work in Harrisburg, Pennsylvania in October 2003, but then was moved to York, Pennsylvania in January 2004 to take over that territory from Mike Rooney, a sales representative who had been underperforming. Forest then moved Mr. Rooney into Harrisburg, the higher-performing territory of the two.

202.    However, in January 2007, when Ms. Eckenrode applied for a promotion to Hospital Sales Representative based in the vicinity of Allentown and Harrisburg, Pennsylvania,

Forest management gave the position instead to Mr. Rooney, who had not won President's Club and had not performed as well as Ms. Eckenrode.

203.    One of Ms. Eckenrode's male colleagues, Kurt Koennecke, subsequently told Ms. Eckenrode that it was well known at Forest that the hiring manager, Timothy Schmidt, had already decided to promote Mr. Rooney to the position even before Ms. Eckenrode interviewed.

204.    In February 2010, Ms. Eckenrode applied for a Specialty Sales Representative position when she was visibly pregnant.  The Specialty Sales Representative position would have increased Ms. Eckenrode's base salary by six to eight percent (6-8%).  Ms. Eckenrode's bonuses also would have been significantly higher, since Specialty Sales Representatives cover larger territories than Territory Representatives and are assigned physicians who prescribe more often, thereby generating more revenue for the Company.

205.    Other applicants for the Specialty Sales Representative position included one male and two female sales representatives.  Of the four applicants, Ms. Eckenrode was the only candidate who had won a President's Club award.  Ms. Eckenrode also had the longest tenure at Forest among the candidates, and, at the time of her application, was the highest-ranking applicant.  She was also the only applicant who was pregnant.

206.    Despite Ms. Eckenrode's superior qualifications, the position was given to Elizabeth Shover, a female representative who was not pregnant.  Ms. Eckenrode had won the President's Club award while Ms. Shover had not; Ms. Eckenrode's tenure was a year-and-a-half longer than Ms. Shover's; and Ms. Eckenrode had experience selling one of the target drugs, Savella, while Ms. Shover did not.  In addition, Ms. Eckenrode had significantly more years of experience selling Lexapro, for which the specialty position was primarily responsible.

50

207. After Forest management denied her the promotion to Specialty Sales Representative, Ms. Eckenrode asked hiring manager Jason Siegel ("Mgr. Siegel") why she was not awarded the position so that she could learn how to improve her chances of obtaining a promotion in the future. Mgr. Siegel became irate and replied that he did not have to justify his decision to her.

208. In or around late 2010 or early 2011, Ms. Eckenrode and Territory Representative Julie Smyth together informally inquired with Forest management about a job share opportunity.

209. Initially, Mgr. Lisa Bair told Ms. Eckenrode and Ms. Smyth that they were the "right pair" and could pursue the job share. Believing they had Forest management's support for the job share, Ms. Smyth and Ms. Eckenrode made a formal request for a job share opportunity in or around February or March 2011.

210. Ms. Eckenrode and Ms. Smyth were especially qualified for a job share position because they had worked in the same territory, had a friendly working relationship with one another, and were both strong performers.

211. However, Forest denied Ms. Eckenrode and Ms. Smyth's request later that month. Each of the women's divisional managers provided a different reason for the denial. Ms. Smyth's manager, Chris Devennie, claimed that Ms. Eckenrode's manager, Lisa Bair, was opposed to supervising a job share in her territory, whereas Mgr. Bair insisted that while she would have supported the job share, Forest upper management did not want it. However, neither manager affirmed that he or she had forwarded the application to their superiors, the Regional or Area Business Directors, as is customary for job share requests.

212. When Ms. Eckenrode asked Mgr. Bair why her job share request had been denied, Mgr. Bair instructed Ms. Eckenrode to be professional and accept management's decision.

Although job shares are offered and promoted as part of "work/life balance" at Forest, Mgr. Bair then added that if Ms. Eckenrode wanted to work part-time or share a job, she needed to seek employment elsewhere.

213.   After Ms. Eckenrode requested a job share, Mgr. Bair began disparaging her to a new sales representative in the division, Erin Rupp, by claiming that Ms. Eckenrode had a "poor attitude" and needed to give up her disappointment over the denial of the job share.  Mgr. Bair's complaints to Ms. Rupp about Ms. Eckenrode were so incessant that Ms. Rupp eventually felt compelled to tell Mgr. Bair to stop making such unprofessional comments.

214.   Despite Ms. Eckenrode's quantitative success, she feared that her job was in jeopardy because of Mgr. Baird's discriminatory behavior and comments.  Ms. Eckenrode called Human Resources Representative Shannon Atterbury ("HR Rep. Atterbury") on three separate occasions to report Mgr. Bair's comments and behavior, and her fear of retaliation.   Ms. Eckenrode got no response to her initial complaints, so on March 28, 2011, she wrote a letter to HR Rep. Atterbury reiterating her concerns.  Ms. Eckenrode never received a response from Forest.

215.   In August 2011, Ms. Eckenrode applied for another Specialty Sales Representative position to sell three drugs.  The other candidate was a male Territory Sales Representative, Edward Smith, who had no history selling one of the relevant drugs and had limited experience with the other two.  In contrast, Ms. Eckenrode had more than seven years of field experience selling two of the drugs, and was trained in the sale of the third drug.  Ms. Eckenrode had higher sales numbers and at least three years' more experience at Forest than Mr. Smith as well as a President's Club win.

216.   However, although Ms. Eckenrode was clearly the best candidate for the position, Hiring Manager Roy did not select her after the interview, but subjected her to three additional telephone interviews that included questions regarding her interest in a job share and potential pregnancy and caregiver status, as well as comments about women becoming pregnant.

217.   During one of these calls, Hiring Manager Roy told Ms. Eckenrode that Regional Director Bill Johnson told him that Ms. Eckenrode had previously applied for, and been denied, a job share.  Mr. Roy asked, "Why would you now want to go for a promotion if you pursued a job share?"  Ms. Eckenrode assured him that she would not have pursued the promotion unless she was committed and capable of succeeding in the position.  During another of these calls, Mr. Roy lamented to Ms. Eckenrode that "everybody who works for me gets pregnant."  Again, Ms. Eckenrode reassured Mr. Roy that she was fully committed to the position.

218.   Only after overcoming these additional rounds of gender-based interrogations, notwithstanding her undeniably far superior qualifications, was Ms. Eckenrode ultimately selected for the Specialty Sales Position.

219.   Thus, it took Ms. Eckenrode nearly a decade to obtain a promotion at Forest, although the Company promoted her male colleagues at faster rates.  At the time Ms. Eckenrode left Forest, men were disproportionately represented among managers in her division.  The Regional Director was a man; both Specialty Sales Managers were men and three out of four divisional managers were men.

220.   One of the divisional managers was Chris Devennie, who rose swiftly through the ranks after joining Forest within one month of Ms. Eckenrode.  Despite the fact that Mr. Devennie had never won a President's Club award, Forest promoted him to Specialty Sales Representative in 2008, and then to Divisional Manger a mere year later.

53

221.    Upon information and belief, from August 2011 to May 2012, when Ms. Eckenrode was a Specialty Sales Representative in Harrisburg, Pennsylvania, Forest paid her less than similarly-situated males such as Randy Otte, a Specialty Sales Representative in Johnstown, Pennsylvania, and Steven Gross, a Specialty Sales Representative based near Washington, D.C. These men did not have superior qualifications, and they held jobs requiring the same skills, efforts and responsibilities which they performed under similar working conditions as Ms. Eckenrode.

222.    Ms. Eckenrode served Forest as a Specialty Sales Representative for nine months, during which time she continued to improve her already stellar record.  She launched a new drug and sustained sales for two other drugs, all while leading eight sales representatives and calling on more than 300 physicians in two territories.  Ms. Eckenrode continued to achieve all her sales goals, advance in the rankings, and receive praise from her customers.

223.    However, after becoming pregnant for a second time, Ms. Eckenrode resigned from Forest in May 2012 and accepted a much lower-paying position that would allow her a more flexible working environment.  At the time of her resignation, Ms. Eckenrode, seven-and-a half -months pregnant, was the only representative in her division in the top twenty-five percent (25%) for a lead product.

### G.    JULIE SMYTH'S FACTUAL ALLEGATIONS

224.    Plaintiff Julie Smyth was employed by Forest from May 2005 until September 2012, when the Company forced her to resign.

225.    Ms. Smyth was a Territory Representative for Forest in Hershey, Pennsylvania from May 2005 to August 2006.  In September 2006, she was promoted to Specialty Sales Representative for the Harrisburg/York, Pennsylvania territory, in which capacity she worked

until January 2010.  After Forest advised Ms. Smyth that she must accept a demotion in order to apply for the Company's job share program, she then served as a Territory Representative from February 2010 until she resigned in August 2012 because Forest continually had denied her job sharing.

226.   Ms. Smyth reported to Divisional Manager Scott Youmans from May 2005 to August 2006, Divisional Manager Michael Cullison ("Mgr. Cullison") from September 2006 to May 2009, Divisional Manager Jason Siegel ("Manager Siegel") from June 2009 to January 2010, and Divisional Manager Chris Devennie ("Mgr. Devennie") from approximately February 2010 to August 2012.

227.   In her first year at Forest, Ms. Smyth immediately distinguished herself among her incoming class of more than 100 sales representatives by winning the Leadership Award, an honor given to one member of the training class.  Throughout her tenure at Forest, Ms. Smyth was continually recognized for her sales performance, and won Representative of the Quarter awards in the third quarter of Fiscal Year ("FY") 2006 (October – December 2005) and the second quarter of FY 2011 (July – September 2010).  In the first quarter of FY 2008 (April – July 2007), she won the Regional Representative of the Quarter award out of the approximately 100 representatives in her region.

228.   Despite Ms. Smyth's impressive sales performance, however, her pay lagged behind that of her equally and less qualified male colleagues from the start of her career at Forest.  For example, when Ms. Smyth was hired by Forest, she was given a base salary of $46,000.  Upon information and belief, Ms. Smyth's male colleague, Territory Representative Peter Regan, was paid a higher base salary than Ms. Smyth, even though he did not have superior qualifications, and even though Ms. Smyth and he held jobs requiring the same skills,

efforts and responsibilities, which they performed under similar working conditions.  Further, Mr. Regan joined Forest approximately four months after Ms. Smyth and at that time Ms. Smyth had approximately three years of sales experience, whereas Mr. Regan had no prior sales experience.

229.   The salary disparity between Ms. Smyth and her male colleagues was perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary.  Under this policy, female representatives like Ms. Smyth, even if they were awarded the same percentage merit increase as their male counterparts, would receive less money than their male colleagues with larger base salaries.

230.   In 2006, Ms. Smyth was promoted to Specialty Sales Representative.  Ms. Smyth excelled during her tenure as a Specialty Sales Representative, including by ranking in the top eight percent (8%) of the nation's sales representatives in FY 2008, when she also won a Regional Representative of the Quarter award.

231.   After unsuccessfully applying for a Divisional Manager position in 2008, Ms. Smyth followed the recommendation of Hiring Manager Gerhard Shulz to gain more experience and seek opportunities at Forest to build her resume by applying to become a Regional Sales Trainer ("RST"), a position between Sales Representative and Divisional Manager.

232.   In or around November or December 2008, Ms. Smyth applied for a Regional Sales Trainer position.  At the time, Ms. Smyth was one of Forest's top sales representatives nationwide, and also the top performing sales representative in her region.

233.   When Ms. Smyth contacted Manager Cullison to express her interest in the RST position, he neither encouraged nor actively discouraged her from applying.  However, a few days later, shortly before Ms. Smyth was scheduled to interview for the position, Mgr. Cullison

told Ms. Smyth that the "timing was not right" for her to seek the position.   His negative reaction deeply affected Ms. Smyth as she prepared to interview for the promotion.

234.   Several months later, the Regional Sales Trainer position was awarded to Ms. Smyth's colleague Paul Lewis, a male specialty representative based in Washington, D.C. who also reported to Mgr. Cullison.  Upon information and belief, Representative Lewis had inferior sales performance to Ms. Smyth the year prior to the interview, as well as a shorter tenure as a specialty representative.

235.   From Ms. Smyth's observations and experience at Forest, hiring managers have a practice of consulting with Divisional Managers about their performance reviews and assessments of candidates for promotion.  As a result, a Divisional Manager's support is an important factor in obtaining a promotion.  Upon information and belief, Ms. Smyth's divisional manager, Mgr. Cullison, did not support Smyth for the promotion, while supporting Paul Lewis despite his inferior sales performance.

236.   Ms. Smyth learned that she did not receive the RST position in a phone call from Hiring Manager Brian Belak. At the time, Ms. Smyth was on a ride-along with Mgr. Cullison and they were in a meeting to discuss his evaluation of the ride-along.  After Ms. Smyth told him that she had not received the promotion, Mgr. Cullison sat silently for twenty minutes, typing on his laptop and then asked Ms. Smyth to step down from her position as a Specialty Sales Representative.  Mgr. Cullison claimed that Ms. Smyth was not "urgent enough" with her clients and would do better in the Territory Representative position.

237.   At the time of Mgr. Cullison's request, Ms. Smyth was rated at least among the top half of specialty representatives in her division.  Moreover, she had been ranked the number one specialty representative in her division for FY 2008.

238.   Ms. Smyth replied that stepping down was not an option for her, as she wanted to continue to seek promotional opportunities and was already a leader at Forest.   In response, Mgr. Cullison said that if Ms. Smyth did not agree to step down, he would gradually lower her ride-along scores until she received a Letter of Concern that would effectively place her on probation.   Mgr. Cullison then gave Ms. Smyth the lowest ride-along score she had received to date.

239.   Later that day, Ms. Smyth reported Mgr. Cullison's statements to Regional Director Bill Johnson via a voicemail message.   The next day, Regional Director Johnson informed her that he did not agree with Mgr. Cullison's decision and would communicate his disapproval to Mgr. Cullison.

240.   Mgr. Cullison called Ms. Smyth later that day, retracted his request that she step down, and promised to provide her with the career development training she sought.   However, despite repeated requests, Ms. Smyth has never received any career development training from Mgr. Cullison.

241.   In contrast to Ms. Smyth's unsuccessful efforts to progress into a management position, male Territory Representatives in Ms. Smyth's division advanced quickly through the ranks at Forest, despite their lack of superior sales performance or tenure.   Upon information and belief, Mgr. Cullison rose from a Territory Representative to Divisional Manager within five years of joining the Company. Similarly, upon information and belief, Chris Devennie, originally a Territory Representative in Ms. Smyth's region, rose from Territory Representative to Regional Sales Trainer within five years of his start at Forest.

242.   Further, Brandon Devennie, also a Territory Representative in Ms. Smyth's region, rose from Territory Representative to Divisional Manager within five years of his start

at Forest.  Moreover, Brandon Devennie was promoted directly to Divisional Manager from the Specialty Representative position.

243.   Upon information and belief, at the time Brandon Devennie was promoted to Divisional Manager, Forest did not advertise the position or interview other candidates for the position.  Although Forest has a standard practice of emailing out all open positions to sales representatives on a weekly basis, neither Ms. Smyth nor several colleagues saw the position posted in an e-mail.  In addition, Ms. Smyth never heard of anyone interviewing for the position, even though she was generally aware of such interviews.

244.   Despite Ms. Smyth's lack of advancement, she remained fully committed to developing professionally at Forest.  In 2008, she earned a Master of Business Administration degree from Temple University while working as a full-time sales representative.

245.   In early 2009, Ms. Smyth became pregnant with her first child.  During ride-alongs with Ms. Smyth during her pregnancy in 2009, both her Divisional Manager and Regional Director made inappropriate comments that made her extremely uncomfortable.   For example, during several ride-alongs during her pregnancy, Mgr. Siegel told Ms. Smyth that she would "never" get her body back after she had kids and noted that he had paid over $20,000 to get his wife a "mommy makeover" after she had children.  During another ride-along, Regional Director Bill Johnson told Ms. Smyth that he hoped she would get "real big" because he "loved" pregnant women and, shortly before they were to do a sales visit with a physician, said that she was "young" and "attractive" and really needed to "work it."

246.   From November 2009 to January 2010, Ms. Smyth went on maternity leave.

247.   In January 2010, shortly before returning to Forest from maternity leave, Ms. Smyth asked about a job share opportunity that was available in her region in order to

accommodate her new child-care responsibilities.  Unfamiliar with the application process for the position, Ms. Smyth asked her manager, Jason Siegel, how to apply.  Mgr. Siegel explained that Company policy permits only Territory Representatives to apply for job shares, so Ms. Smyth would have to step down from her Specialty Sales Representative role to be eligible. At the same time, Mgr. Siegel told Ms. Smyth that he would "fully support" her application for a job share.

248.   Based on Mgr. Siegel's representation, in March 2010 Ms. Smyth stepped down from the Specialty Sales Representative position and became a Territory Representative, shortly before she and another female sales representative made a formal request for a job share opportunity.   Because specialty sales representatives earn greater bonuses than territory representatives, her move from Specialty Sales Representative down to Territory Sales Representative resulted in the loss of $5,000 to $7,000 per quarter in commissions and bonuses. In addition, she was not eligible for an annual merit increase for the year in which she stepped down from Specialty Sales Representative to Territory Sales Representative.

249.   Forest subsequently denied Ms. Smyth's request for the job share.  When Ms. Smyth asked her Mgr., Chris Devennie, why the job share had been denied, he told her that Regional Director Bill Johnson did not want to approve a second job share opportunity in the region even though an Human Resources ("HR") representative confirmed with Ms. Smyth that two job shares per region were permitted.

250.   With this information from HR, in or about February 2011 Ms. Smyth submitted a second request for a job share opportunity.  She applied with Ms. Eckenrode, a Territory Representative who had worked in her territory and was familiar with the physicians in her

region.  Because of their familiarity with the territory and physicians, Ms. Smyth believed that this application would satisfy any of management's concerns.

251.  Ms. Smyth's second application for a job share was also denied.  Ms. Smyth's manager, Chris Devennie, said Ms. Eckenrode's manager, Lisa Bair, was opposed to supervising a job share in her territory.

252.  Even as Ms. Smyth maintained her full-time position at Forest, she saw her pay decline after returning from maternity leave in January 2010.  Prior to taking maternity leave from November 2009 through January 2010, Ms. Smyth received annual raises, which Forest referred to as a "merit increase," of up to ten percent (10%) per year, and no less than six to seven percent (6-7%) in any given year.

253.  For FY 2011, Ms. Smyth received no annual raise because her move from specialty sales representative down to territory sales representative made her ineligible for an increase.  For FY 2012, Ms. Smyth received an annual increase of just 2.3%, or approximately $2,400, even though her sales performance placed her in the top quartile of all sales representatives nationwide.

254.  From January 10, 2011 to April 1, 2011, Ms. Smyth went on a second maternity leave.

255.  Ms. Smyth learned of her exceeding low merit increase for the FY 2012 in an email sent by Mgr. Devennie in September 2011.  Previously, Ms. Smyth was always told the amount of her annual merit increase during a direct conversation with her manager, which also included feedback including her performance.

256.  In May 2012, Ms. Smyth submitted a third proposal for a job share opportunity to accommodate the needs of her infant son, who had recently been diagnosed with severe asthma

and required extensive daily care.  She applied with Territory Representative Betsy Bjorkman and the pair proposed a detailed plan of action, which included contingency plans should the job share interfere with targeted sales goals.  In the proposal, Ms. Smyth and Ms. Bjorkman agreed to dissolve the job share if their Divisional Managers no longer found it to be an effective arrangement.

257.   Like the previous two applications, Ms. Smyth's third application for a job share also was denied. Several weeks later, during a regional meeting in York, PA., Regional Director Johnson informed Ms. Smyth that employees must achieve an "annual score" of at least 3.5 in order to be eligible for job shares, suggesting that either Ms. Smyth or Ms. Bjorkman had an annual score below 3.5.  Having never previously heard of an "annual score" and not knowing what hers was, Ms. Smyth called the Human Resources department to ask how to obtain it.  HR referred her back to Mgr. Devennie, who stated that he did not have the score but assured her he had rated her above 3.5.  When Ms. Smyth called HR to report that Mgr. Devennie did not have her annual score either, she was redirected to Forest's Sales Administrative Department. However, Ms. Smyth never was provided her annual score.

258.   Although Ms. Smyth continued to meet and exceed expectations, by August 2012 she concluded that although she did not want to leave her employment at Forest, she could not continue without the job sharing she had been denied.  Thus, she reluctantly resigned, but indicated her desire to return to employment at Forest "[i]f the opportunity to job-share is reconsidered."

259.   At the time that Ms. Smyth left Forest, men were disproportionately represented on the leadership team of her division, accounting for eight out of ten Divisional Managers.

Further, upon information and belief, the two women who served as Divisional Managers were in their forties and did not have young children.

### H.   MARIE AVILA'S FACTUAL ALLEGATIONS

260.   Plaintiff Marie Avila was a Territory Representative for Forest's South Bay, Los Angeles territory from June 2010 through August 2011, when she was forced to resign.

261.   Ms. Avila performed exceedingly well as a sales representative for Forest. Throughout her time at the Company, she steadily improved the ranking of her territory, and ranked in the top five percent (5%) of sales representatives nationwide at the time of her departure from the Company.

262.   Despite Ms. Avila's impressive sales performance, however, her pay lagged behind that of her equally or less qualified male colleagues from the start of her career at Forest.

263.   For example, when Ms. Avila was hired by Forest, her base salary was approximately $55,700. Upon information and belief, Ms. Avila's male colleague Travis Alexander was paid a higher base salary than Ms. Avila, even though he did not have superior qualifications, and even though Ms. Avila and he held jobs requiring the same skills, efforts and responsibilities which they performed under similar working conditions

264.   The salary disparity between Ms. Avila and her male colleagues was perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary.  Under this policy, female representatives like Ms. Avila, even if they were awarded the same percentage merit increase as their male counterparts, would receive less money than their male colleagues with higher base salaries.

265.   Throughout Ms. Avila's tenure at Forest, she reported to Divisional Sales Manager Raymond Gerace ("Mgr. Gerace").   Mgr. Gerace oversaw ten Territory Sales

Representatives.   Only Ms. Avila and one other representative reporting to Mgr. Gerace had children.

266.   Initially, Mgr. Gerace gave Ms. Avila positive feedback about her performance. Specifically, in both August 2010 and September 2010, Mgr. Gerace told Ms. Avila that her performance was satisfactory.

267.   During the week of October 11, 2010, Ms. Avila had a ride-along with Mgr. Gerace.   At the time, Ms. Avila had two young children, so she asked about job share opportunities in her territory during the field ride.

268.   Mgr. Gerace denied Ms. Avila's job share request and instead questioned her commitment to her job by suggesting, "Maybe this job isn't for you if you're not committed." He told Ms. Avila that she would need to choose work over family in order to succeed as a Territory Sales Representative.   According to him, her new reality after an 8:30 a.m. to 5 p.m. work day would be coming home, kissing her kids, and saying, "Mommy has more work to do."

269.   The next day, during the second half of their ride-along, Mgr. Gerace gave Ms. Avila her performance evaluation, and gave her a low Field Trip Evaluation ("FTE") rating of 2.33.   FTEs are manager-supplied performance assessments through which divisional managers rate their sales representatives.   Under Forest policy, low FTE scores contribute significantly to a sales representative's annual review, which in turn is a basis for determining a sales representative's bonus compensation.

270.   Mgr. Gerace told Ms. Avila that she was not adequately progressing and warned that he would likely extend her probation.   Although it is customary for Forest employees to be on probation for the first six months of their employment, there was no reason to extend Ms. Avila's probation beyond the standard six months.

271.   In light of Mgr. Gerace's criticisms, Ms. Avila asked what exactly she needed to do to successfully end her probation.   Mgr. Gerace informed her that she needed to get three of her products selling in the top fifty percent (50%) of Forest's pharmaceutical sales — even though no sales representative in recent memory had ever achieved that standard.

272.   In addition, Mr. Gerace assigned Ms. Avila administrative tasks which he did not assign to any other of his direct reports.  For example, he required her to send a weekly update to the team each Sunday night via email, which included a detailed overview of doctors' prescribing trends.   Further, he required her to leave a weekly voicemail for him which consisted of a "success story" — a detailed overview of a particularly successful visit with a physician. These additional assignments required Ms. Avila to work two to three hours more per week than her co-workers worked.

273.   In direct contrast to the low scores she received from Manager Gerace, Ms. Avila continued to meet high performance standards by increasing her rank with strong sales results each month.  Ms. Avila placed in the top five percent (5%) of sales representatives nationwide.

274.   In addition, Ms. Avila met the ambitious sales performance targets Manager Gerace had imposed. By December 2010 all three of her products were selling in the top fifty percent (50%) of Forest's pharmaceutical sales. Ms. Avila also consistently provided the additional weekly reports requested by Manager Gerace.

275.   Despite these accomplishments, in December 2010, when Ms. Avila's customary probation was set to end, Manager Gerace extended her probation by three additional months. He claimed that she was not "progressing adequately," even though he had refused to go on any additional ride-alongs, as requested by Ms. Avila, in order to evaluate her progress.

276.   Meanwhile, Ms. Avila's team members who were also new to Forest — none of whom had children — were promptly taken off probation at the end of their first six months at the Company.

277.   Due to the stress of her unjustified probation, in January or February 2011, Ms. Avila was prescribed the anti-depressant Lexapro by her primary-care physician.

278.   In addition, following the extension of her probation in December 2010, Ms. Avila contacted Forest's Human Resources Department ("HR") in New York to complain of Mgr. Gerace's treatment of her.  Ms. Avila's report was transferred to HR Representative Mimi Robinson, but no one in HR followed up on her complaint.

279.   Ms. Avila subsequently complained to HR a second time in January 2011 after Mgr.  Gerace's harassment and negative comments persisted.  Ms. Avila asked Regional HR Director Bonnie McDonald to investigate her claims; however, HR Director McDonald instead proposed a conference call with Mgr.  Gerace.  Ms. Avila protested that a conference call would only exacerbate the problems she was having with Mgr.  Gerace; however, with no other option available to her, she agreed to what HR Director McDonald proposed.   During the telephone call with Mgr.  Gerace and Ms. McDonald, Ms. Avila explained how Mgr.  Gerace had set unusually high goals for her to get off probation, and extended her probation even though she achieved those goals.  She added that Mgr.  Gerace extended her probation only after she had inquired about job shares.

280.   Ms. Avila requested to have a new manager conduct her field rides so as to receive an unbiased evaluation.  HR Director McDonald denied the request but informed Ms. Avila that she would soon have a new manager anyway because of a realignment in the

Company.  HR Director McDonald also informed Ms. Avila that she would still be on probation under her new manager.

281.   In addition to complaining to Forest HR, Ms. Avila also reported Mgr.  Gerace's unfair evaluations of her to Mgr.  Gerace's supervisor, Regional Manager Chris Sweeney ("Regional Mgr. Sweeney"), on January 25, 2011.   After reviewing Ms. Avila's records, Regional Mgr. Sweeney agreed that Ms. Avila was performing according to Company standards.

282.   Nevertheless, in approximately April 2011, Mgr.  Gerace extended Ms. Avila's probation for a second time.

283.   On April 12, 2011, Ms. Avila sent an email to HR Director McDonald reiterating her concerns that Mgr.  Gerace was subjecting her to "gender bias/discrimination."

284.   Further, in the spring of 2011, a Specialty Representative position opened up in Ms. Avila's territory.  However, Ms. Avila was ineligible to apply for this position due to her continued probation.  But for the impediment of her probationary status, Ms. Avila would have applied for the Specialty Representative position.

285.   Instead, Forest promoted Territory Sales Representative Travis Alexander, a male in his mid-twenties who joined Forest at same time as Ms. Avila.  Ms. Avila believes that her sales performance surpassed Mr. Travis' because Ms. Avila had dramatically increased sales within her territory, while Mr. Travis had merely maintained the sales levels of the territory he inherited, or in some cases even allowed them to decline slightly.

286.   In mid-2011 Mr. Gerace conducted a ride-along with Ms. Avila, who was still on her extended probation.  During the ride, Mr. Gerace asked Ms. Avila if she was planning on having more children.

287.   Upon information and belief, at the end of a second probationary period, Forest employees are especially vulnerable for termination.  Ms. Avila experienced extreme stress and anxiety due to being unjustifiably held on probation without explanation.

288.   Seeing no end to probation and fearing termination, Ms. Avila began seeking employment outside of Forest in July 2011.  Due to the continued discrimination and retaliation, Ms. Avila was forced to resign from Forest in August 2011.

289.   At the time Ms. Avila left Forest, she was ranked 25 out of all sales representatives nationwide, 108 places higher than the ranking of her territory when she started at Forest a little more than a year previously.  Moreover, at the time Ms. Avila left Forest, she ranked in the top five percent (5%) of all sales representatives nationwide at the Fiscal Year's end, and in the top one percent (1%) of representatives for the drug Namenda.

290.   At the time Ms. Avila left Forest, males were disproportionately represented among management positions in her region.  Although six out of ten territory representatives in her division were female when Ms. Avila left Forest, approximately eight out of ten divisional managers were male, as were the Regional Sales Trainer and the Regional Director in her region.

**I. ANDREA HARLEY'S FACTUAL ALLEGATIONS**

291.   Plaintiff Andrea Harley was a Territory Representative for Forest's Louisville, Kentucky territory from March 2011 until she was forced to resign in January 2013.  From approximately January 2012 through approximately May 2012, Ms. Harley's Divisional Manager was Stacy Barrett.  In or about May 2012, Divisional Manager Jon Mathes ("Mgr. Mathes") took over as Ms. Harley's supervisor.

292.   From the beginning of her tenure at Forest, Ms. Harley excelled.   During her initial staff training, in approximately April 2011, she repeatedly received rave reviews and ranked at the top of her training class.   She concluded her first year among the top five percent (5%) of sales representatives nationwide, and received the prestigious President's Club award.

293.   Even though Ms. Harley's sales performance was excellent, her pay lagged behind that of her equally or less qualified male colleagues from the start of her career at Forest. For example, when Ms. Harley was hired by Forest as a Territory Representative, her base salary was $52,200.   Upon information and belief, Ms. Harley's male colleague, Territory Representative Marcus Barnes, who was hired by Forest at the same time as Ms. Harley, was paid a higher base salary than Ms. Harley, even though he did not have superior qualifications than Ms. Harley's, and worked under similar conditions in a position that required the same skills, efforts and responsibilities.

294.   The salary disparity between Ms. Harley and her male colleagues was perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary.   Under this policy, female representatives like Ms. Harley, even if they are awarded the same percentage merit increase as their male counterparts, receive less money than their male colleagues with larger base salaries.

295.   In approximately May 2012, Divisional Mgr. Jon Mathes became Ms. Harley's supervisor.   Shortly after, he conducted a ride-along with Ms. Harley that concluded on May 9, 2012 and issued her a 2.84 Field Trip Evaluation ("FTE") rating.   During the ride-along, Mgr. Mathes rode in Ms. Harley's car, as is common practice at Forest.   He also gave her positive feedback, telling Ms. Harley that she was "very coachable."

296.   In or about late May or early June 2012, Ms. Harley informed Mgr. Mathes that she was four months pregnant.  On June 21, 2012, Mgr.  Mathes conducted a ride-along with Ms. Harley.  At the conclusion of the ride-along, he rated her with a 2.65 FTE score and gave her qualitative feedback that was considerably more negative than his previous feedback, including by telling Ms. Harley that she was both "uncoachable" and "unteachable" and did not take her job seriously.

297.   On July 10, 2012, Forest issued Ms. Harley a Letter of Concern, which placed her on a 90-day probation.   The Letter of Concern stated that Ms. Harley lacked salesmanship, despite her nationally outstanding rankings.   At the time Ms. Harley received the Letter of Concern, she was rated number one among the 400 sales representatives in Forest's "FPI" group.  Ms. Harley was surprised to receive the letter because of her strong sales record and because she had good working relationships with her previous managers.

298.   On July 19 and 26, 2012, Mgr. Mathes conducted a two-day ride-along with Ms. Harley.   Throughout the evaluation, Mgr. Mathes was cold and distant to Ms. Harley.   For example, Mgr. Mathes, like all Forest managers, typically rode in the same car with his sales representatives to evaluate them.   For Ms. Harley, however, Mgr. Mathes refused to ride in her car and instead insisted on driving separately to their common destinations.

299.   Throughout the ride-along, when Ms. Harley asked Mgr. Mathes for feedback, he told Ms. Harley that she was doing everything she needed to do, and did not offer any suggestions for improvement.  However, on July 26, 2012, Mgr. Mathes concluded the ride-along with Ms. Harley and gave her negative feedback, including an FTE score of 2.64.  As he had after their previous ride-along, Mgr.  Mathes told Ms. Harley that she was "unteachable."  He also told her that that there was nothing he could do to help her because, according to Mgr.

Mathes, "Either you have it, or you don't."  In his evaluation, Mgr. Mathes wrote that Ms. Harley was "combative."

300.   On July 30, 2012, Regional Manager Susie Brandt ("Regional Mgr. Brandt") reviewed the Letter of Concern with Ms. Harley during a meeting by telephone.  Mgr. Brandt warned Ms. Harley that the consequence of not improving her performance, according to the terms of the letter, was termination.  During her conversation with Regional Mgr. Brandt, Ms. Harley raised concerns about Mgr. Mathes' treatment of her, including his failure to give constructive feedback throughout the course of their ride-alongs, his refusal to ride in the car with her, and his extreme negativity in giving feedback at the conclusion of their ride-alongs.

301.   Regional Mgr. Brandt did not address Ms. Harley's concerns.  Moreover, she minimized Ms. Harley's strong performance by attributing her high rankings to the combined efforts of the representatives on her team, not to Ms. Harley's own successful efforts.  Although individual and team performance are interrelated at Forest, Ms. Harley's team achieved the number one ranking in the country only after she joined the Company.  When Ms. Harley went on maternity leave, her team dropped rank and was no longer in President's Club.

302.   Concerned by Regional Mgr. Brandt's lack of response to her concerns, on August 27, 2012 Ms. Harley reported Mgr. Mathes' behavior directly to Forest's harassment hotline.

303.   Mgr. Mathes continued to subject Ms. Harley to hostile treatment.  On August 28, 2012, Ms. Harley had a ride-along with Mgr. Mathes, who gave Ms. Harley an FTE score of 2.56.  Once again, Mgr. Mathes berated Ms. Harley for her allegedly poor performance, although her sales performance remained solid.  When Ms. Harley asked what she could do to improve, he dismissed her questions and accused her of acting like "Dr. Jekyll and Mr. Hyde"

71

because of supposed pregnancy-related mood swings.  As before, Mgr. Mathes told Ms. Harley

that she was "unteachable" and that there was nothing he could do to help her improve.

304.   Moreover, during this ride-along Mgr. Mathes asked Ms. Harley a number of

inappropriate questions about the status of her pregnancy, including what her measurements

were, if she was dilated at all, and if she was expecting an early delivery.

305.  Because a new sales representative must maintain an average rating of

approximately 3.0 to be eligible for promotion, Mgr. Mathes' ratings made Ms. Harley

ineligible for a promotion.

306.   Further, even as he gave Ms. Harley a series of negative reviews, Mgr. Mathes

insisted on completing more ride-along evaluations with her than with any of her colleagues

throughout 2012.  Upon information and belief, Mgr. Mathes almost always chose to ride along

with Ms. Harley instead of her direct partner, Territory Representative Keith Brandenburg,

when he needed to evaluate their team.  Moreover, while Mr. Brandenburg won awards such as

Representative of the Quarter, Ms. Harley was never selected for the award, despite the fact

that, even as Ms. Harley remained on probation, she continued to achieve all her sales goals,

advance in the rankings, and receive praise from her customers.

307.   In early September 2012, Ms. Harley contacted HR to follow up on her call on

August 27, 2012.  According to the HR representative with whom she spoke, the identification

number Ms. Harley had been given for her claim on August 27 did not match any number in the

HR system.  Ms. Harley was thus unable to obtain any information about the status of her

complaint.

308.   In mid-September 2012, Mgr. Mathes began requiring Ms. Harley to take

"personal" days as opposed to "sick" days for any obstetrics appointments she had during the

72

day, regardless of whether she returned to work after the appointment.  As a result, Ms. Harley's records showed an inflated number of "personal" days, which could be falsely used as evidence of poor work ethic.  Because Ms. Harley was still on probation, such an infraction left her vulnerable to termination under Forest policy.

309.   On September 14, 2012, Ms. Harley called HR Associate Director Jackson to inquire about the status of her complaint.  Unable to speak with him personally, Ms. Harley left a voice message requesting information.  Ms. Harley followed up with an e-mail to Associate Director Jackson on October 1, 2012, detailing specific dates she was available to speak about her claim.  She received no response.  Although Ms. Harley had put Forest on notice of Mgr. Mathes' intolerable behavior by contacting the Company's HR department on three separate occasions, Forest continued to disregard Ms. Harley's complaints of discriminatory treatment.

310.   Since it was apparent that continuing her work at Forest would require a futile battle against discrimination, Ms. Harley submitted her Letter of Resignation to Associate Director Jackson during the first week of January 2013.  At the time of her resignation, Ms. Harley's territory was ranked at the very top of all territories in the country.  When Ms. Harley was hired in 2011, her territory ranked 86; by the end of Fiscal Year 2012 it was ranked first in the region, and thereafter maintained a high ranking.

311.   After Ms. Harley's resignation from Forest, Associate Director Jackson finally contacted Ms. Harley on January 10, 2013 to discuss the claims Ms. Harley had made and asked if he could contact her with further questions in the future.  She never heard from him again.

## L. Christy Lowder's Factual Allegations

312.    Plaintiff Christy Lowder was hired by Forest as a Specialty Representative for Forest's Chicago Region in the Champaign and Springfield Territory in September 2010. Specialty Manager Chris Loiseau ("Mgr. Loiseau") supervises Ms. Lowder.

313.    Ms. Lowder joined Forest with more than seven years of experience in the pharmaceutical industry. Prior to that, Ms. Lowder was employed as a researcher at the Southern Illinois School of Medicine where she co-authored several journal articles on the various effects of medication.

314.    Ms. Lowder has achieved an admirable performance record at Forest. Within her first year, Ms. Lowder rose through Forest's ranking, from 181 to 31 out of 263 sales representatives. Ms. Lowder has won a Representative of the Quarter award and regularly outperforms sales representatives in her territory. As a result of Ms. Lowder's efforts, her territory has moved from the bottom 80 percent of Forest's territories to the Company's top 30 percent. Ms. Lowder's clients have written letters of recommendation to Forest citing her work ethic.

315.    Despite Ms. Lowder's impressive sales performance, however, her pay has lagged behind that of her equally or less qualified male colleagues from the start of her career at Forest. For example, when Ms. Lowder was hired by Forest, her base salary was approximately $62,000. Upon information and belief, Ms. Lowder's male colleagues, Specialty Representatives Nick Meyers, Marshall Chubirka, and Joseph Gubbins, were paid higher base salaries than Ms. Lowder, even though they did not have superior qualifications to Ms. Lowder and held jobs requiring the same skills, efforts and responsibilities which they performed under similar working conditions as Ms. Lowder.

74

316.    The salary disparity between Ms. Lowder and her fellow male representatives has been perpetuated throughout her time at Forest by the Company's policy of awarding merit increases as a percentage of salary. Under this policy, female representatives like Ms. Lowder, even if they are awarded the same percentage merit increase as their male counterparts, would receive less money than their male colleagues with larger base salaries.

317.    From the beginning of her employment, Ms. Lowder faced persistent harassment from her male colleagues and managers. For example, Territory Representative Granville Colvin ("Representative Colvin") regularly referred to Ms. Lowder as a "dumb bitch" or "cunt" under his breath when she walked past him. At work meetings, Representative Colvin directed statements like "No bitch is going to walk in here and run my business" towards Ms. Lowder. On other occasions, Representative Colvin would say he was going to "punch a bitch in the face," referring to Ms. Lowder. He also ignored comments or suggestions from Ms. Lowder during work meetings and described her work as "bullshit" in text messages.

318.    Territory Representative Marshall Chubirka ("Representative Chubirka") similarly insulted and sought to silence Ms. Lowder for attempting to penetrate the boys' club in her territory. For example, Representative Chubirka did his best to silence Ms. Lowder during a meeting where Regional Director Luke Stiller ("Regional Director Stiller") was present, first gesturing with a finger across his throat, and then, when Ms. Lowder proceeded to speak, interrupting her and saying "sshhh" to quiet her. Representative Chubirka further embarrassed Ms. Lowder by revealing personal information about her health in front of the group.

319.    Forest's management has participated in the discriminatory treatment of Ms. Lowder and other female representatives at Forest. For example, Divisional Manager Brian Pennington ("Mgr. Pennington") excludes Ms. Lowder from social events that are designated for

the whole team and encourages others to exclude Ms. Lowder. Mgr. Pennington has insinuated that Ms. Lowder's success in the field is due to sexual favors she performs for clients in exchange for prescriptions. During a workshop for specialty representatives, Mgr. Pennington asked each representative to share a tactic they used to ensure a sale. When he turned to Ms. Lowder, he said, "I don't even want to hear what you do," suggesting that her sales tactics were of a sexually explicit nature that would not be appropriate to discuss in a professional setting. Ms. Lowder was humiliated in front of her colleagues.

320.   On a separate occasion, one of Ms. Lowder's female sales partners discussed the difficulty of getting to the top twenty-five percent (25%) for the quarter. In response, Mgr. Pennington suggested that the woman should "fuck" a doctor, and insinuated that it would not have been her first time employing that strategy.

321.   Other representatives have followed management's lead in degrading and taunting female employees on the basis of their gender. For example, Territory Representative Tim Lyons ("Representative Lyons") asked Ms. Lowder and a female counterpart, "Who's going to take one for the team and show Dr. Bova their tits?" Female representatives, particularly those who outperform their male peers, frequently face such animosity in the field. They are accused of quid pro quo, exchanging sexual favors for higher prescriptions. As a result, female representatives' accomplishments are perversely used to justify gender-based hostility against them.

322.   Ms. Lowder has reported her colleagues' discriminatory behavior to Mgr. Loiseau several times. However, Mgr. Loiseau consistently refrains from intervening, and instead advises Ms. Lowder to tolerate her male colleagues' misconduct and to not be "so emotional." Specifically, concerning Mgr. Pennington's efforts to exclude her from work events, Mgr.

Loiseau told Ms. Lowder that he was not going to report his friend Mgr. Pennington to Forest's Human Resources ("HR") department. Upon information and belief, Mgr. Loiseau has never confronted Ms. Lowder's harassers and has not escalated Ms. Lowder's complaints of harassment to upper management. When another female representative reported Representative Colvin to HR on her own, upon information and belief, Forest closed the investigation and took no disciplinary action against him.

323.    Beginning in mid-2011, Representative Lyons sent Ms. Lowder text messages each week, wishing her good luck on her appointments with doctors. These messages routinely included lewd references, such as allusions to "Blow Job Friday." In May 2012, after one particularly upsetting string of text messages from Representative Lyons, Ms. Lowder's husband contacted Mgr. Loiseau and demanded that the Company take action. In response, Mgr. Loiseau agreed to make a formal complaint to management about Mr. Lyons's text messages. When Ms. Lowder asked Mgr. Loiseau why he had not previously reported the inappropriate text messages although she had complained to him about such text messages on several previous occasions, he replied that he would do so this time because Ms. Lowder's husband became involved. Ms. Lowder asked Mgr. Loiseau to include her other, earlier complaints in his report to management, but Mgr. Loiseau objected, stating that he did not want to "open that can of worms" and would only report Representative Lyons' inappropriate text messages.   Ms. Lowder was never contacted by Forest about her complaint.   In fact, Representative Lyons was still permitted to contact her during the week.

324.    Ms. Lowder and other female representatives suffer professional setbacks as a result of this environment. Of the approximately twenty-seven Territory and Specialty Representatives in Ms. Lowder's division, fifteen male employees have been promoted

compared to only five female employees.  By contrast, female representatives represent half of the field's lowest ranking employees, Territory Representatives.

325.    Representative Colvin has openly bragged about being able to intimidate women who rank above him.  Specifically, he has boasted that he had a former female superior, Divisional Manager Allison Miller, demoted to a Primary Care Representative. Representatives Colvin and Lyons also expressed their disdain for Specialty Representative Erin Evans. Specifically, Representative Lyons referred to Ms. Evans with derogatory terms such as "dumb," "stupid " and" lazy bitch," and in group-wide conversations made it known that he did not want Ms. Evans as a Specialty Representative on his team. Representative Colvin echoed Representative Lyons' opinions about Ms. Evans and claimed she was incompetent and undeserving of her position. Representative Colvin and Lyons resented the advantages conferred on Ms. Evans as a Specialty Representative, which included opportunities to lead programs and train lower-ranking representatives like Representatives Colvin and Lyons on best practice methods. Ms. Evans was subsequently demoted to Territory Representative.

326.   In April 2011, a Regional Sales Trainer position became available in Ms. Lowder's region. With more than eight years in the field, including relevant experience training representatives when she worked at pharmaceutical companies Schering Plough and Abbot Laboratory, Ms. Lowder believed she was a qualified candidate for the position. The Regional Sales Trainer would have represented a stepping stone toward entry into Forest management.

327.   Ms. Lowder knew from experience at Forest that a sales representative needs the approval and support of her manager to be considered a candidate for promotion. Although her manager had not identified her as a candidate for the Regional Sales Trainer position through the common practice of a "tap on the shoulder," Ms. Lowder approached her manager on her

own and sought his support for her bid. However, Mgr. Loiseau informed Ms. Lowder that she could not apply for the position because she was on probation for having too much alcohol on the receipt for a work function with doctors, despite the fact that male representatives were placed on probation for the same infraction and were allowed to apply for promotions. Two male candidates, Representatives Nickolas Meyers and Chubirka, were similarly on probation for this infraction but were permitted to apply for the Regional Sales Trainer position. Mr. Chubirka was awarded the job, and Representative Meyers eventually became a Divisional Manager, despite the fact that Ms. Lowder had outperformed them both.

328.    In May 2012, Ms. Lowder applied for a Field Sales Trainer position. She submitted her application to Mgr. Loiseau, and when she did not receive an email confirming receipt, she contacted Mgr. Loiseau a second time. Mgr. Loiseau replied that he was surprised by the strength of Ms. Lowder's application and asked if her husband had written the application. Ms. Lowder received no further communication from Forest regarding her bid for the position.

329.    In September 2012, Ms. Lowder attempted to leave the hostile environment of the Champaign and Springfield Territory by applying for a Divisional Manager position in the neighboring St. Louis, Missouri territory. When Regional Director Stiller heard Ms. Lowder had applied for the position, he called her to say he was offended she had not previously communicated her interest in a promotion to Forest management. Ms. Lowder explained that she had, in fact, communicated interest to her direct supervisor, Mgr. Loiseau, on many occasions, and cited her previous applications for higher ranking positions as further proof of her interest in career advancement. Regional Director Stiller accused Ms. Lowder of only being interested in a promotion because she could not get along with her teammates. He asserted that her inability to cooperate with all personality types — including her harassers, as he expressly mentioned —

would hinder Ms. Lowder's career advancement with the Company. Regional Director Stiller further questioned whether Ms. Lowder really wanted a promotion, considering that she had children.

330.    Meanwhile, out in the field, Ms. Lowder was subjected to lewd comments and propositions from her clients. It was known within the territory that certain doctors, like Dr. Patil and Dr. Bova, were prone to harass female representatives. Mgrs. Loiseau and Pennington, along with male Territory Representatives, often joked about the reputations of these doctors for such conduct.  In one instance, during their first field ride together, Mgr. Loiseau accompanied Ms. Lowder to visit a client, Dr. Bova. When Mgr. Loiseau told Dr. Bova that Ms. Lowder was among the top sales representatives in the region, Dr. Bova laughed and asked whether it was because Ms. Lowder was "good at fucking other doctors." On other occasions, Dr. Bova has made sexually graphic suggestions to Ms. Lowder like "I want to eat your pussy," and asked whether she "likes to spit" (referring to oral sex). Although Mgr. Loiseau was present and heard Dr. Bova's lewd comments, he refused to do anything to address the issue. Instead, after the visit, Mgr. Loiseau told Ms. Lowder that he would not penalize **her** for Dr. Bova's comments because "that's the way he is." Thus, Mgr. Loiseau was aware of Dr. Bova's inappropriate behavior towards his sales representative but accepted it as part of doing business.

331.    Ms. Lowder became the subject of sexual harassment by Dr. Patil in or around September 2011, which culminated in an assault in April 2012. Prior to the assault, Dr. Patil sought to spend time alone with Ms. Lowder, often asking teammates who may have accompanied her on the call to fetch items outside of the office. Dr. Patil offered to purchase expensive items for Ms. Lowder, all of which she refused. When Ms. Lowder expressed to Mgr. Loiseau her discomfort with calling on a client who acted so inappropriately, Mgr. Loiseau

commented how important it was to make a sale. Based on Mgr. Loiseau's response, Ms.

Lowder reasonably believed that her responsibility was to continue to make the sale.

332.     At the end of one visit to Dr. Patil's office in April 2012, Ms. Lowder went to get

up from her chair when Dr. Patil pushed Ms. Lowder back down into her seat. He leaned into

her, pulled her breast out from her shirt, and attempted to lick it. Ms. Lowder quickly pushed him

away, covered herself, and immediately left the office. Ms. Lowder then called her manager and

attempted to report the incident. Mgr. Loiseau, however, did his best to silence her, asserting that

he did not wish her to speak any further on the matter so as not to be implicated.

333.     Dr. Patil was, and remains, one of the highest prescribing psychiatrists of Forest

products in the region. Accordingly, given Mgr. Loiseau's comments about the importance of

making the sale, Ms. Lowder feared her employment would be in jeopardy if she pursued a

complaint against a client who generated so much business for the Company. As a result, Ms.

Lowder continued to call on Dr. Patil, even as his harassment continued. Dr. Patil invited Ms.

Lowder to his house. He called her when he drove past what he believed to be the highway exit

to her home. Dr. Patil sent Ms. Lowder a text message outside of business hours referring to her

as part of his "harem." Ms. Lowder attempted to establish boundaries of professional behavior by

reminding Dr. Patil she was happily married with children. Dr. Patil was not persuaded and

continued to harass Ms. Lowder.

334.     On numerous occasions, Ms. Lowder attempted to inform Mgr. Loiseau of Dr.

Patil's continued harassment, but Mgr. Loiseau continued to insist that he did not wish to know

about clients' indiscretion. He told Ms. Lowder that if he heard the full extent of such incidents,

he would be obligated to report them to management, which could lead those doctors to stop

prescribing Forest products. Losing those clients would be bad for business, and Mgr. Loiseau told Ms. Lowder that he did not want to take that risk.

335.    Despite Mgr. Loiseau's lack of support, Ms. Lowder reported her complaints to HR. In September 2012, Ms. Lowder filed a report with HR concerning Representative Colvin's hostile behavior towards her. Shortly after this, she went on short-term disability leave. During her leave of absence, Ms. Lowder sought psychological treatment to help her cope with the sexual harassment she had been suffering.

336.    On November 6, 2012, Ms. Lowder joined this Forest litigation as a named plaintiff against the Company.  Approximately one month later, Ms. Lowder returned to work at Forest. Upon her return to work after joining the lawsuit, Ms. Lowder faced several impediments to her ability to perform her job. For example, Ms. Lowder was without Linzess drug samples for nearly one-and-a-half months after her return from leave, hindering her from providing samples to physicians who made requests. Ms. Lowder also asked Forest's tech support office to repair her laptop, a necessary tool used by sales representatives to record physicians' signatures on visits in order to comply with regulatory obligations; however, her requests for repairs went unanswered for several weeks.

337.    Before Ms. Lowder joined this lawsuit, she did not have trouble communicating with representatives in her territory, with the exception of Representative Colvin. However, when Ms. Lowder returned from her leave after joining this lawsuit, nearly all representatives in the territory ceased communicating with her. When Ms. Lowder sends a message to her teammates, almost no representative will respond. For example, in early December 2012, Ms. Lowder set up a conference call for her teammates, yet no representatives attended the meeting.

338.    On December 31, 2012, Ms. Lowder complained about the breakdown in communication to Mgr. Loiseau. He said he would speak to the other managers in the region, including Mgr. Pennington because the managers could compel the representatives to resume normal interactions. Ms. Lowder also requested that Mgr. Loiseau remove four doctors from her call cycle, including Dr. Bova and Dr. Patil, for sexual harassment.

339.    Approximately one week later, Ms. Lowder called HR Representative Martin Allen to follow up on the allegations she had made against the four doctors. HR Representative Allen asked whether she was certain of the sexual harassment, emphasizing that it was a very serious accusation. Although troubled by HR Representative Allen's skeptical tone, Ms. Lowder repeated her complaint and requested to have the physicians removed from her call cycle. In January 2013, after a month during which the communication with her teammates did not improve and the doctors had not been removed from her call panel, Ms. Lowder submitted her complaint to HR Director Derek Jackson.

340.    In February 2013, Ms. Lowder met with HR Director Bonnie McDonald about the three complaints she had made to HR between September 2012 and January 2013 concerning hostility from male colleagues such as Representative Colvin, sexual harassment and assault by physician clients like Dr. Patil, and deteriorating communication between Ms. Lowder and her teammates. During the meeting, HR Director McDonald asked Ms. Lowder to recount, in detail the various harassing behaviors to which Ms. Lowder and other female representatives have been subjected during Ms. Lowder's tenure. HR Director McDonald appeared unaware of complaints such as Representative Lyons' lewd text messages to Ms. Lowder, even though Mgr. Loiseau had claimed to Ms. Lowder that he had reported the incident. When Ms. Lowder recounted the sexual harassment and assault to which Drs. Patil and Bova had subjected her, HR Director

McDonald attempted to correct Ms. Lowder, falsely claiming that the first time Mgr. Loiseau became aware of the harassment was after Ms. Lowder's most recent report, dated December 31, 2012. Ms. Lowder informed HR Director McDonald that this was untrue, explaining that Mgr. Loiseau had simply endeavored to silence Ms. Lowder each time she brought her harassment complaints to him. HR Director McDonald often expressed surprise and disgust at the details of the sexual harassment and her manager's response, exclaiming, "What is wrong with these people!"

341.    HR Director McDonald also asked Ms. Lowder about her promotions history at Forest. Ms. Lowder discussed management's refusal to support her applications. In particular, she referred to the Regional Sales Trainer position to which she applied in April 2011. She explained that Mgr. Loiseau told her she was could not apply because she was on probation. Yet, two male candidates from her territory, also on probation, went on to bid for the position. HR Director McDonald informed her that being on probation should not have prohibited her from applying for the position.

342.    When Ms. Lowder asked how HR would be able to help with the ongoing communication problem she faced from her teammates, HR Director McDonald said that she would "fix" matters with management and that resolution would in turn resolve Ms. Lowder's communication problems.

343.    In February 2013, a Regional Sales Trainer position opened in the St. Louis Territory. When Ms. Lowder sought Mgr. Loiseau's support for the job, Mgr. Loiseau warned Ms. Lowder that the position required the candidate to have achieved at least a score of 3.5 on her annual review, which Ms. Lowder did not have. The bid sheet for the position, however, did not mention any such requirement. Accordingly, Ms. Lowder corrected Mgr. Loiseau and asked

whether he would support her application if the hiring managers for the position contacted him, but Mgr. Loiseau refused to confirm that he would support Ms. Lowder's application, despite her strong performance in the field. The position ultimately went to a male candidate with far less experience than Ms. Lowder's two-and-half-years at Forest and ten years as a sales representative in the industry.

344.    When Ms. Lowder inquired why she had not received the position, the hiring managers informed her that the primary reason they awarded the position to the male candidate was because Ms. Lowder did not have the support of her Divisional and Regional Managers. The hiring managers also expressed concern that Ms. Lowder would not be able to work with various personalities in the territory, thus echoing the discriminatory comments of Regional Director Stiller. Ms. Lowder countered that she had several years of experience working with and training many different representatives without conflict. However, she had never before faced the hostility and discrimination she currently faces in her territory from her male clients and colleagues.

345.    Ms. Lowder later learned that another highly-qualified female representative had applied for the Regional Sales Trainer position and was denied the job. That female candidate had recently vacated a Regional Sales Trainer position she held in Pennsylvania for two-and-a-half years to move to St. Louis for family reasons. This female candidate had coached her team to high sales figures and was qualified for an open Divisional Manager position in her territory. Upon information and belief, however, Forest management had informed her that she would need to prove herself in a new territory by beginning as a Territory Representative. When this impressive candidate submitted her application for the Regional Sales Trainer position in St. Louis, she was denied.

346.     The gender discrimination and harassment Ms. Lowder has experienced at Forest has caused Ms. Lowder physical and emotional harm.   While Ms. Lowder continues to receive therapy for the sexual harassment she suffered from Forest clients, she has also lost significant weight and developed gastrointestinal problems as a result of the persistent distress she suffers. However, having served six years in the Army National Guard and the Air National Guard, Ms. Lowder remains unwilling to yield to Forest's discriminatory and retaliatory actions against her, and thus has continued as an employee at the Company to date.

### M.     TRACY LE'S FACTUAL ALLEGATIONS

347.     Plaintiff Tracy Le was hired by Forest in March 2012 as a Territory Representative for Forest's Southern California region, which covers Pasadena and the greater north Los Angeles area.   Ms. Le continues to work for Forest as a Territory Sales Representative.

348.     In her one year of employment, Ms. Le has established a strong performance record.  Ms. Le currently ranks in the nation's top sixteen percent (16%) of sales representatives and is in the running for President's Club.  Ms. Le has received praise from customers and co-workers alike for knowledge of her products and execution of her sales.  Ms. Le is ranked in the top seven percent (7%) of sales representatives nationwide for her primary drugs, Tudorza and Daliresp.

349.     Despite Ms. Le's accomplishments, however, her pay lags behind that of her equally or less qualified male colleagues.  For example, when Ms. Le was hired by Forest, her base salary was approximately $56,000.   Upon information and belief, Ms. Le's male colleague, Ilija Ognenovski, is paid a higher base salary than Ms. Le even though he does not have superior qualifications compared to Ms. Le's more than five years of prior experience in the

pharmaceutical sales industry.   Ms. Le and Ognenovski hold jobs requiring the same skills, efforts, and responsibilities, which they perform under similar working conditions.

350.   When Ms. Le first joined Forest, she was assigned to work with a male counterpart, Territory Representative Steve Yeu ("Mr. Yeu"). Ms. Le and Mr. Yeu would call upon doctors together in the field and coordinate business events to build relationships with their shared clients.

351.   In her first month of employment, Ms. Le and Mr. Yeu rode together in Mr. Yeu's car to make joint visits to clients.  During these rides, Mr. Yeu would "accidentally" brush his hands over Ms. Le's breasts and touch her leg.  Mr. Yeu also commented that Ms. Le's body could be an asset for sales.  Specifically, Yeu told Ms. Le that he wished he could keep her in his pocket and bring her out to parade in front of doctors so they could get an "eye-full."  Then, Yeu reasoned, he would not have to do much else to sell the product.  Ms. Le asked Mr. Yeu to cease such comments and asked also that he refrain from touching her, but Mr. Yeu continued his improper conduct and commentary.   Mr. Yeu also unnecessarily invited Ms. Le to stay at a hotel with him in advance of a conference, despite the fact that the conference was within their territory and close to their respective homes.  Ms. Le declined.

352.   In April 2012, Ms. Le reported Mr. Yeu's harassing behavior to her Manager, Raymond Gerace ("Mgr. Gerace").   Mgr. Gerace explicitly instructed Ms. Le *not* to contact Forest's Human Resources ("HR") department. Instead, Mgr. Gerace told Ms. Le that he would handle the issue himself.  Approximately one week later, Mgr. Gerace called a meeting with Mr. Yeu and Ms. Le.  Mgr. Gerace instructed Mr. Yeu to stop harassing Ms. Le and noted that Mr. Yeu was "lucky [Ms. Le was] not going to HR with this," at Mgr. Gerace's orders.

353.    Mgr. Gerace then reprimanded Ms. Le.  He informed Ms. Le that the problems between her and Mr. Yeu were also due to a "breakdown in communication" for which Ms. Le was responsible and which Ms. Le needed to repair.   Mgr. Gerace ordered Ms. Le to work even more closely with her harasser going forward.

354.    Approximately three or four weeks following this meeting, in May 2012, an unnamed employee reported Mr. Yeu to Forest's HR department for harassing and hostile behavior.  Forest HR began an investigation into the matter and, as part of its inquiries, interviewed Ms. Le regarding Mr. Yeu's behavior in the workplace.  Ms. Le was forthcoming about the details of Mr. Yeu's recent sexual harassment of her to HR Representative Martin Allen.   Representative Allen recorded Ms. Le's complaints but responded, "Maybe you misunderstood him. Maybe he was trying to get to know you better."

355.    In June 2012, not having heard anything further from Forest HR, Ms. Le inquired with HR Representative Allen into the results of HR's investigation of Mr. Yeu.  Ms. Le was told that although Forest HR had found that Mr. Yeu's actions were indeed inappropriate, they concluded that those actions did not rise to the level of sexual harassment.   Upon information and belief, Forest did not discipline Mr. Yeu for his conduct.

356.    During this time, Mr. Yeu grew more hostile in his interactions with Ms. Le, and looked for opportunities to report Ms. Le to Mgr. Gerace for insubordination.  For example, if Ms. Le did not respond to Mr. Yeu's every phone call, he would immediately notify Mgr. Gerace and claim that Ms. Le was being unresponsive and causing further breakdowns in communication.  On several occasions, Mgr. Gerace then scolded Ms. Le for not answering Mr. Yeu's calls, even after she explained that she had been with a client at the time. Further, Mgr.

Gerace threatened to dock points from Ms. Le's Field Trip Evaluation ("FTE") score for what he characterized as her problems communicating with Mr. Yeu.

357.    Until August 2012, when Mr. Yeu left the Company, his unprofessional behavior continued.  For example, Mr. Yeu yelled at Ms. Le in front of their customers, embarrassing her, and sent Ms. Le abrasive text messages, emails, and voice mails claiming that her work was subpar.  Ms. Le came to dread communicating with her teammate, particularly for activities such as doctor visits or programs that Mgr. Gerace instructed Ms. Le and Mr. Yeu to complete together.  However, when Ms. Le approached Mgr. Gerace with complaints about Mr. Yeu's continued hostility and its impact on her ability to perform her responsibilities as a representative, Mgr. Gerace responded dismissively that Ms. Le needed to learn to take things less seriously.

358.    While Mr. Yeu left the Company in August 2012, Ms. Le continued to face adverse actions by Mgr. Gerace in retaliation for her complaints.  Specifically, Mgr. Gerace retaliated against Ms. Le by freezing her FTE scores below 3.0 or "Meets Standards," which new representatives like Ms. Le must achieve in order to come off the obligatory six-month probation placed on them at the start of their employment.  Although Mgr. Gerace's written evaluations alleged that Ms. Le's performance in the field was deficient, Ms. Le's objective sales performance showed otherwise.  In fact, Ms. Le is in the running for the prestigious President's Club, reserved for the top five percent (5%) of representatives in the nation.

359.    In September 2012, at the end of Ms. Le's first six months at Forest, Mgr. Gerace elected to continue Ms. Le's probation for another 90-day period.  According to Forest policy, representatives who achieve minimum sales and have not committed disciplinary infractions may be taken off of probation at the six-month mark.  However, by giving Ms. Le low FTE scores,

Mgr. Gerace created a pretext to extend Ms. Le's probation for another ninety days.  As a result of her extended probationary status, Ms. Le was ineligible for merit increases, bonuses, awards, and career-advancement opportunities such as promotions which she would have otherwise been likely to receive due to her excellent sales performance.

360.    When Ms. Le asked Mgr. Gerace why he was keeping her on probation, he claimed that he had not spent enough time with her in the field and therefore was not satisfactorily familiar with her performance.   Under Forest policy, divisional managers are responsible for scheduling all field trips with their representatives, and representatives like Ms. Le have no recourse if a manager chooses to schedule fewer than the standard number of rides per quarter, even if that failure has a negative impact on the representative's scores or status.

361.    According to Forest policy, any probation decision must be accompanied by documentation from the representative's manager stating the reason for the probation, the terms of the probation, and the minimum requirements the representative must meet in order to be removed from probation.  Ms. Le asked for such a letter, formally outlining the reason for her continued probation.   However, Mgr. Gerace did not, verbally or through documentation, provide Ms. Le with this information about her probation

362.    As a result of her extended probationary status, Ms. Le was not only ineligible for merit increases, bonuses, awards, and career-advancement opportunities such as promotions, but was also ineligible to apply for a transfer to another territory to escape Mgr. Gerace's discriminatory and retaliatory actions.

363.    In the meantime, Manger Gerace's discrimination against Ms. Le only increased. For example, Mgr. Gerace refused to coach Ms. Le as was his duty as her manager, and ignored

Ms. Le's requests for explanations or clarifications.  Instead, Mr. Gerace claimed that Ms. Le's questions constituted insubordination.

364.   Moreover, during his training sessions with Ms. Le, Mgr. Gerace frequently used former Mr. Yeu as an example of a model representative whose performance Ms. Le should seek to emulate.  Whenever Mgr. Gerace mentioned Mr. Yeu he would carefully watch Ms. Le to note her reaction.   Believing that Mgr. Gerace hoped to elicit a reaction, Ms. Le took pains to maintain her composure.

365.   At the same time Mgr. Gerace was subjecting Ms. Le to hostility and a discriminatorily extended probation, Mgr. Gerace also was treating other female employees under his supervision with hostility.  For example, Ms. Le witnessed Mgr. Gerace mock female representative Kelly Bishop for participating in a meeting, by saying "there goes Kelly again" when Ms. Bishop attempted to contribute to the group's discussion.  At the same meeting, Mgr. Gerace encouraged more talkative men to continue contributing to the conversation.

366.   Upon information and belief, Mgr. Gerace's hostility toward the female representatives under his supervision led them to leave Forest or seek employment in another territory.  When Ms. Le joined Forest, there were four female and four male representatives who reported to Mgr. Gerace.  Within nine months of her employment, Ms. Le was the only original female representative left in her territory.  By comparison, all of Ms. Le's male counterparts, except Mr. Yeu, remained on the team.

367.   Ms. Le observed Mgr. Gerace treat male representatives more favorably than female representatives and provide them with advantages in the field.  For example, in October 2012 Mgr. Gerace hired Ilija Ognenovski to replace Mr. Yeu as Ms. Le's teammate.  Ms. Le observed Mgr. Gerace proactively coach Mr. Ognenovski and offer tips on best-practice methods

that he did not offer to Ms. Le.  When Ms. Le asked Mgr. Gerace for comparable assistance, Mgr. Gerace dismissively suggested she perform in whatever way she thought was appropriate.

368.   Nevertheless, even while Ms. Le was on probation, she continued to surpass her sales goals, advance in the rankings, and receive praise from her customers.

369.   On December 21, 2012, Mgr. Gerace held a one-on-one meeting with Ms. Le and conducted a review of Ms. Le's probationary status.  At the end of his evaluation, Mgr. Gerace informed Ms. Le that he was extending her probation for a second time.  When Ms. Le asked why Mgr. Gerace continued to extend her probation despite objective evidence of her impressive sales performance, Mgr. Gerace claimed that Ms. Le was the reason why there was, allegedly, no trust among the team members.  In response, Ms. Le cited examples of her effective communication with fellow representatives and customers, including email correspondence, call records, and the testimony of her colleagues.  Mgr. Gerace became irate and said that these examples were not sufficient.

370.   Instead, Mgr. Gerace explained to Ms. Le that, at this juncture — the end of the 90-day extension of her probation — he could choose to terminate her employment.  Ms. Le grew visibly upset at the suggestion of termination and Mgr. Gerace responded, "Well, at least I'm not firing you."

371.   Shortly after the meeting, Ms. Le contacted HR Director Bonnie McDonald to report Mgr. Gerace's retaliation against her.  Ms. Le also contacted Regional Director Chris Sweeny to request that she be placed with another divisional manager who would be able to give her a more objective, unbiased review of her performance.  Ms. Le contacted Regional Director Sweeny in addition to HR Director Bonnie McDonald because from experience with her prior harassment complaint, Ms. Le was not confident HR would act.  Ms. Le was certain that given

the feedback of her clients and teammates, along with her exceptional sales, she would be rated, at the least, as "Meets Expectations" by an unbiased manager.

372.    Regional Director Sweeny and HR Director McDonald assigned Divisional Manager Amanda Wells ("Mgr. Wells") to complete a FTE with Ms. Le in February 2013. During the field trip, Mgr. Wells went out of her way to speak positively of Mgr. Gerace and Director Sweeny, even when Ms. Le did not bring up their names.  Mgr. Wells did not, however, offer many criticisms of Ms. Le's performance during the ride-along.   When Ms. Le asked specifically what she could do to improve her performance, Mgr. Wells offered no suggestions.

373.    Ms. Le, therefore, was surprised to find that Mgr. Wells' written assessment of the field trip included many criticisms that Mgr. Wells had not articulated during the field trip itself, something Mgr. Gerace's written evaluations had also done.

374.    Ms. Le's second extended probation status was due to end on March 10, 2013. However, in January 2013 HR Director McDonald confirmed to Ms. Le that Mgr. Wells did not have the power to review Ms. Le's probation.  Ms. Le expressed concern to Ms. McDonald that her second probation period would be extended without review, but received no information on when or how she can come off of probation.

375.    The extension of Ms. Le's probation for a third time has extended her ineligibility for merit increases and awards that she would have otherwise been likely to receive due to her impressive sales performance.   The probation extension also continues to render Ms. Le ineligible to enter the bidding process for a promotion.  Further, as probationary status becomes part of a sales representative's employment records accessible to Forest supervisors, Ms. Le's unusually and unfairly extended probation status can reasonably be expected to be seen as a blight on her record and have an adverse impact her ability to obtain promotions going forward.

376.    The extreme stress and anxiety caused by Forest's continued mistreatment has led Ms. Le to seek medical attention.  Ms. Le has been diagnosed with anxiety and depressive symptoms as a result of her work environment and continues to receive treatment.  Nevertheless, Ms. Le remains committed to her employment at Forest and continues to deliver strong sales results for the Company.

### N.  FOREST'S DISCRIMINATORY POLICIES AND PRACTICES

377.   Forest has a practice of administering its policies regarding base salary that results in women disproportionately receiving lower base salaries than men.  Specifically, at the time of hire and in connection with promotions or assignments to different positions, women are disproportionately afforded lower base salaries than men.  On information and belief, the manner in which Forest management determines the base salary to be paid to employees, including the criteria considered and weighted, disproportionately adversely affects and has a disparate impact upon women.

378.   Forest's policies regarding annual merit salary increases and the performance reviews and performance review policies and criteria on which they rely are administered in a manner that results in women disproportionately receiving lower annual merit salary increases than men, contributing to disproportionately lower salaries for women.  Forest policy provides that employees' annual performance reviews include both objective sales data and manager-supplied input, including input from Field Trip Evaluations (FTEs). Forest's predominantly male managers disproportionately rate women lower than men on those performance assessments, resulting in disproportionately lower annual ratings for women and thus relatively lower annual merit increases for women.  The inclusion of or weight given by Forest policy to manager-supplied performance assessments and FTEs, in comparison to objective sales

94

performance, has a disparate impact on the performance reviews and merit increases of women that is not justified by business necessity.

379.   Forest management has a practice of discriminating against women who become pregnant and have children in the administration and scoring of performance reviews, and, as a result, in annual merit increases and decisions to place employees on probation.  Specifically, Forest management has a practice of disproportionately lowering the performance reviews of women who have become pregnant and who have had children, after their return from maternity leave.

380.   Forest management has a practice of discriminating against women who inquire about or seek to participate in the "Field Sales Flexible Work Option" or job sharing program in performance reviews and, as a result, in annual merit increases and decisions to place employees on probation.  Specifically, Forest management has a practice of disproportionately lowering the performance reviews of women who inquire about or seek to participate in the job-sharing program.

381.   Forest's policy of refusing to pay earned bonuses to employees on leave for six weeks or more has a disparate impact on women.  Because maternity or parental leave taken by women is normally greater than six weeks, the policy disproportionately disqualifies women from receiving bonuses earned prior to their maternity leave.

382.   Forest's policies and practices that place employees on probation or extend probation on the basis of manager-supplied performance assessments and then disqualify employees on probation from receiving awards are administered in a manner that results in women receiving disproportionately fewer awards and accompanying compensation than their objective sales performance would merit.   As with annual merit increases, Forest's

predominantly male managers disproportionately rate women lower on manager-supplied performance assessments and FTEs and disproportionately place them on probation, resulting in disproportionately fewer awards and accompanying compensation than women's objective sales performance would merit.  Also, as with annual merit increases, the inclusion or weight given by Forest policy to manager-supplied performance assessments in comparison to objective sales performance has a disparate impact on women, who are disproportionately placed on probation or extended probation and thus receive relatively fewer awards and accompanying compensation than their objective sales performance would merit.

383.   Forest's policy or practice of conditioning promotions on the approval or support of a sales representative's manager is administered in a manner that results in women receiving disproportionately fewer promotions, including promotions to management positions.  As with merit increases, as described above, women are disproportionately rated lower than men on manager-supplied performance assessments and FTEs and thus are disproportionately less likely to be approved or supported by their managers for promotions.  Forest's policy or practice of requiring manager approval or support for promotions introduces stereotypical judgments about women by predominately male managers that disqualify or disadvantage women who are interested in promotions.  This policy also has the effect of deterring women from applying for promotions and nullifying the formal application process, preventing women from being considered and fairly compared to other candidates for promotion.  Forest's policy or practice of requiring manager approval or support for promotions has resulted in a "tap on the shoulder" promotion system, where managers disproportionately pre-select men to approve and support for promotion and provide them with information and other advantages in competing for promotions.

384.   Forest's requirement that applicants for promotions to positions above territory representative must have minimum annual review and FTE scores disqualifies or disadvantages women interested in promotions to those positions.   As with annual merit increases, Forest's predominantly male managers disproportionately rate women lower on manager-supplied performance assessments and FTEs, and thus the required minimum scores disproportionately disqualify women for eligibility for promotions to those positions.   Also, as with annual merit increases, the inclusion or weight given by Forest policy to manager-supplied performance assessments in comparison to objective sales performance, coupled with the required minimum scores, has a disparate impact on women being disqualified from eligibility for promotions to those positions.

385.   Forest's policies and practices that prohibit sales representatives who are on probation from applying for promotions or lateral moves have a disparate impact on women. Those policies and practices disproportionately disqualify or disadvantage women who are interested in promotions because women are disproportionately placed on probation or extended probation, and are then foreclosed from moving to a position where they would have the opportunity to have their performance assessed and be approved or supported for promotion by a different manager

386.   Forest's practice of discriminating against women who become pregnant and have children in the administration and scoring of performance reviews disproportionately disqualifies or disadvantages women interested in promotions.

387.   Forest's practice of discriminating against women who inquire about or seek to participate in the "Field Sales Flexible Work Option" or job sharing program in the

administration and scoring of performance reviews disproportionately disqualifies or disadvantages women interested in promotions.

388.   Forest's policy or practice of conditioning job-sharing on the initial approval of an employee's District Manager disadvantages or denies women the opportunity to participate in job-sharing.  Specifically, Forest policy purports to make job-sharing available to accommodate the caregiving roles of certain of its employees.   However, Forest policy provides that employees can apply for job-sharing only with the initial participation and approval of their District Manager. This results in managers refusing job-sharing on the basis of stereotypical assumptions about women with children, even prior to a formal application.   In contrast, approval of job-sharing requires not only the approval of the District Manager, but of the Regional Director, Area Business Director, Vice President and corporate Human Resources. Further, the job-share policies, practices and program have a disparate impact on women because, while they purport to accommodate employees with caregiving roles that disproportionately are assumed by women and are more likely to be sought by women, they allow managers to deny requests for job-sharing where it would not serve employees' job responsibilities and performance standards, but fail to provide criteria or standards that describe those circumstances or to distinguish them from stereotypical assumptions about women with children.

389.   Forest's job-sharing policies, practices and program also have disparate impact on women because they purport to accommodate employees with caregiving roles that disproportionately are assumed by women and are more likely to be sought by women, yet job-sharing is made available only at the lowest sales representative position—Territory Sales Representative—requiring women in higher-level positions to abandon their higher-level

positions and the associated compensation and career  attainments and be demoted to that lower position as a precondition to participate in the program and accommodate their caregiving roles.

390.   Forest has a practice of administering its Human Resources ("HR") policies in a manner that results in the perpetuation of discrimination against women and the participation or acquiescence of the highest levels of Forest management in that discrimination.  Forest's HR policies and practices discriminate against women because they fail effectively to inform or train managers about impermissible sex discrimination, or have adequate incentives for managers not to engage in or correct impermissible sex discrimination, or to impose consequences for impermissible sex discrimination.  Further, Forest's HR policies purport to provide the opportunity for women to make complaints of sex discrimination that will be investigated and, where discrimination exists or has occurred, be remedied by the company.  However, Forest administers its HR policies and practices in manner that discriminates against women because complaints of sex discrimination are not investigated, sex discrimination is justified or ignored by HR and Forest management and thus goes unremedied, and because those making complaints to HR often are subjected to further discrimination for having done so.  To the extent that Forest HR policies provide for compliance measures and a complaint and investigation process, they lack meaningful standards, implementation metrics, quality control measures, or means of addressing impermissible sex discrimination.

391.  Forest's practices in administering its HR policies demonstrate a reckless disregard or deliberate indifference to its women employees by failing to address, prevent or remedy impermissible sex discrimination throughout the company, of which it has long been aware.

392. Forest administers its compensation, performance review, merit increase, probation, promotion, leave, job sharing and human resources policies in a manner that discriminates against women and leads to their separation from employment with Forest. These practices disproportionately adversely affect the salary, annual increases, compensation associated with awards, performance evaluations, probation, promotions, leave, participation in job-sharing, and other employment terms and conditions of women, all of which communicate the message that women are unwelcome in management positions and if they become pregnant, have children and assume caregiving roles.

393. Forest's policies and practices that discriminate against women described here are long-standing and have been administered and operated substantially as they were at the time the complaint in this action was first filed, or with the same effects, for as long as any of the Plaintiffs and members of the class have been employed by Forest. The ongoing administration of these long-standing discriminatory policies and practices represent a continuing violation of the applicable laws against sex discrimination.

## V.   **CLASS ACTION ALLEGATIONS**

394. Class Representatives bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory and monetary relief for the Forest's pattern and practice of gender discrimination throughout their employment with Forest.

395. As described above, Forest's compensation, performance review, merit increase, probation, promotion, leave, job sharing and human resources policies and practices represent a pattern or practice of intentional discrimination against women, including women who become pregnant, have children and engage in caregiving.

396.   As well, as described above, Forest's compensation, performance review, merit increase, probation, promotion, leave, job sharing and human resources policies and practices have a disproportionate adverse impact on women, including women who become pregnant, have children and engage in caregiving, that are not valid, job-related, or justified by business necessity.  Further, there are alternative criteria, methods or measures available to Forest that do not have an adverse disparate impact on women, or have less of a disparate impact, and achieve the same business ends.

397.   Forest's discriminatory employment policies, practices, and procedures described here and to which the Class Representatives and the Class Members are subject, are established at Forest's corporate management level, which is headquartered in and directed from New York.

398.   Forest's discriminatory employment policies, practices, and procedures apply uniformly and systematically to Forest sales representatives across the Company and throughout the country, throughout all levels and organizational  units of Forest.

399.   The adoption, administration and application of Forest's discriminatory policies, practices, and procedures across the Company cause discrimination against women to be Forest's standard operating procedure.

400.   Because of Forest's pattern and practice of discrimination against women, the Class Representatives and members of the proposed Class have suffered harm, including lost compensation, wages, back pay, and employment benefits.

401.   The Class Representatives and Class Members have no plain, adequate, or complete remedy at law to redress, and this suit is their only means of securing adequate equitable relief from Forest's continuing pattern and practice of discrimination against women alleged here.   The Class Representatives and Class Members are now suffering irreparable

injury from Forest's unlawful policies, practices, and procedures alleged here, and will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

### A.   Class Definition

402.   The proposed Rule 23 Title VII Gender Class is defined as:

All female Sales Representatives who are, have been, or will be employed by Forest in the United States from 2008 to the date of judgment.  "Sales Representatives" include Territory Sales Representatives, Field Sales Representatives, Medical Sales Representatives, Professional Sales Representatives, Specialty Sales Representatives, Field Sales Trainers, and Regional Sales Trainers. Upon information and belief, there are approximately 1,500 Sales Representatives currently in the proposed class.

In addition, a Title VII Pregnancy Sub-class is defined as:

All female Sales Representatives who are, have been, or will become pregnant while employed by Forest in the United States from 2008 to the date of judgment.  Upon information and belief, there are approximately 150 to 300 of such Sales Representatives currently in the proposed class.

403.   All Class Representatives are members of the Class they seek to represent.

404.   Plaintiffs reserve the right to amend the class definition in a separate motion for class certification or otherwise based on information obtained in discovery or legal developments.

### B.   Efficiency of Class Prosecution of Common Claims

405.   Certification of a class of female Sales Representatives is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of Class Representatives and the proposed Class.

406.   The individual claims of Class Representatives require resolution of the common questions to determine whether Forest has engaged in a systemic pattern and practice of discrimination against female Sales Representatives.   Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions, to eliminate the adverse effects of gender discrimination in the lives, careers, and working conditions of the proposed class members, and to prevent continued gender discrimination in the future.

407.   Class Representatives have standing to seek such relief because one or more of them have been adversely affected by each of the discriminatory policies and practices alleged. Forest caused Plaintiff's injuries through its discriminatory practices, policies, and procedures, and disparate treatment of employees who are female.   The injuries Forest's discriminatory policies and practices have caused and will cause are redressable through systemic relief, including an injunction, and other appropriate class-wide and individual remedies sought in this action.

408.   In addition, proper relief for the claims of Plaintiffs who no longer are Forest employees includes their reinstatement to the positions they would have held absent Forest's discriminatory pattern or practice.   As such, each Plaintiff has a personal interest in equitable relief from the discriminatory policies, practices, and procedures of Forest.

409.   To obtain relief for themselves and the Class Members, Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek.   Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

410.   Class Representatives' individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case.  Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

### C.   Numerosity and Impracticability of Joinder

411.   The Title VII Class that Class Representatives seek to represent is so numerous that joinder of all members is impracticable.  Upon information and belief, the members of the proposed Class currently number approximately 1,500.

412.   Additionally, Forest's pattern and practice of discrimination makes joinder impracticable by discouraging females from applying for or pursuing promotional opportunities, thereby making it impractical and inefficient to identify many members of the class prior to determination of the merits of Forest's class-wide liability.

### D.   Common Questions of Law and Fact

413.   The prosecution of the claims of Class Representatives will require the adjudication of numerous questions of law and fact common to the Class.

414.   The common issues of law and fact include, *inter alia*:

a.   Whether Forest administers its policies regarding base salary such that women disproportionately receive lower base salaries than men, by disproportionately assigning them lower base salaries at hire and with promotions or assignments, and through criteria considered and weighted in determining and assigning base salary, whether those criteria are valid and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends

b.   Whether Forest's performance review policies and practices result in

women, including women who become pregnant, have children, provide caregiving and express interest in job sharing disproportionately receive lower performance reviews and are placed on probation or extended probation, as a result of manager-supplied input and FTEs by Forest's predominantly male managers and the inclusion or weighting of manager-supplied performance assessments and FTEs relative to objective sales performance, whether those criteria are valid and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

c.     Whether Forest's policy of refusing to pay earned bonuses to employees on leave for six weeks or more disproportionately disqualifies women from receiving bonuses earned prior to their maternity leave and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

d.     Whether Forest's policies that disproportionately disqualify employees on probation from receiving awards and accompanying compensation than their objective sales performance would merit disproportionately disqualifies women from receiving bonuses earned prior to their maternity leave and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

e.     Whether Forest's policy or practice of conditioning promotions on the approval or support of a sales representative's manager disproportionately disqualifies, disadvantages, discourages or deters women from seeking and obtaining promotions, is a valid selection criterion, nullifies the formal application process, has resulted in a "tap on

the shoulder" promotion system, and disproportionately prevents women from being considered and their qualifications fairly compared for promotions and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

f.      Whether Forest's requirement that applicants for promotions to positions above territory representative must have minimum annual review and FTE scores, in tandem with its performance review policies and practices disproportionately disqualifies or disadvantages women interested in promotions to those positions, whether they are valid selection criteria and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

g.      Whether Forest's policies and practices that prohibit sales representatives on probation from applying for promotions or lateral moves have a disparate impact on the evaluation of women and their opportunities for promotions and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

h.      Whether Forest's policy or practice of conditioning job-sharing on the initial approval of an employee's District Manager has a disparate impact on women, introduces stereotypical assumptions about women with children into the process, deters women from seeking job shares, nullifies the formal application process, contains valid selection criteria and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends.

i.       Whether Forest's policy of making job sharing available only to employees in the lowest sales representative position—Territory Sales Representative—

and requiring the demotion of those in higher-level positions as a precondition to participate in the program has a disproportionate adverse effect on women's' access to and participation in the program, represents valid selection criteria and, if so, whether there are alternative means available to Forest that have less adverse impact and achieve the same business ends..

j.      Whether Forest administers its HR policies in a manner that has a disproportionate adverse effect on women and perpetuate discrimination against women, fails effectively to inform or train managers about, to have adequate incentives to prevent, to impose consequences for, and to receive, investigate and remedy impermissible sex discrimination; and whether its HR policies fail to provide compliance measures, a complaint and investigation process, meaningful standards, implementation metrics, quality control measures, or means for addressing impermissible sex discrimination.

k.      Whether Forest's practices in administering its HR policies demonstrate a reckless disregard or deliberate indifference to its women employees by failing to address, prevent or remedy impermissible sex discrimination throughout the company, of which it has long been aware.

l.      Whether Forest administers its compensation, performance review, merit increase, probation, promotion, leave, job sharing and human resources policies in a manner that discriminates against women and leads to their separation from employment with Forest by their direct effects and as a means communicating that women are unwelcome in management positions and if they become pregnant, have children and assume caregiving roles.

m.     Whether Forest's policies and practices that discriminate against women are long-standing, have been administered and operated in substantially the same manner or with the same effects for the time any Plaintiffs and members of the class have been employed by Forest and represent a continuing violation of the applicable laws against sex discrimination.

### E.     Typicality of Claims and Relief Sought

415.   Class Representatives' claims are typical of the claims of the proposed Class. Class Representatives assert each of the types of claims that they assert on behalf of the proposed Class.  The relief they seek for themselves is also typical of the relief sought on behalf of the proposed Class.

416.   Like the members of the proposed Class, Class Representatives are female employees who have worked for Forest during the liability period.

417.   Forest's pattern and practice of discrimination against women is accomplished through Companywide policies regarding compensation, performance review, merit increase, probation, promotion, leave, job sharing and human resources and that applies to all Sales Representatives and thus applies to and the affects the Class Representatives and members of the Class Members in the same or similar ways.

418.   Forest's pattern and practice of discrimination against female Sales Representatives occurs throughout all levels and organizational units of Foresthas and thus applies to and affects Class Representatives and members of the Class Members in the same or similar ways.

419.   The relief necessary to remedy the claims of Class Representatives is the same as that necessary to remedy the claims of the proposed Class Members.

### F.      Adequacy of Representation

420.     Class Representatives' interests are coextensive with those of the members of the proposed Class.

421.     Class Representatives are willing and able to represent the proposed class fairly and vigorously.

422.     Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and financial demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience, and resources of Class Representatives and their counsel to litigate competently the class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.      Requirements of Rule 23(b)(2)

423.     Forest has acted or refused to act on grounds generally applicable to Class Representatives and the proposed Class.

424.     Forest has acted on grounds generally applicable to Class Representatives and the proposed Class through the Company wide policies and practices alleged here.

425.     Forest's systemic pattern and practice of discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

426.     Injunctive and declaratory relief are the predominant relief sought in this case, and  flows directly from proof of systemic pattern or practice gender discrimination by Forest. In turn, entitlement to declaratory and injunctive relief provides a factual and legal predicate for recovery by Class Representatives and Class Members of monetary and nonmonetary remedies

for losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

### H.    Requirements of Rule 23(b)(3)

427.    The common issues of fact and law affecting the claims of Class Representatives and proposed Class Members – including, but not limited to, the common issues identified above – predominate over any issues affecting only individual claims because they can be decided on class-wide evidence and dispose of important issues appropriate to the claims of the Class as a whole.

428.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of Class Representatives and members of the proposed Class.  The cost of proving Forest's pattern and practice of discrimination makes it impracticable for Class Representatives and members of the proposed Class to pursue their claims individually.

429.    The bifurcated method of determining pattern or practice claims provides an established, efficient and manageable means of determining both liability to the Class as a whole and class-wide relief, and to individual class members, including their entitlement to monetary remedies for losses caused by the systemic discrimination and other appropriate individual relief.

### I.    Requirements of Rule 23(c)(4)

430.    This action may be certified as a class pursuant to Rule 23(c)(4) because the Class Issues apply to all class members and to all Forest locations nationwide.

431.    Class Representatives alternatively seek to maintain this action as a class pursuant to 23(c)(4), seeking partial certification of the common questions of law and fact.

VI.     **COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT**

432.     Plaintiffs bring collective claims under the EPA pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which is defined as: all current, former, and future female Sales Representatives of Forest Laboratories and Forest Pharmaceuticals during the applicable liability period, including until the date of judgment, who (a) were not compensated equally to male employees who had substantially similar job classifications, functions, titles, and/or duties; and/or (b) were not compensated equally to male employees who performed substantially similar work; and/or (c) were denied equal compensation to similarly situated male employees by being hired into positions at lesser grades than male employees who performed substantially similar work; and/or (d) were denied promotion and advancement opportunities that would result in greater compensation in favor of lesser qualified males.

433.     Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following:

> (a)     Whether Defendants unlawfully failed and continue to fail to compensate female employees at a level commensurate with similarly situated male employees;
>
> (b)     Whether Defendants unlawfully assigned and continue to assign female employees into positions graded at a lower pay and compensation scale to similarly qualified males;
>
> (c)     Whether Defendants' policy and practice of failing to compensate female employees on par with comparable male employees as a result of (a) and (b) violates applicable provisions of the EPA; and
>
> (d)     Whether Defendants' failure to compensate female employees on par with comparable male employees as a result of (a) and (b) was willful within the meaning of the EPA.

434.     Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective

Action Plaintiffs who opt in to this action because the claims of Plaintiffs are similar to the claims of the EPA Collective Action Class.

435.    Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles, and duties; and (c) are subject to Defendants' common policy and practice of gender discrimination in (i) failing to compensate female employees on par with male employees who perform substantially equal work and/or hold equivalent levels and positions; (ii) failing to provide female employees with job classifications, grades, and titles commensurate with male employees who perform substantially equal work and/or have similar duties and responsibilities; (iii) hiring and assigning female employees into lower-level positions than male employees who perform substantially equal work and/or have similar or lesser experience and qualifications; and (iv) failing to provide female employees equal pay by denying opportunities for promotion and advancement to them comparable to those afforded to male employees who perform substantially equal work.

## VII.   COUNTS

## CLASS AND COLLECTIVE ACTION COUNTS

### COUNT I

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),
42 U.S.C. § 2000e, *ET SEQ.*
PAY DISCRIMINATION
(On Behalf of All Plaintiffs and the Class Against Defendants)**

436.    Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

437.    This Count is brought on behalf of Class Representatives and all members of the Class.

438.    Defendants have discriminated against Class Representatives and all members of the Class through the policies and practices alleged here that subject them to discriminatory compensation in base salary, annual merit increases, compensation accompanying awards, bonuses and stock options, promotions and other differential treatment on the basis of their gender affecting their compensation, in violation of Title VII.

439.    Defendants' policies, practices, and procedures have had a disparate impact on Plaintiffs and the members of the Class with respect to their compensation and related terms and conditions of employment.

440.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives and the members of the proposed class, entitling Class Representatives and the members of the Class to punitive damages.

441.    By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of Plaintiffs and the members of the Class, Plaintiffs and the members of the Class are entitled to the application of the continuing violation doctrine to all violations alleged herein.

442.    As a result of Defendants' conduct alleged in this Amended Complaint, Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to: lost wages, lost back pay and front pay, lost bonuses, and other forms of compensation, lost benefits, lost interest, and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

443.    As a further result of Defendants' unlawful conduct, Class Representatives and

the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.  Plaintiffs are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT II

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**
**42 U.S.C. § 2000e, *ET SEQ.***
**PROMOTON DISCRIMINATION**
**(On Behalf of All Plaintiffs and the Class Against Defendants)**

444.    Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

445.    This Count is brought on behalf of Plaintiffs and all members of the Class.

446.    Defendants have discriminated against Class Representatives and all members of the Class in violation of Title VII because of or on the basis of their gender.

447.    Defendants have discriminated against Class Representatives and all members of the Class through the policies and practices alleged here that subject them to discrimination in relation to promotions and promotional opportunities, including by discouraging and deterring women from seeking or applying for promotions, nullifying the application process, disqualifying or disadvantaging them in obtaining promotions, requiring demotions, and through other terms and conditions of employment that disadvantage women in seeking or obtaining promotions.

448.    Forest's policies, practices, and procedures have a disparate impact on Class Representatives and the Class members with respect to their opportunities for promotion.

449.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives and the members of the

114

proposed Class, entitling Class Representatives and the members of the Class to punitive damages.

450.    By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Plaintiffs and the members of the Class, Plaintiffs and the members of the Class are entitled to the application of the continuing violation doctrine to all violations alleged herein.

451.    As a direct and proximate result of Defendants' conduct alleged in this Complaint, Class Representatives and the members of the Class have suffered and continue to suffer harm, including but not limited to: lost wages, lost back pay and front pay, lost bonuses, other forms of lost compensaton, lost benefits, lost interest, and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

452.    As a further direct and proximate result of Defendants' unlawful conduct, Class Representatives and the members of the Class have suffered and continue to suffer, among other items, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.  Plaintiffs are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT III

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-5(f), *ET SEQ*.**
**PREGNANCY DISCRIMINATION**
**(On Behalf of Class Representatives Ms. Barrett, Ms. Houser,  Ms. Eckenrode, Ms. Smyth,**
**Ms. Harley, and all members of the Class Against Defendants)**

453.    Class Representatives re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

454.   This Count is brought on behalf of Class Representatives Ms. Barrett, Ms. Houser, Ms. Eckenrode, Ms. Smyth, Ms. Harley and all members of the Class.

455.   Defendants have discriminated against Class Representatives and all members of the Class in violation of Title VII because of or on the basis of pregnancy, childbirth, or related medical conditions.

456.   Class Representatives and the members of the proposed Class were not treated the same for all employment-related purposes, including compensation, performance review, merit increase, probation, promotion, leave, job sharing and human resources and other terms and conditions of employment as other similarly-situated employees with similar ability or inability to work who were either non-pregnant or not known to be pregnant.

457.   Forest's policies, practices, and procedures have a disparate impact against Class Representatives and the Class members who have been, are or will become pregnant as alleged here.

458.   By reason of the continuous nature of Defendants' discriminatory conduct, which persisted throughout the employment of Class Representatives and all members of the class, Class Representatives and the members of the Class are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

459.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives and the members of the proposed class, entitling Class Representatives and the members of the Class to punitive damages.

460.   As a direct and proximate result of Defendants' conduct alleged in this Complaint, Class Representatives and the members of the Class have suffered and continue to

suffer harm, including but not limited to: lost wages, lost back pay and front pay, lost bonuses and other compensation, lost benefits, lost interest, and attorneys' fees and costs. Plaintiffs are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendants under Title VII.

461.    As a further direct and proximate result of Defendants' unlawful conduct, Class Representatives and the members of the Class have suffered and continue to suffer, among other items, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish.  Plaintiffs are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT IV

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"), 29 U.S.C. §§ 206, *ET SEQ.* (On Behalf of All Plaintiffs and EPA Collective Action Plaintiffs Against Defendants)

462.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

463.    This Count is brought on behalf of Plaintiffs and all EPA Collective Action Plaintiffs, including all EPA Collective Action Plaintiffs who "opt in" to this action.

464.    Defendants have discriminated against Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the EPA in violation of FLSA, 29 U.S.C. §§ 206, *et seq.*, as amended by the EPA, by providing them with lower pay than similarly situated male colleagues on the basis of their gender, female, even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility of male counterparts.

465.    Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male

employees all perform similar job duties and functions as Forest sales representatives.  Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated males all performed jobs that required equal skill, effort, and responsibility, and are or were performing under similar working conditions.

466.    Defendants discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation, discriminatory denial of promotions, and other forms of discrimination in compensation in violation of the EPA.

467.    The differential in pay between male and female employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

468.    Defendants caused, attempted to cause, contributed to, or caused the continuation of wage rate discrimination based on gender, in violation of the EPA.

469.    The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendants have willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

470.    As a result of Defendants' conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

471.    By reason of Defendants' discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA,

including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

472.    Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## INDIVIDUAL COUNTS

## COUNT V

**VIOLATION OF FAMILY MEDICAL LEAVE ACT ("FMLA")**
**29 U.S.C. § 2601, *ET SEQ.***
**(On Behalf of Ms. Barrett, Ms. Houser, and Ms. Smyth Against Defendants)**

473.    Ms. Barrett, Ms. Houser, and Ms. Smyth re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Amended Complaint as though fully set forth herein.

474.    Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions.  Ms. Barrett, Ms. Houser, and Ms. Smyth took approved FMLA leave for maternity leave.

475.    Forest interfered with Ms. Barrett, Ms. Houser, and Ms. Smyth's taking of protected maternity leave, and discriminated against them for the taking of such leave, in violation of the Family Medical Leave Act ("FMLA").

476.    Defendants interfered with Ms. Barrett, Ms. Houser, and Ms. Smyth's taking of FMLA-protected maternity leave and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, denying them career-advancement opportunities, making inaccurate statements harmful to their

professional careers, creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave, and ultimately wrongfully terminating Ms. Barrett and constructively discharging Ms. Houser and Ms. Smyth.

477.    Defendants acted willfully, intentionally, and with reckless disregard for Ms. Barrett, Ms. Houser, and Ms. Smyth's rights under the FMLA.

478.    As a direct and proximate result of Defendants' actions, Ms. Barrett, Ms. Houser, and Ms. Smyth suffered injury and monetary damages, including but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses and costs, and are entitled to all legal and equitable remedies available.

479.    By reason of Defendants' discrimination, Ms. Barrett, Ms. Houser, and Ms. Smyth are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT VI

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e-5(f), *ET SEQ.*
RETALIATION
(On Behalf of Ms. Jones, Ms. Seard, Ms. Eckenrode, Ms. Lowder
and Ms. Le Against Defendants)**

480.    Ms. Jones Ms. Seard, Ms. Eckenrode, Ms. Lowder and Ms. Le re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Amended Complaint as though fully set forth herein.

481.    These Plaintiffs engaged in protected activity by filing EEOC Charges or otherwise complaining about gender discrimination—including but not limited to pay disparity, denial of opportunities for professional advancement, favorable treatment towards male

employees, derogatory remarks, and sexual harassment—to people in management positions and in HR.

482.    Defendants engaged in adverse employment actions against These Plaintiffs for engaging in protected activity.  Such adverse employment actions taken have been in the form of subjecting these Plaintiffs to unfavorable terms and conditions of employment, including *inter alia*, denials of promotions, negative performance reviews, hostile working environments, and ultimately constructively discharging these Plaintiffs.  The adverse employment actions have materially and adversely changed Plaintiffs' overall terms and conditions of employment.

483.    A reasonable employee would find the Company's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

484.    Defendants' retaliatory acts against these Plaintiffs were a direct, proximate, and pretextual result of Plaintiffs' protected activities.

485.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of these Plaintiffs, entitling these plaintiffs to punitive damages.

486.    As a result of Defendants' conduct alleged in this Amended Complaint, these plaintiffs have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

487.    By reason of Defendants' discrimination, these plaintiffs are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

488.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT VII

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e-5(f),** *ET SEQ.*
**SEXUAL HARASSMENT**
**(On Behalf of Ms. Jones and Ms. Lowder Against Defendants)**

489.     Ms. Jones and Ms. Lowder re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Amended Complaint as though fully set forth herein.

490.     Forest has discriminated against Ms. Jones and Ms. Lowder by permitting an ongoing, severe, or pervasive pattern and practice of sexual harassment against them by creating and maintaining a sexually hostile work environment in violation of Title VII.

491.     Forest's sexual harassment detrimentally affected Ms. Jones and Ms. Lowder by altering their condition of employment to create a hostile working environment for them.

492.     Forest's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Ms. Jones and Ms. Lowder's rights, entitling them to punitive damages.

493.     As a direct and proximate result of Forest's aforementioned conduct, Ms. Jones and Ms. Lowder suffered economic losses, mental and emotional harm, anguish, and humiliation.

494.     By reason of the continuous nature of Forest's discriminatory conduct, persistent throughout the employment of Ms. Jones and Ms. Lowder, they are entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

495.     By reason of the sexual harassment they suffered at Forest, Ms. Jones and Ms. Lowder are entitled to all legal and equitable remedies available under Title VII, including an award of punitive damages.

### ***PRAYER FOR RELIEF ON CLASS CLAIMS***

WHEREFORE, Class Representatives, on their own behalf and on behalf of the Class, pray that this Court:

A.     Certify this case as a class action under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) or (b)(3), or alternatively, under (c)(4), on behalf of the proposed Plaintiff Class; designate the proposed Class Representatives as representative of this Class; and designate of Plaintiffs' counsel of record as Class Counsel;

B.     Designate this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

> (i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

> (ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C.     Designate Plaintiffs Barrett, Houser, Jones, Seard, Clinton, Eckenrode, Smyth, Avila, Harley, Lowder and Le as representatives of the EPA Collective Action;

D.      Declare and adjudge that the Defendants' employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Class Representatives and Class members under Title VII of the Civil Rights Act of 1964, as amended, the EPA, and the FMLA;

E.      Issue a permanent injunction against Defendants and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of Plaintiffs, class members, and collective action plaintiffs, and those similarly situated as secured by 42 U.S.C. §§ 2000e *et seq.*, and order such injunctive relief as will prevent Defendants from continuing their discriminatory practices and protect others similarly situated;

F.      Issue a permanent injunction against Forest Laboratories and its partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

G.      Order Defendants to initiate and implement programs that will: (i) provide equal employment opportunities for female employees; (ii) remedy the effects of Defendants' past and present unlawful employment policies, practices, and/or procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above; and

H.      Order Defendants to initiate and implement systems of assigning, transferring, compensating, and promoting female employees in a non-discriminatory manner; and

I.      Order Defendants to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii)

124

the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in G through H above; and

G.      Order Defendants to adjust the wage rates and benefits for Class Representatives and the Class members to the level that they would be enjoying but for Defendants' discriminatory policies, practices, and procedures; and

H.      Order Defendants to place or restore Class Representatives and the Class members into those jobs they would now be occupying but for Defendants' discriminatory policies, practices, and procedures; and

I.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law; and

J.      Award nominal, compensatory, and punitive damages to Class Representatives and the Class members, in excess of one hundred million dollars; and

K.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Class Representatives and Class members; and

L.      Award backpay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Class Representatives and the Class members to be determined at trial; and

M.      Order Defendants to make whole Class Representatives and Class members by providing them with appropriate lost earnings and benefits, reinstatement opportunities, and other affirmative relief; and

N.      Award any other appropriate equitable relief to Class Representatives and Class

members; and

O.      Award any additional and further relief as this Court may deem just and proper.

## VIII.  JURY DEMAND

The Class Representatives demand a trial by jury on all issues triable of right by jury.

Dated: March 20, 2013

**SANFORD HEISLER, LLP**

By: _____

Jeremy Heisler (JH-0145)
Deborah Marcuse (DKM-0611)
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5650
jheisler@sanfordheisler.com
dmarcuse@sanfordheisler.com

David Sanford, D.C. Bar No. 457933
Thomas J. Henderson, D.C. Bar No.476854
Stefanie Roemer, D.C. Bar No. 450464
Lubna Alam, D.C. Bar No. 982169
**SANFORD HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5201
Facsimile:  (202) 499-5119
dsanford@sanfordheisler.com
thenderson@sanfordheisler.com
sroemer@sanfordheisler.com
lalam@sanfordheisler.com

*Attorneys for Plaintiffs Megan Barrett,*
*Lindsey Houser, Jennifer Jones, Jennifer*
*Seard, Kimberly Clinton, Erin Eckenrode,*
*Julie Smyth, Marie Avila, Andrea Harley,*
*Christy Lowder, Tracy Le and the Class*

126

## CERTIFICATE OF SERVICE

I, Deborah Marcuse, certify that on this 20th day of March, I caused a true and correct

copy of the Second Amended Complaint to be served upon the following, via electronic mail:

Gary D. Friedman
**WEIL, GOTSHAL & MANGES, LLP**
767 Fifth Avenue
New York, NY 10153
p: 212 310 8963
f: 212 310 8007
gary.friedman@weil.com

*Attorney for Defendants*

By: _____
Deborah Marcuse