UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/14/14

MEGAN BARRETT, et al.,                         :

                          Plaintiffs,          :

                                               :        No. 12-cv-5224 (RA)

              -v-                              :
                                               :        OPINION AND ORDER
FOREST LABORATORIES, INC. and                  :
FOREST PHARMACEUTICALS, INC.,                  :

                          Defendants.          :

------------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

      Plaintiffs are eleven current or former female employees of Defendants Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc. (collectively, "Defendants," "Forest" or "the Company"). In their Second Amended Class Action Complaint ("SAC"), Plaintiffs allege primarily that Defendants discriminated against female employees with respect to pay and promotions.

      Before the Court is Defendants' motion to dismiss each of Plaintiffs' class claims and the majority of their individual claims. In the alternative to dismissing the class claims, Defendants ask the Court to narrow the putative class.

      For the following reasons, Defendants' motion is granted in part and denied in part. To summarize: in addition to stating a number of individual claims, the Court concludes that Plaintiffs have plausibly alleged that Defendants have engaged in a pattern or practice of gender-based discrimination with respect to pay and promotions, and that several of Defendants' policies have a disparate impact on women. With one modification, the Court grants Defendants' request to narrow the scope of the putative class.

## BACKGROUND

The Court draws the following facts from the SAC, all of which it assumes to be true for purposes of this motion. See, e.g., Fahs Constr. Grp., Inc. v. Gray, 725 F.3d 289, 290 (2d Cir. 2013).

### A.    Defendants

Defendant Forest Laboratories, Inc. is "a multi-national corporation engaged in the business of developing, manufacturing, and marketing pharmaceutical products." (SAC ¶ 22.) Its wholly-owned subsidiary, Defendant Forest Pharmaceuticals, Inc., is responsible for the "manufacture, distribution, and sales of prescription medicine" for its parent company. (Id. ¶ 23.) Both entities are incorporated in Delaware; Forest Laboratories is headquartered in New York and Forest Pharmaceuticals has eight offices in the state. (Id. ¶¶ 22-23.)

### B.    Plaintiffs

Although many of Plaintiffs' claims are similar—in that all allege some form of gender-based discrimination—the Court details briefly the circumstances surrounding each Plaintiff's employment as alleged in the 126-page SAC.

#### 1.    Plaintiff Megan Barrett

Defendants hired Barrett in January 2004 as a Territory Representative.[1] (Id. ¶ 25.) During the period at issue in the SAC, she worked in Scranton, Pennsylvania region until she was terminated on April 26, 2011. (Id.)

As do all but one other Plaintiff, Barrett identifies a "male colleague" and alleges "[u]pon information and belief" that he was paid a higher base salary than she was, "even though he did not have superior qualifications, and even though Ms. Barrett and he held jobs requiring the

---

[1]      The SAC uses the terms "Territory Sales Representative" and "Territory Representative" interchangeably. (See, e.g., ¶ 248.) For consistency, the Court uses the latter term.

same skills, efforts and responsibilities, which they performed under similar working conditions." (Id. ¶ 30.) She alleges further that the Company's policy "of awarding merit increases as a percentage of salary" exacerbated this pay disparity. (Id. ¶ 31.)

The thrust of Barrett's allegations is that her male manager began to mistreat her after she returned from maternity leave in February 2009—despite her excellent sales record—and continued mistreating her after she returned from another maternity leave in February 2010. Manager performance assessments, known as "Field Trip Evaluations" or "FTE's," are a significant component of an employee's annual review score. (Id. ¶¶ 39-41.) Barrett alleges that when she returned from maternity leave in February 2009, her manager began rating her 2.4 or 2.5 on a 5.0 scale—the lowest ratings she had received, and well below the 3.0 or higher she had received before her maternity leave began in "late 2008." (Id. ¶ 40.) These low scores "result[ed] in a reduction in her bonus compensation" and rendered Barrett ineligible to apply for promotions. (Id. ¶¶ 41-42.)

This mistreatment allegedly worsened after Barrett returned from maternity leave in February 2010, which led her to contact a human resources representative after she was issued a disciplinary letter in July 2010. (Id. ¶ 50.) Aside from recommending that she document her concerns, Barrett alleges, the Company did not contact her again or investigate her complaint. (Id. ¶¶ 50-51.) In December 2010, her manager placed her on "probation," which required her to undertake certain remedial measures, such as submitting weekly self-assessments. (Id. ¶ 52.)

Barrett asserts that she was singled out for such treatment, alleging that she was the only member of her team placed on probation, even though "other team members had performance numbers lower or similar to hers." (Id. ¶ 54.) She further alleges that a male team member committed "a serious infraction," but was not disciplined, and the manager allegedly told this

3

individual "Don't worry, I have your back." (Id. ¶ 56.) Barrett remained on probation even though she continued to "achieve her sales goals" and receive praise from customers. (Id. ¶¶ 55-58.) Despite her alleged success, Barrett was terminated in April 2011. (Id. ¶ 59.)

### 2.    Plaintiff Lindsey Houser

Defendants employed Houser from June 2003 to November 2010, initially as a Territory Representative and then as a Sales Representative, in several offices in Texas. (Id. ¶ 60.) In addition to identifying male colleagues who were paid a higher base salary despite equivalent qualifications and responsibilities (id. ¶ 63), Houser alleges that she earned certain bonus payments in the quarter before she took maternity leave, but never received those payments because of a Company policy prohibiting representatives "who are on leave for a period of more than six weeks" from collecting "bonuses distributed during the leave period." (Id. ¶ 84).

In her allegations, Houser also describes applying for a promotion while eight months pregnant, asserting that the questions at her interview focused almost exclusively on her pregnancy. (Id. ¶¶ 75-76.) Despite being told by a previous supervisor that management would be "crazy" not to promote her, Houser alleges, Defendants instead promoted another employee—who also happened to be pregnant, but was not visibly so at the time of the interview. (Id. ¶ 77.)

The SAC further asserts that Houser's manager began reducing her FTE scores after her return from maternity leave[2]—despite her allegedly "strong performance"—which reduced her annual salary increase and stock options. (Id. ¶¶ 95-96.) This manager also allegedly made comments to male colleagues about Houser's breasts (id. ¶ 72), sent her a sexually-suggestive birthday card (id. ¶ 79), and remarked to another employee that "he was not going to hire women

---

[2]     The SAC alleges that Houser took maternity leave from "approximately July 2009 to November 2009." (SAC ¶ 80.) Elsewhere, the SAC notes that Ms. Houser was "eight months pregnant" in "March 2009," and also that she was "eight months pregnant" in "early July 2009" when she applied for and was denied the promotion. (Id. ¶¶ 73-74.) The Court assumes that the March 2009 date is incorrect.

anymore because they all get pregnant and go on maternity leave, like Ms. Houser" (id. ¶ 83).

After she was denied the opportunity to take a job-share position in her sales territory—although

she did temporarily share a position in a different territory—Houser resigned from the Company.

(Id. ¶¶ 97-103.)

### 3.    Plaintiff Jennifer Jones

Jones worked as a Territory Representative at the Company's Fort Worth, Texas office

from January 2008 to September 27, 2010. (Id. ¶ 104.) Like the other Plaintiffs, Jones alleges

that a similarly-qualified male, performing a similar job, received a higher base salary. (Id.

¶ 106.) Unlike the nine other Plaintiffs who allege discrimination in base pay, the SAC states

precisely how much Jones's male comparator was paid. (Id. ¶ 106.)

Jones alleges that her manager engaged in overt sexual harassment at a work function one

evening, which included (1) mouthing to another employee, about Jones, "You need to fuck

her"; (2) remarking to a table of employees, after Jones excused herself to use the restroom, that

"he would 'fuck the shit out of her'" and asking why no one had done so yet; (3) walking Ms.

Jones back to her condominium and then propositioning her, an overture that she rejected; and

(4) "aggressively urg[ing] her not to say anything to anyone" about what happened. (Id. ¶¶ 108-

10.)

In the following months, the manager continued to confirm with Jones that she had not

reported the incident. (Id. ¶ 111.) She did not, despite learning that the individual had allegedly

harassed other women and that he continued to ask team members about Jones's relationship

status. (Id. ¶¶ 111-13.) Eventually, this manager became Jones's direct supervisor, and after he

told another manager that Jones "was not a valuable member of the team," Jones finally

described the harassment—first to the other manager, then in a written report to the Company's

Human Resources ("HR") department, and then in a phone call to the Company's "Compliance Hotline." (Id. ¶¶ 114-18.)

Over two months after the phone call to the "Compliance Hotline"—during which time Jones continued to report to her alleged harasser (id. ¶ 120)—an HR director interviewed Jones (id. ¶¶ 121-22). According to Jones, "the majority of the meeting" was spent discussing her work performance, and she was ultimately placed on "probation"—despite being ranked sixteenth in her region out of one hundred sales representatives. (Id. ¶ 121.) Another individual, who also "acted as a witness on Ms. Jones' behalf during the investigation" was also interviewed and placed on "probation." (Id. ¶ 122.) Jones resigned from the Company five days after her interview. (Id. ¶¶ 121, 123.)

### 4.    Plaintiff Jennifer Seard

Seard served as a Territory and Specialty Sales Representative in the Waco, Texas region from December 2003 until April 2011. (Id. ¶ 124.) She is the only Plaintiff who does not allege that a male comparator received a higher base salary than her for performing the same work. She does allege, however, that she was denied bonus compensation during her two maternity leaves "based on Forest's policy of denying bonuses to representatives on leave, even for commissions earned before the period of leave." (Id. ¶ 126.)

According to Seard, after she unsuccessfully requested a job-sharing position in March 2010, her manager "began reviewing Ms. Seard's assignments with unusual detail," and told her that she "had no place at Forest." (Id. ¶¶ 138-39.) Despite ranking "first in sales" on her team and placing in the top quarter of sales representatives nationwide, her manager gave her some of the lowest FTE rankings she had received since her first year as a sales representative, resulting in lower annual salary increases. (Id. ¶¶ 140-41.) Seard sought advice from the Company's HR

6

department; in subsequent discussions with her manager, he would make remarks such as "Are you going to call HR again? I thought we were over that," and "While you're at it, why don't you just copy HR on it?" (Id. ¶¶ 145-46.) After continued scrutiny from her manager, Seard resigned in April 2011. (Id. ¶¶ 147-52.)

### 5.   Plaintiff Kimberly Clinton

Clinton worked as a Territory Representative in the Company's Norwich, Connecticut territory from May 2011 until November 30, 2012. (Id. ¶ 153.) She alleges that her base salary was lower than a male coworker's, who performed a similar job and was no more qualified. (Id. ¶ 156.)

Clinton's allegations reveal a contentious relationship with her coworkers. According to the SAC, Clinton's male coworkers accused her of forging doctors' signatures and falsifying call information; these accusations ultimately resulted in the Company issuing Clinton a "Formal Warning Letter." (Id. ¶¶ 164, 175.) Clinton believed that these accusations were discriminatory, and alleges that her coworkers made comments to her about being a single parent (id. ¶ 165), and that on one occasion, her manager encouraged her to be more "'positive' and enthusiastic' during her calls with doctors," punctuating the phrases by cupping his hands underneath his chest to mimic a woman showing cleavage (id. ¶ 174). Clinton then filed a complaint with the HR department, alleging that her coworkers were discriminating against her and had falsified the accusations. (Id. ¶ 180.)

Clinton further alleges that her manager decreased her FTE scores after she filed the complaint with HR. (Id. ¶ 188.) She eventually resigned on November 30, 2012. (Id. ¶ 192.)

### 6.   Plaintiff Erin Eckenrode

Eckenrode worked as a Territory Representative and Specialty Sales Representative in

the Harrisburg and York, Pennsylvania territories from October 2003 until May 2012. (Id. ¶ 48.)
She alleges that three male Territory Representatives, from her territory or nearby territories,
were paid higher base salaries even though they performed similar jobs and had similar
qualifications. (Id. ¶ 198.)

According to Eckenrode, the Company waited almost a decade to promote her, even
though she twice applied for a promotion and was the most qualified candidate. (Id. ¶¶ 202-
206.) On the first occasion, the Company gave the promotion to a male employee; on the
second, it promoted a female employee who, unlike Eckenrode, was not pregnant. (Id. ¶¶ 202-
03, 206.) Eckenrode was promoted on her third try—despite the hiring manager's lament, during
Eckenrode's interview for the promotion, that "everybody who works for me gets pregnant."
(Id. ¶¶ 217-18.) Eckenrode further alleges that once she was promoted to Specialty Sales
Representative, she still received a lower base salary than two other male Specialty Sales
Representatives, even though the other employees had similar responsibilities and were no more
qualified. (Id. ¶ 221.) She resigned in May 2012. (Id. ¶ 223.)

### 7.   Plaintiff Julie Smyth

Smyth served as a Territory Representative and Specialty Sales Representative from May
2005 to August 2012 in the Hershey, Harrisburg, and York territories in Pennsylvania. (Id.
¶¶ 224-25.) She alleges that a male colleague, who was also a Territory Representative, received
a higher base salary, even though he performed a similar job and did not have superior
qualifications. (Id. ¶ 228.) In fact, according to the SAC, this individual did not have any prior
sales experience—whereas Smyth had three years—and he joined the Company four months
after Smyth did. (Id.)

Smyth was promoted to Specialty Sales Representative the year after she joined the

Company.  (Id. ¶ 230.)  Several years later, she applied for another promotion, but was unsuccessful; according to the SAC, the position was awarded to a male Specialty Sales Representative who, "[u]pon information and belief," had a shorter tenure as a Specialty Sales Representative and who had not performed as well as Smyth had in the year prior to the promotion.  (Id. ¶ 234.)

Smyth further alleges that after she learned she did not receive the promotion, her manager asked her to step down from her Specialty Sales Representative position, and stated that if she "did not agree to step down, he would gradually lower her ride-along scores until she received a Letter of Concern that would effectively place her on probation."  (Id. ¶ 238.)  He then gave her "the lowest ride-along score she had received to date."  (Id.)  Later that day, Smyth informed her manager's supervisor about these comments; the manager subsequently "retracted his request that she step down."  (Id. ¶ 240.)

After Smyth returned from maternity leave, she inquired about a job-sharing position.  (Id. ¶ 247.)  She then applied three times—accepting a voluntary demotion to Territory Representative based on a supervisor's representation that such a demotion was necessary—but did not receive the job-sharing position.  (Id. ¶¶ 247-57.)  Smyth "reluctantly resigned" in August 2012.  (Id. ¶ 258.)

### 8.    Plaintiff Marie Avila

Avila served as a Territory Representative in the Company's Los Angeles territory from June 2010 through August 2011.  (Id. ¶ 260.)  As do most of her co-Plaintiffs, she alleges that a male colleague was paid a higher base salary, despite holding a similar job and despite being no more qualified.  (Id. ¶ 263.)

Avila alleges that after she inquired about job-sharing (so she could care for her two

9

young children), her manager denied her request, remarked "Maybe this job isn't for you if you're not committed," and gave her a low FTE score. (Id. ¶¶ 267-269.) Subsequently, her manager twice extended her probation—on which all new employees are placed, typically for only their first six months of employment—and also set unrealistic sales goals and assigned Avila certain administrative tasks that he did not assign to other employees he supervised. (Id. ¶¶ 270-75.) Avila alleges that before she inquired about job-sharing, she had received only positive feedback (id. ¶ 266), and was ranked in the top five percent of sales representatives nationwide when she received this low score (id. ¶ 273). During a subsequent "ride-along" assessment, the manager asked Avila "if she was planning on having more children." (Id. ¶ 286.)

Because her manager twice extended her probation, Avila was ineligible to apply for a promotion to a Specialty Representative position that opened in her territory. (Id. ¶ 284.) A male employee—who joined the Company at the same time Avila did and, according to the SAC, had a less impressive sales record—obtained the promotion instead. (Id. ¶ 285.)

Avila resigned from the Company in August 2011, "[d]ue to the continued discrimination and retaliation." (Id. ¶ 289.)

### 9.    Plaintiff Andrea Harley

Harley served as a Territory Representative in the Company's Louisville, Kentucky territory from March 2011 until June 2013. (Id. ¶ 291.) A "male colleague," who "was hired by Forest at the same time as Ms. Harley" and who also served as a Territory Representative, was paid a higher base salary, despite being no more qualified and despite performing a similar job. (Id. ¶ 293.)

Harley alleges that her manager initially gave her strong FTE scores, offering positive feedback and telling her that she was "very coachable." (Id. ¶ 295.) After she informed him that

she was four months pregnant, however, this positive feedback changed. (Id. ¶ 296.) Her manager began to give her lower FTE scores, called her "unteachable," and reviewed her performance more often than he did that of her team members. (Id. ¶ 296-99, 306.) Eventually, Harley was issued a "Letter of Concern," which placed her on ninety-day probation—even though at the time she was "rated number one among the 400 sales representatives in Forest's 'FPI' group." (Id. ¶ 297.)

Harley complained to the Company's HR department about this discriminatory treatment on three separate instances—in August, September, and October 2012. (Id. ¶¶ 302, 307, 309.) She did not receive a response until January 10, 2013, after she resigned. (Id. ¶¶ 310-11.)

### 10.    Plaintiff Christy Lowder

Lowder was hired as a Specialty Representative in the Company's Champaign and Springfield, Illinois territories in September 2010. (Id. ¶ 312.) She identifies three male Specialty Representatives who, "[u]pon information and belief," were paid higher base salaries than Lowder, even though they were no more qualified and performed the same job. (Id. ¶ 315.)

The SAC alleges that one of Lowder's managers, Pennington, "has insinuated that Ms. Lowder's success in the field is due to sexual favors she performs for clients in exchange for prescriptions" and once suggested that she "'fuck' a doctor." (Id. ¶ 319-20.) Lowder continues by alleging that she has been subjected to degrading remarks from other Territory Representatives (id. ¶¶ 317, 321), and that Lowder's supervisor refused to take action after he was notified of this harassment (id. ¶ 322).

The SAC also details Lowder's unsuccessful attempts to apply for promotions. During one such attempt, her manager informed her that she was ineligible to apply because she was on probation for a disciplinary infraction; according to Lowder, two male employees, who were also

11

on probation for the infraction, were permitted to apply for the promotion and one obtained it (the other obtained a different promotion). (Id. ¶ 327.) On another occasion, her manager noted "that he was surprised by the strength of Ms. Lowder's application and asked if her husband had written the application"; Lowder did not receive that promotion, either. (Id. ¶ 328.)

According to Lowder's allegations, her coworkers were not the only ones who acted inappropriately. The SAC alleges that several of Lowder's clients—both of whom were doctors—made sexually explicit comments and, on one occasion, one of the doctors "leaned into [Lowder], pulled her breast out from her shirt, and attempted to lick it." (Id. ¶¶ 330-32.) When Lowder reported these incidents to her manager, he "commented how important it was to make a sale" and insisted "that he did not wish to know about clients' indiscretion" because "if he heard the full extent of such incidents, he would be obligated to report them to management, which could lead those doctors to stop prescribing Forest products." (Id. ¶¶ 331-34.) The SAC alleges that Lowder complained about this behavior to HR; although the SAC states that HR initially did not remove the doctors from Lowder's "call panel" (id. ¶ 339), the SAC does not indicate whether the doctors were ultimately removed.

Lowder also alleges that after joining the instant lawsuit, her coworkers stopped communicating with her, and a promotion she applied for was given to another male employee "with far less experience than Ms. Lowder's two-and-[a-]half-years at Forest and ten years as a sales representative in the industry." (Id. ¶¶ 337, 344.)

### 11.   Plaintiff Tracy Le

Le was hired in March 2012 as a Territory Representative in the Company's Southern California region, and continued to work at the Company as of the filing of the SAC. (Id. ¶ 347.) Like most of her co-Plaintiffs, she alleges that a "male colleague" is paid a higher base salary,

12

even though he and Le perform the same job and have comparable qualifications. (Id. ¶ 349.)

The SAC alleges that one of Le's coworkers, Steve Yeu, would "'accidentally' brush his hands over Ms. Le's breasts and touch her leg," and commented "that Ms. Le's body could be an asset for sales." (Id. ¶ 351.) When Le informed her manager, Raymond Gerace, of this harassment, Gerace "explicitly instructed Ms. Le *not* to contact Forest's Human Resources ("HR") Department." (Id. ¶ 352.) Le alleges that in the wake of this complaint, not only did Gerace "order[ ] Ms. Le to work even more closely with her harasser going forward," Gerace began to freeze her FTE scores below 3.0 and extended her probation—even though her sales performance placed her near the top five percent of representatives in the nation. (Id. ¶¶ 353, 358-59.) According to Le, Gerace refused her requests for constructive criticism and "treat[ed] other female employees under his supervision with hostility," by, for example, making disparaging comments. (Id. ¶¶ 363-65.)

Although Le reported Gerace's behavior to HR, at the time of the SAC her probation had been extended again, and she remained ineligible for merit increases, awards, and promotions. (Id. ¶ 375.)

## C.   Procedural History

Plaintiffs filed their Complaint in the instant action on July 5, 2012, and filed an Amended Complaint on November 5, 2012. (Dkt. nos. 1, 13.) After Defendants moved to dismiss—raising arguments similar to those now before the Court—Plaintiffs sought leave to file the SAC. (Dkt. no. 27.) The Court granted Plaintiffs leave to amend and stated that the SAC "would be Plaintiffs' final opportunity to amend to cure any pleading deficiencies." (Dkt. no. 33.)

The SAC seeks to certify a class (the "Class") consisting of "[a]ll female Sales

13

Representatives who are, have been, or will be employed by Forest in the United States from 2008 to the date of judgment. 'Sales Representatives' include Territory Sales Representatives, Field Sales Representatives, Medical Sales Representatives, Professional Sales Representatives, Specialty Sales Representatives, Field Sales Trainers, and Regional Sales Trainers." (SAC ¶ 402.) It also seeks to certify a "Pregnancy Sub-class," defined as "All female Sales Representatives who are, have been, or will become pregnant while employed by Forest in the United States from 2008 to the date of judgment." (Id.) Additionally, the SAC seeks to bring an opt-in collective action under the Equal Pay Act of 1963 ("Equal Pay Act" or "EPA") on behalf of "all current, former, and future female Sales Representatives" who were subjected to unequal pay in one of four enumerated ways.[3]

In total, the SAC asserts seven counts: (1) pay discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") on behalf of the Class and all Plaintiffs; (2) promotion discrimination under Title VII on behalf of the Class and all Plaintiffs; (3) pregnancy discrimination under Title VII on behalf of "Class Representatives Ms. Barrett, Ms. Houser, Ms. Eckenrode, Ms. Smyth, Ms. Harley, and all members of the Class Against Defendants";[4] (4) violation of the Equal Pay Act, on behalf of all Plaintiffs and EPA Collective Action Plaintiffs;

---

[3]    The EPA Collective Action Class is defined in full as:

> [A]ll current, former, and future female Sales Representatives of Forest Laboratories and Forest Pharmaceuticals during the applicable liability period, including until the date of judgment, who (a) were not compensated equally to male employees who had substantially similar job classifications, functions, titles, and/or duties; and/or (b) were not compensated equally to male employees who performed substantially similar work; and/or (c) were denied equal compensation to similar situated male employees by being hired into positions at lesser grades than male employees who performed substantially similar work; and/or (d) were denied promotion and advancement opportunities that would result in greater compensation in favor of lesser qualified males.

(SAC ¶ 432.)

[4]    As discussed *infra*, although Plaintiffs purport to bring Count Three on behalf of the "Class," presumably they intend to bring this claim on behalf of the Pregnancy Sub-Class. (See also Defs.' Mem. of Law at 26 n.43 (noting this discrepancy).)

14

(5) violation of the Family Medical Leave Act, on behalf of Plaintiffs Barrett, Houser, and

Smyth; (6) retaliation under Title VII, on behalf of Plaintiffs Jones, Seard, Eckenrode, Lowder,

and Le; and (7) sexual harassment under Title VII, on behalf of Plaintiffs Jones and Lowder.

     The Court notes at the outset that the organization of the SAC makes it difficult to

understand the exact nature of many of Plaintiffs' claims.  The SAC begins with eighty-nine

pages of factual allegations, providing a narrative of each of the eleven Plaintiffs' experiences

while employed by Defendants.  (Id. ¶¶ 25-376.)  Following these allegations, the SAC lists each

of the policies or practices—approximately fifteen in total—that it asserts are discriminatory.

(Id. ¶¶ 377-93.)  After class and collective allegations (id. ¶¶ 394-435), the SAC conclusorily

recites the elements of each of its seven claims (id. ¶¶ 436-495).

     Whether intentionally or not, Plaintiffs have left it to the Court to attempt to sort out

which policy or practice corresponds to each claim.  Although the task is straightforward for

some policies or practices, it is more difficult for others.  For instance, as described below, the

SAC's allegations about Defendants' job-sharing policies could relate to Plaintiffs' pay

discrimination claim, their promotion discrimination claim, their pregnancy discrimination claim,

or some combination of the three.  The SAC does not specify.  At oral argument on the instant

motion, Plaintiffs twice acknowledged that aspects of the pleadings in the SAC were "inartful."

(Jan. 16, 2014 Tr. at 27:5, 38:16.)  In the Court's view, this is an understatement.

     In spite of the SAC's somewhat haphazard organization, the Court concludes that its

factual allegations state a number of plausible claims.

## DISCUSSION

     To survive a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556

15

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Although the Court accepts as true all the facts alleged in the complaint, it need not credit legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  Determining whether the complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.

## A.    Legal Framework for Title VII Claims

Counts One through Three of the SAC assert claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  These claims—and, as described below, a closely related claim under the Equal Pay Act in Count Four—form the heart of the SAC and are the focus of the majority of Defendants' arguments on the motion to dismiss.  The Court therefore begins by articulating the legal standard for Title VII claims—particularly those asserting a "pattern or practice" of discrimination—and then considers several overarching issues related to each of Plaintiffs' Title VII claims.

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or national origin."  Ricci v. DeStefano, 557 U.S. 557, 577 (2009).  The law protects employees from "both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')."  Id.

### 1.    Disparate Treatment

Disparate treatment is "the most easily understood type of discrimination" and was "the

16

most obvious evil Congress had in mind when it enacted Title VII." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977) ("Teamsters"). To that end, Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Proof of discriminatory motive is critical" in disparate treatment claims, "although it can in some situations be inferred from the mere fact of differences in treatment." Teamsters, 431 U.S. at 335 n.15.

Disparate treatment may be shown in one of two ways. An individual plaintiff may prove disparate treatment under the familiar McDonnell-Douglas framework[5] by first establishing "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). If she makes this prima facie showing, the burden shifts to the employer to "articulat[e] a legitimate, non-discriminatory reason for the employment action." Id. In order to prevail after the employer makes this showing, plaintiff must then offer "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." Id. (alterations omitted).

Alternatively, a "group of plaintiffs, entitled to be certified as a class, may also initiate a pattern-or-practice suit." United States v. City of New York, 717 F.3d 72, 82 (2d Cir. 2013).

---

[5]     See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Of course, a plaintiff need not resort to the McDonnell-Douglas framework if she possesses "direct evidence of discrimination—a smoking gun attesting to a discriminatory intent." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 76 (2d Cir. 2001) (alteration omitted).

Whereas an individual disparate impact claim "requires an intent to discriminate against one person," id. at 83, a pattern-or-practice claim requires plaintiffs to show that "discrimination was the company's standard operating procedure"—the "regular rather than the unusual practice," Teamsters, 431 U.S. at 336—and that "the discrimination was directed at a class of victims," City of New York, 717 F.3d at 83 (alteration omitted). A "pattern or practice case is not a separate and free-standing cause of action, but is really merely another method by which disparate treatment can be shown." Id. (alteration omitted).[6]

A plaintiff's initial burden in a pattern-or-practice case "is heavier in one respect and lighter in another respect than the burden in an individual case." Id. at 84. It is heavier "in that the plaintiff must make a prima facie showing of a pervasive policy of intentional discrimination," instead of only "a single instance of discriminatory treatment." Id.; see also Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 878 (1984) ("[A] class plaintiff's attempt to prove the existence of a companywide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved."). The burden in a pattern-or-practice claim is lighter "in that the plaintiff need not initially show discrimination against any particular present or prospective employee": although "instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, they are not required," and "a statistical showing of disparate impact might suffice." City of New York, 717 F.3d at 84.

As in an individual claim, once plaintiffs make their initial showing in a pattern-or-practice case, the burden of production shifts to the employer to rebut the inference of

---

[6]     The Equal Employment Opportunity Commission and the Attorney General may also bring "pattern or practice" suits. See 42 U.S.C. § 2000e-5(f); id. § 2000e-6(a); Gen. Tel. Co. of the Nw., Inc. v. Equal Employment Opportunity Comm'n, 446 U.S. 318, 329 (1980). The "pattern-or-practice method of proof is not available to nonclass, private plaintiffs." Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 150 (2d Cir. 2012).

discrimination, which it may do by attacking plaintiff's statistical evidence or by offering affirmative evidence demonstrating the absence of an intent to discriminate (such as the existence of an affirmative action program). Id. at 85-87. The trier of fact then must determine whether plaintiffs have proven "the ultimate fact at issue": whether the employer has "a policy of intentional discrimination." Id. at 87.

If plaintiffs successfully establish the existence of a "pattern or practice" of discrimination, the Court may fashion classwide injunctive relief. Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 159 (2d Cir. 2001), abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011). The litigation then proceeds to a "remedial" stage, at which individual employees seeking relief are entitled to a presumption "that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The burden then rests on the employers to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." United States v. City of New York, 717 F.3d 72, 87-88 (2d Cir. 2013) (quoting Teamsters, 431 U.S. at 362) (alterations omitted).

### 2.    Disparate Impact

Title VII also prohibits "employers' facially neutral practices that, in fact, are discriminatory in operation." Ricci, 557 U.S. at 577-78. To establish a prima facie violation, a plaintiff must show that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). The employer may defend against liability by demonstrating "that the challenged practice is job related for the position in question and consistent with business necessity." Id. Even if the employer makes this showing, a plaintiff may still prevail by "showing that the

employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." Ricci, 557 U.S. at 578 (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)).

To make out a prima facie disparate impact case, a plaintiff therefore must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." Chin, 685 F.3d at 151 (citation omitted). The facially-neutral "policy" must be something more than an isolated incident. See, e.g., Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 277 (S.D.N.Y. 2001) (Lynch, J.) (concluding that "one alleged instance of the defendant's failure to post a job" was insufficient "to plead an actionable employment practice or policy"). The complaint must then plead a connection between the policy at issue and the disparity. See Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998) ("Allegations which contend only that there is a bottom line racial imbalance in the work force are insufficient.").

### 3.    Pleading Standard for an Individual Disparate Treatment Claim

The elements required to make out a prima facie disparate treatment claim are well-established, as is the subsequent burden-shifting analysis. What a disparate treatment plaintiff must allege in her complaint is, however, somewhat of an open question in the Circuit.

Prior to Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002), the Second Circuit required plaintiffs to plead a prima facie case under McDonnell Douglas in order to state a claim. See id. at 510. In Swierkiewicz, however, the Supreme Court reversed the Second Circuit, holding that a plaintiff need not allege a prima facie case of discrimination, but rather need provide only "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 513 (quoting Fed. R. Civ. P. 8(a)(2)). This statement "must simply give the defendant fair notice of

20

what the plaintiff's claim is and the grounds upon which it rests," the Court explained. Id. "Liberal discovery rules and summary judgment motions," the Court continued, are the appropriate means to "define disputed facts and issues" and "dispose of unmeritorious claims." Id.

Five years later the Supreme Court handed down Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)—which subjected complaints to the familiar "plausibility" requirement, id. at 570—and in it, expressly affirmed the validity of Swierkiewicz, see id. at 569-70. The Second Circuit is yet to address how district courts should treat Swierkiewicz in the wake of Twombly and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Recently, the Circuit noted that it was "skeptical" of decisions by other courts that "questioned the continued vitality of Swierkiewicz." Brown v. Daikin Am. Inc., --- F.3d ----, 2014 WL 2895974, at *5 & n.10 (2d Cir. June 27, 2014). The Circuit in Daikin, however, concluded that the plaintiff had plausibly alleged a Title VII claim under both the pre-Swierkiewicz "prima facie" standard as well as the Swierkiewicz "fair notice" standard and thus declined to reach the issue. See also Chepak v. Metro. Hosp., 555 F. App'x 74, 76 (2d Cir. 2014) (reversing district court's dismissal of *pro se* plaintiff's claim because the "complaint, on its face, was sufficient to give [defendant] fair notice of [plaintiff's] claims and the grounds upon which they rested" (citing Swierkiewicz, 534 U.S. at 512)); Hedges v. Town of Madison, 456 F. App'x 22, 23 (2d Cir. 2012) ("Swierkiewicz's reliance on Conley suggests that, at a minimum, employment discrimination claims must meet the standard of pleading set forth in Twombly and Iqbal, even if pleading a prima facie case is not required. We need not resolve these conflicts here, however, for Hedges's claims fail any conceivable standard of pleading.").

Other courts in this District, before the Second Circuit's most recent discussion of the issue in Daikin, have treated the elements of a prima facie case as "an outline of what is

21

necessary to render a plaintiff's employment discrimination claims for relief plausible" and have

"consider[ed] these elements in determining whether there is sufficient factual matter in the

complaint which, if true, gives Defendant a fair notice of Plaintiff's claim and the grounds on

which it rests." Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 461 (S.D.N.Y. 2013); accord

Graham v. Women in Need, Inc., No. 13 Civ. 0706(LGS), 2014 WL 2440849, at *2 (S.D.N.Y.

May 30, 2014); Pahuja v. Am. Univ. of Antigua, 11 Civ. 4607(PAE), 2012 WL 6592116, at *9

(S.D.N.Y. Dec. 18, 2012).  This standard reconciles Swierkiewicz, Twombly, and Iqbal, and the

Court applies it in this case.

### 4.    Pleading Standard for a Pattern-or-Practice Claim

A similar question arises with respect to pattern-or-practice claims: although the law is

clear that a pattern-or-practice claim requires a plaintiff to show a "pervasive policy of

intentional discrimination," City of New York, 717 F.3d at 84, few courts have addressed what a

complaint must allege in order to state a plausible pattern-or-practice claim.

Defendants assert—in an argument they repeat with respect to each of Plaintiff's pattern-

or-practice claims—that Plaintiffs must allege statistics in order to make their claims plausible.

(E.g., Defs.' Mem. of Law at 16, 19-20.)  To be sure, statistics are an important way of proving

pattern-or-practice claims, and Plaintiffs will be unlikely to survive summary judgment without

them.  See Robinson, 267 F.3d at 158 ("The heavy reliance on statistical evidence in a pattern-

or-practice disparate treatment claim distinguishes such a claim from an individual disparate

treatment claim proceeding under the McDonnell Douglas framework."); 1 Arthur Larson et al.,

Employment Discrimination § 9.03[1] (2014) ("Plaintiffs have typically depended upon two

kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of

intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past

treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination.").

None of the cases Defendants cite, however, stand for the proposition that statistics must be pled in the complaint in order to survive a motion to dismiss. Indeed, the weight of the case law from other district courts points in the opposite direction. See E.E.O.C. v. Performance Food Grp., Inc., NO. CIV.A. MJG-13-1712, 2014 WL 1760936, at *5 (D. Md. Mar. 11, 2014) ("To the extent that PFG contends the EEOC's use of statistical allegations in the Amended Complaint is insufficient to support a plausible claim of entitlement to relief, the Court agrees with the EEOC that it is not required to plead statistical allegations, much less provide detailed explanations of those statistics to survive a motion to dismiss."); E.E.O.C. v. Propak Logistics, Inc., 1:09CV311, 2010 WL 3081339 (W.D.N.C. Aug. 6, 2010) ("[T]he EEOC may prove this pattern or practice of discrimination through statistical and anecdotal evidence that need not be recited in the complaint."); United States v. Nobel Learning Communities, Inc., 676 F. Supp. 2d 379, 384 (E.D. Pa. 2009) ("Although many courts use statistical information at the summary judgment stage to evaluate pattern or practice claims, such data is not required to survive a motion to dismiss."); see also Sidor v. Reno, No. 95 Civ. 9588 (KMW), 1997 WL 582846, at *10 (S.D.N.Y. Sept. 19, 1997) (denying, under pre-Twombly standard, defendant's motion to dismiss, which argued that plaintiff had failed to allege statistical evidence of discrimination against deaf employees within FBI's New York office). The reasoning underlying these decisions is valid: in most cases, plaintiffs will be unable to provide reliable statistics before they have access to discovery.

Additionally, at least "when there is a small number of employees, anecdotal evidence alone can suffice" to survive summary judgment and even to impose liability after a trial. Sidor

v. Reno, 95 CIV. 9588 (KMW), 1997 WL 582846, at *10 (S.D.N.Y. Sept. 19, 1997); see United States v. City of New York, 713 F. Supp. 2d 300, 318 (S.D.N.Y. 2010) (concluding, after a bench trial, that anecdotal evidence was sufficient to show a pattern of gender-based discrimination among bridge painters employed by New York City's Department of Transportation); see also Stoler v. Inst. for Integrative Nutrition, 13 Civ. 1275, 2013 WL 6068598, at *7 (S.D.N.Y. Nov. 18, 2013) ("In class actions such as this, individual and class issues are not readily separated. Evidence of company-wide policies of discrimination strengthen individual discrimination claims and vice versa."). It follows that allegations of a sufficient number of instances of discrimination may permit a plausible inference that discrimination was the defendant's standard operating procedure, even if the defendant is a multinational company.

This is not to say that every complaint that alleges instances of discrimination necessarily states a pattern or practice claim. See Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 159, 102 S. Ct. 2364, 2371, 72 L. Ed. 2d 740 (1982) ("If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action."). Plaintiffs must still plead facts supporting an inference that discrimination was the Company's "standard operating procedure," and allegations of statistical disparities will go a long way toward making such a claim plausible. Statistics are not necessary, however, if a complaint pleads other facts that allow the court to infer a pattern of discrimination.

The question, then, is how many instances of discrimination are sufficient to allege a pattern in the absence of statistics. Reviewing a verdict after trial, the Second Circuit explained that "[w]hile the definition of a pattern or practice is not capable of a precise mathematical formulation, more than two acts will ordinarily be required." Ste. Marie v. E. R. Ass'n, 650

F.2d 395, 406 (2d Cir. 1981) (citations omitted). If, however, "there were evidence that a policy of discrimination had been adopted, perhaps two or even one confirmatory act would be enough." Id. Several years later, in Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 879 (1984), the Supreme Court similarly suggested that "two or three instances of discrimination" would not be "sufficient to establish a general policy." Specifically with respect to motions to dismiss, courts have held that three instances of discrimination were insufficient to state a plausible pattern-or-practice claim, see Krish v. Connecticut Ear, Nose & Throat, Sinus & Allergy Specialists, P.C., 607 F. Supp. 2d 324, 332 (D. Conn. 2009), as were six instances, Rubinow v. Ingelheim, No. CIVA 3:08-CV-1697VLB, 2010 WL 1882320, at *4 (D. Conn. May 10, 2010), but that eleven or twelve instances were sufficient, see Nobel Learning Communities, Inc., 676 F. Supp. 2d at 384.

 With these principles in mind, the Court considers the sufficiency of Plaintiffs' allegations.

**B.    Count One: Title VII Pay Discrimination**

 The SAC alleges that Defendants discriminate against women (1) with respect to the determination of their initial base pay and (2) with respect to payment of annual salary increases, bonuses, and other compensation.

**1.    Discrimination in Base Pay**

 Plaintiffs assert class pattern-or-practice, disparate impact, and individual disparate treatment claims with respect to base pay.

 **Pattern-or-Practice Claim:** The SAC alleges that "at the time of hire and in connection with promotions or assignments to different positions, women are disproportionately afforded lower base salaries than men." (SAC ¶ 377.) Ten of the eleven Plaintiffs identify a male

employee and allege that the male colleague was paid a higher base salary, despite being no more qualified and despite holding a job "requiring the same skills, efforts and responsibilities," which was "performed under similar working conditions." (Id. ¶¶ 30 (Barrett), 63 (Houser), 106 (Jones), 156 (Clinton), 198 (Eckenrode), 228 (Smyth), 263 (Avila), 293 (Harley), 315 (Lowder), 349 (Le).)

In Defendants' view, the SAC's allegations fail to state a plausible pattern-or-practice claim of discrimination in base pay.

First, Defendants assert that the claim fails because Plaintiffs have only alleged "upon information and belief" that their male comparators received higher base salaries. (Defs.' Mem. of Law at 10; Reply at 7.) Of the ten Plaintiffs who allege that a male coworker received a higher base salary, only one Plaintiff—Jones—specifies her male comparator's base salary. (SAC ¶ 106.) The nine other Plaintiffs simply allege "upon information and belief" that an identified male, who performed a similar job, was paid more. (Id. ¶¶ 30 (Barrett), 63 (Houser), 156 (Clinton), 198 (Eckenrode), 228 (Smyth), 263 (Avila), 293 (Harley), 315 (Lowder), 349 (Le).) According to Defendants, these Plaintiffs have not stated a plausible claim because they have failed to allege the facts supporting their "belief."

"When a plaintiff sets out allegations on information and belief, he is representing that he has a good-faith reason for believing what he is saying, but acknowledging that his allegations are 'based on secondhand information that [he] believes to be true.'" Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 442 (7th Cir. 2011) (quoting Black's Law Dictionary 783 (7th ed. 1999)) (alteration in original)). The Second Circuit has explained that the "Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession

and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010).

Information about how much a coworker is paid would seem to be precisely the type of

information Plaintiffs would not have access to until discovery.

Yet Defendants' argument in this case is not without force: a plaintiff who invokes the

protection of the federal courts by asserting that a male coworker is paid more should have some

reason for doing so. Even if the plaintiff cannot allege the precise amount of her coworker's

salary, she should at least be able to allege the facts that form the basis for her belief that he is

paid more, as some courts in this District have required in other contexts. See JBCHoldings NY,

LLC v. Pakter, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) ("[A]lthough a plaintiff may do so

[plead facts upon information and belief] where the facts are peculiarly within the possession and

control of the defendant or where the belief is based on factual information that makes the

inference of culpability plausible, such allegations must be accompanied by a statement of the

facts upon which the belief is founded." (citations omitted)); Prince v. Madison Square Garden,

427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) ("However, allegations pled on 'information and

belief' are proper if 'accompanied by a statement of the facts upon which the belief is

founded.'").

Although the Court is skeptical of Plaintiffs' inability to allege any facts supporting their

belief that the male comparators receive a higher base salary, at this early stage of the case

Plaintiffs have the better of the argument. The Court need not decide the appropriateness of

pleading "upon information and belief" in every circumstance: deciding the plausibility of a

complaint is, of course, a "context-specific task." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

Here, the SAC's pleading "upon information and belief" is not fatal to Plaintiffs' claims because

each of the ten Plaintiffs (1) states the amount of her base salary, (2) identifies at least one male

27

comparator, and (3) alleges that the comparator received a higher base salary.

These allegations are sufficient to state a claim under Twombly/Iqbal and Swierkiewicz. Both Twombly and Iqbal recognize that, on a motion to dismiss, courts must assume as true the factual allegations in a complaint. See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Here, the allegation that an identified male coworker receives a higher base salary is a factual allegation, not a legal conclusion. In holding that plaintiffs need not prove a prima facie McDonnell-Douglas case to survive a motion to dismiss, the Supreme Court in Swierkiewicz emphasized that a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" and that "[t]his simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." 534 U.S. at 998. Here, the allegation that an identified coworker received a higher salary gives Defendants fair notice of the nature of Plaintiffs' claims. If this assertion is inaccurate—if the comparator is not paid any more than the plaintiff—the complaint can be disposed of quickly on summary judgment after minimal discovery.[7]

The two cases Defendants cite from this District—which require that allegations "upon information and belief" be "accompanied by a statement of the facts upon which the belief is founded"—are not to the contrary. (See Defs.' Reply at 5 n.10 (citing JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013) (quoting Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006)).) Tracing the citations in these cases, one sees that the initial authority for this position is a Second Circuit case, Schlick v. Penn-Dixie Cement

---

[7]     It also bears mention that the mere inclusion of the phrase "upon information and belief" does not absolve a plaintiff's attorney of her Rule 11 obligations. See 5 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1224 (3d ed.) ("[S]ince Rule 11 requires that allegations be based on 'reasonable inquiry,' care must be exercised in terms of the pleader having a solid basis for pleading on information and belief.").

Corp., 507 F.2d 374, 379 (2d Cir. 1974), which addressed the sufficiency of allegations of fraud

under the heightened pleading standard of Fed. R. Civ. P. 9(b). The primary authority on which

Schlick relied—aside from two other Circuit court decisions, both of which also addressed Rule

9(b)—was the treatise of Professors Wright and Miller. See Schlick, 507 F.2d at 379. The

current version of the treatise still explains that "[a]llegations of the circumstances of a fraud

based on information and belief, which are commonplace and often a necessity in many litigation

contexts, usually do not satisfy the particularity requirement of Rule 9(b), unless accompanied by

a statement of the facts upon which the pleader's belief is founded." 5A Charles Alan Wright &

Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2008). With respect to non-

fraud claims under Rule 8, however, the treatise says just the opposite:

> Some cases suggest that when allegations are made on the basis of
> information and belief, the facts on which the pleader's belief is founded
> also should be alleged. Such supporting allegations seem to be
> unnecessary and inconsistent with the philosophy of the federal pleading
> rules, except when the stricter pleading requirements of Rule 9, which
> relate to such matters as fraud and special damages, are involved or the
> matter pleaded in some way casts aspersions on the defendant's moral
> character.

Id. § 1224 (footnote omitted). In view of this authority, the Court concludes that Plaintiffs'

allegations made "upon information and belief" are sufficient at this stage.

Defendants next assert that Plaintiffs' claims fail because they have not alleged facts

supporting their claim that their male comparators engaged in similar work. This argument is

similarly unpersuasive.

Each of the ten Plaintiffs who claims discrimination in base pay alleges that an identified

"male colleague" was paid a higher base salary, "even though he did not have superior

qualifications" and even though he and Plaintiff "held jobs requiring the same skills, efforts and

responsibilities, which they performed under similar working conditions." Of the ten Plaintiffs,

four allege no additional facts in support of their allegation that their male comparators performed similar work. (SAC ¶¶ 30 (Barrett), 156 (Clinton), 263 (Avila), 349 (Le).)  Three others add that their male comparators held the same title as they did.  (Id. ¶¶ 60-63 (Houser), 291-293 (Harley), 312-15 (Lowder).)  Plaintiff Smyth describes specifically why she believed her qualifications were superior—noting that her male comparator had been hired four months after her and had no prior sales experience, whereas she had three years' experience (id. ¶ 228)— and Plaintiffs Eckenrode and Jones allege that their comparators held the same title and worked in the same (or a neighboring) territory (id. ¶¶ 104, 106, 109 (Jones), 198, 221 (Eckenrode)).

Although "job content and not job title or description" is the ultimate "standard for determining whether there was a violation of the anti-discrimination laws,"[8] Chepak v. Metro. Hosp., 2014 WL 552682, at *2 (2d Cir. Feb. 13, 2014),[9] the six Plaintiffs who identify a male comparator who held the same title have at least plausibly alleged that he performed similar work.  In Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013), the Court

---

[8]     The Second Circuit has also explained that "[e]mployees may be similarly situated" if they "are subject to the same standards governing performance evaluation and discipline." Brown v. Daikin Am. Inc., 2014 WL 2895974, at *6 (2d Cir. June 27, 2014).  Plaintiffs' allegations are also sufficient to satisfy this standard.

[9]     As is discussed further in connection with Plaintiffs' Equal Pay Act claims (Count Four), the standards for Title VII wage discrimination and Equal Pay Act claims are "similar." See Gibson v. Jacob K. Javits Convention Ctr. of New York, No. 95 Civ. 9728 (LAP), 1998 WL 132796, at *4 (S.D.N.Y. Mar. 23, 1998).  Accordingly, a number of the cases the Court cites in this section address Equal Pay Act claims.  It is worth noting, however, one way in which Title VII wage discrimination claims are less rigorous than Equal Pay Act (EPA) claims: whereas a Title VII claim requires a showing of intentional discrimination and EPA claims do not, an EPA claim requires a showing that a male employee performed equal work—whereas a Title VII plaintiff could succeed simply by showing that an employer intentionally depressed the wages of female employees, even if the employer did not employ any male employees. See id.; 58 Causes of Action 2d 335 § 3; see also Washington Cnty. v. Gunther, 452 U.S. 161, 178 (1981) (explaining that, if "only those sex-based wage discrimination claims that satisfy the 'equal work' standard of the Equal Pay Act could be brought under Title VII" then "a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay").  This distinction is irrelevant for purposes of the SAC, because it alleges that there were similarly-situated male employees who received a higher base salary—allegations that plausibly state both a Title VII and an Equal Pay Act claim. See Gibson, 1998 WL 132796, at *4 ("If the jobs in question are substantially similar, a plaintiff may of course advance a Title VII wage discrimination claim based on allegations that she was paid lower wages than a male counterpart who performed substantially similar work.  In such a case, the requirements for a prima facie case under Title VII are identical to those under the Equal Pay Act, so long as intentional discrimination is pleaded in the Title VII claim.").

concluded that plaintiff's allegations—which identified a male "comparator," stated his title, and asserted that his "qualifications, experience, and responsibilities were no greater" than plaintiff's—stated a plausible claim. Id.; see Third Amended Complaint ¶¶ 277-83, Kassman v. KPMG LLP, No. 11-cv-3743(LGS) (S.D.N.Y. Jan. 6, 2012), ECF No. 35. Here, the six Plaintiffs who make nearly identical allegations also state a claim.

The Court also concludes that the four Plaintiffs who did not identify their male comparator's job title nonetheless state a plausible claim. In Downes v. JP Morgan Chase & Co., 03 Civ. 8991(GEL), 2004 WL 1277991, at *7 (S.D.N.Y. June 8, 2004), plaintiff alleged that her employer "discriminated against her because it compensated male employees, who had jobs that required equal skill, effort and responsibility and were performed under similar working conditions as [plaintiff's] job, at a higher rate than [plaintiff]." Judge Lynch denied Defendant's motion to dismiss. Citing "the liberal notice-pleading standards of Rule 8" and "the Supreme Court's recent admonition to heed this standard in employment discrimination cases" in Swierkiewicz, the Court explained that the "complaint gives [defendant] adequate notice of the essence of [plaintiff's] claim: that similarly-situated male employees received higher wages than she did." Id.

Similarly, in Chepak v. Metro. Hosp., 11 Civ. 9698(TPG), 2013 WL 1285270, at *1 (S.D.N.Y. Mar. 29, 2013), *pro se* plaintiff alleged that she was paid less than males even though she did "the exact same job" and "performed the same job with equal skill, effort, and responsibility under similar working conditions." The District Court granted defendant's motion to dismiss, id. at *3-*4, but the Second Circuit reversed in a summary order. Citing Swierkiewicz, the Circuit explained that plaintiff's "complaint, on its face, was sufficient to give [defendant] fair notice of her claims and the grounds upon which they rested." Chepak v. Metro.

31

Hosp., 2014 WL 552682, at *1-*2 (2d Cir. Feb. 13, 2014). Although Chepak addressed the allegations of a *pro se* plaintiff, and Judge Lynch's decision in Downes predated Twombly and Iqbal, the Court concludes that these opinions' discussions of Swierkiewicz and Rule 8 apply equally here.

The majority of cases Defendants cite in response are distinguishable because they addressed complaints in which the plaintiff alleged, in conclusory fashion, that male employees received more compensation, without identifying any comparators or providing additional salient facts. (See Defs.' Mem. of Law at 8-9 & n.11 (citing Frasier v. Gen. Elec. Co., 930 F.2d 1004, 1007-08 (2d Cir. 1991); Akinfaderin v. W.P. Carey & Co. LLC, 11 Civ. 3184(LBC), 2011 WL 6961403, at *5 (S.D.N.Y. Dec. 28, 2011); Emmons v. City Univ. of New York, 715 F. Supp. 2d 394, 413-14 (E.D.N.Y. 2010); Black v. New York Univ. Med. Ctr., 94 Civ. 9074(SS), 1996 WL 280802, at *4 (S.D.N.Y. May 24, 1996).) Indeed, one of the cases Defendants cite suggests that the plaintiff's failure to "offer a male counterpart with a higher salary" was one reason why she had failed to state a claim. Bass v. World Wrestling Fed'n Entm't, Inc., 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001). Although the Court does not hold that plaintiffs must necessarily identify a male comparator to state a plausible Title VII wage discrimination claim, doing so will certainly strengthen the complaint's allegations.[10] Here, where all of the Plaintiffs have identified a male comparator, their allegations are sufficient.

Finally, Defendants argue that Plaintiffs' allegations of unequal base salaries fail because

---

[10]    Defendants cite only two cases in which the Court dismissed at the pleading stage a complaint that identified male comparators. The first, Rose v. Goldman, Sachs & Co., Inc., 163 F. Supp. 2d 238, 242-43 (S.D.N.Y. 2001), predated the Supreme Court's decision in Swierkiewicz. In the second, E.E.O.C. v. Port Auth. of New York & New Jersey, 10 Civ. 7462(NRB), 2012 WL 1758128, at *2-*4 (S.D.N.Y. May 17, 2012), the Court found it implausible that all "non-supervisory attorneys" in the Port Authority's legal department performed "substantially equal work." The EEOC's appeal of that decision is currently pending before the Second Circuit. (See dkt. no. 13-2705.)

"nothing in these allegations suggests *intentional* gender-based discrimination." (Defs.' Reply at 7.)

It is well-established that a showing that female employees were treated "less favorably" than "similarly situated" male employees gives rise to an inference of discrimination. E.g., Brown v. Daikin Am. Inc., 2014 WL 2895974, at *6 (2d Cir. June 27, 2014). Factual allegations demonstrating that this practice was sufficiently "pervasive," City of New York, 717 F.3d at 84, would therefore seem sufficient to state a plausible pattern-or-practice claim of intentional discrimination.

Even assuming the disparate treatment itself is insufficient, the SAC contains additional circumstantial evidence of intentional discrimination. Several of the Plaintiffs allege that the Company's Human Resources department and other high-level employees ignored their complaints of discrimination or failed to investigate them. (See, e.g., SAC ¶¶ 50-51, 214, 309.) Others describe comments that their managers made, which ranged from expressions of sexism (see, e.g., id. ¶ 53 (alleging that Plaintiff Houser's manager told another employee that "he was not going to hire women anymore because they all get pregnant and go on maternity leave")), to outright instances of harassment (see, e.g., id. ¶ 192 ("Once inside [Plaintiff Jones's] condominium, Mgr. Wighaman said, 'You don't even know what I want to do to you.'"); id. ¶ 245 ("Regional Director Bill Johnson told Ms. Smyth that he hoped she would get 'real big' because he 'loved' pregnant women and, shortly before they were to do a sales visit with a physician, said that she was 'young' and 'attractive' and really needed to 'work it.'")).

These comments may well be the result of a few "bad apples," and ultimately Plaintiffs will need to prove that the disparities in base pay occurred "pursuant to a deliberate effort to pay women less than men because they are women." E.E.O.C. v. Madison Cmty. Unit Sch. Dist. No.

33

12, 818 F.2d 577, 588 (7th Cir. 1987); see also Brennan v. City of White Plains, No. 97 Civ.

2709 (RWS), 1998 WL 75692, at *9 (S.D.N.Y. Feb. 20, 1998) ("There must be an intent to

discriminate and the intent must encompass an actual desire to pay women less than men because

they are women.").  For purposes of a motion to dismiss, however, Plaintiffs' allegations that a

number of managers made sexist comments, coupled with allegations that the Company

repeatedly ignored complaints of harassment and discrimination, permits at least a plausible

inference that the disparities in base pay occurred as the result of intentional discrimination.

Plaintiffs have therefore pled a plausible pattern-or-practice claim with respect to discriminatory

base pay.

**Disparate Impact Claim:**  As described above, to make out a disparate impact claim,

Plaintiffs must identify a facially-neutral employment practice or policy, demonstrate that a

disparity exists on the basis of gender, and show a causal connection.  Chin v. Port Auth. of New

York & New Jersey, 685 F.3d 135, 151 (2d Cir. 2012).  The SAC alleges that "[o]n information

and belief, the manner in which Forest management determines the base salary to be paid to

employees, including the criteria considered and weighted, disproportionately adversely affects

and has a disparate impact upon women."  (SAC ¶ 377.)

Defendants respond largely by reiterating their disparate treatment argument—that

allegations made "upon information and belief" are insufficient to state a plausible claim.  For

the reasons described above, the Court rejects that argument, as it does Defendants' argument

that Plaintiffs cannot state a plausible claim without alleging statistics.[11]  The allegations that ten

Plaintiffs received lower base pay than similarly-situated male colleagues are sufficient to plead

---

[11]    See Jenkins v. New York City Transit Auth., 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009) ("To the extent the
defendants' argument is that a plaintiff must provide statistical support for a disparate impact claim in order to
survive a motion to dismiss, that argument is incorrect.  It would be inappropriate to require a plaintiff to produce
statistics to support her disparate impact claim before the plaintiff has had the benefit of discovery.").

a gender-based disparity.

Nor is it problematic that the SAC identifies one practice in support of both a pattern-or-practice disparate treatment claim and a disparate impact claim. Of course, were the case to go to trial, the manner in which the Company assigns base salaries cannot support both claims: the alleged disparities in female employees' base salaries are either caused by intentional discrimination or by a facially-neutral policy that has a disparate impact on women. Because the Federal Rules of Civil Procedure expressly permit pleading in the alternative, see Fed. R. Civ. P. 8(d)(2), Plaintiffs have adequately alleged that the manner in which the Company sets base pay has a disparate impact on women.

**Individual Claims:** As described above, ten of the eleven Plaintiffs allege that they received a lower base salary than a similarly-situated male employee. (Id. ¶¶ 30 (Barrett), 63 (Houser), 106 (Jones), 156 (Clinton), 198 (Eckenrode), 228 (Smyth), 263 (Avila), 293 (Harley), 315 (Lowder), 349 (Le).) In addition to forming the basis for the Title VII pattern-or-practice claim, these allegations plausibly state individual claims of disparate treatment with respect to pay. See, e.g., Woodard v. TWC Media Solutions, Inc., No. 09-CV-3000(BSJ)(AJP), 2011 WL 70386, at *13 (S.D.N.Y. Jan. 4, 2011) (noting that a Title VII pay discrimination claim survives summary judgment if plaintiff produces "produce some evidence to show that she was 'substantially similar' to a member outside of her protected class who received more compensation"). The eleventh Plaintiff, Seard, does not make any allegations related to her base salary.

Plaintiffs have thus plausibly alleged pattern-or-practice and disparate impact claims with respect to base pay, and ten of the eleven Plaintiffs (all but Seard) have stated individual base pay discrimination claims.

## 2.    Discrimination in Other Compensation

In addition to alleging discrimination in the setting of their base salaries, Plaintiffs allege that Defendants discriminated against them with respect to their bonuses, annual salary increases, and other compensation.

**Pattern-or-Practice Claim**:  The SAC describes two ways in which Defendants allegedly effected this discrimination: "Forest's predominantly male managers disproportionately rate women lower than men on th[eir] performance assessments, resulting in disproportionately lower annual ratings for women and thus relatively lower annual merit increases for women" (SAC ¶ 378), and managers "disproportionately place [female employees] on probation, resulting in disproportionately fewer awards and accompanying compensation than women's objective sales performance would merit" (id. ¶ 382).  The SAC notes in particular that "Forest management has a practice of disproportionately lowering the performance reviews of women who inquire about or seek to participate in the job-sharing program," and of "lowering the performance reviews of women who have become pregnant and who have had children, after their return from maternity leave."  (Id. ¶¶ 379-80).[12]

The SAC also asserts that the "inclusion of or weight given by Forest policy to manager-supplied performance assessments and FTEs ["Field Trip Evaluations"], in comparison to objective sales performance, has a disparate impact on the performance reviews and merit increases of women that is not justified by business necessity."  (Id. ¶ 378.)  Similarly, the SAC alleges that Defendants' emphasis on "manager-supplied performance assessments" has a "disparate impact on women" with respect to "awards and accompanying compensation."  (Id.

---

[12]    The Court also considers this latter "practice" with respect to Count Three, which alleges pregnancy discrimination.

¶ 382.)[13]

These latter two allegations, though styled as disparate impact claims, are really claims of disparate treatment. The gravamen of the SAC on this point is that managers discriminated against women by giving them unjustifiably low performance evaluations and placing them on probation without reason for doing so, which resulted in reduced compensation. Although, according to the SAC, Defendants' policy of giving weight to these discriminatory assessments caused the discrimination, the real source of the disparity is the managers' allegedly discriminatory reviews and probation decisions. Accepting the SAC's factual allegations as true, this is not a situation where Defendants followed a facially-neutral practice that created a disparity; this is a situation in which managers intentionally treated male and female employees differently. That is a disparate treatment claim. See Maresco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d 106, 115 (2d Cir. 1992) (dismissing disparate impact claim because the "facially neutral employment practice that [plaintiff] invokes as the premise for disparate impact liability coalesces with the discharge which he claims to have constituted disparate treatment"). The Court therefore considers whether the SAC plausibly alleges a pattern-or-practice of gender-based discrimination with respect to bonuses, salary increases, and other compensation.

Four Plaintiffs allege that their bonuses or annual raises were reduced as a result of unjustifiably low performance assessment scores. Plaintiffs Barrett and Houser allege that they began receiving low scores only after they returned from maternity leave. (SAC ¶¶ 40 (Barrett),

---

[13]     Plaintiffs' opposition brief also asserts—in its discussion of pay discrimination—that "the SAC makes clear that Plaintiffs' efforts to remedy discriminatory evaluations were stymied by Forest 'HR' policies and practices that serve to perpetuate discrimination, rather tha[n] prevent or remedy it" and cites four examples from the SAC in which the Company's HR department ignored complaints of discrimination or did not take them seriously. (Pls.' Opp. 8; see also SAC ¶ 390.) These allegations, if proven true, may be relevant to whether Defendants intentionally discriminated. Cf. United States v. City of New York, 717 F.3d at 86 (noting that a defendant's corrective measures may be "probative of the absence of an employer's intent to discriminate").

94 (Houser).)[14]  Plaintiff Seard alleges that she began receiving low ratings after she asked her manager about job sharing opportunities (id. ¶ 137), and Plaintiff Le alleges that her manager began giving her low ratings after she complained about sexual harassment by a coworker (id. ¶ 358).  A fifth Plaintiff, Jones, alleges that after she complained about sexual harassment, Forest placed her on probation, rendering her "ineligible for merit increases, bonuses, awards, and career-advancement opportunities such as promotions, which she would have otherwise been likely to receive due to her excellent sales performance."  (Id. ¶ 121.)

Standing alone, these five instances of discrimination might be insufficient to sustain a plausible pattern-or-practice claim.[15]  These individuals' allegations, however, must be considered alongside the other allegations in the SAC.  See Stoler v. Inst. for Integrative Nutrition, 13 CIV. 1275, 2013 WL 6068598, at *7 (S.D.N.Y. Nov. 18, 2013) ("In class actions such as this, individual and class issues are not readily separated.  Evidence of company-wide policies of discrimination strengthen individual discrimination claims and vice versa.").

Apart from these five instances of discrimination in bonuses and annual raises, the SAC includes allegations by ten of the eleven Plaintiffs that an identified male comparator received a higher base salary for performing the same work;[16] allegations of four Plaintiffs asserting that they received unjustifiably low evaluation scores or extended probation for discriminatory

---

[14]    Barrett alleges that the low ratings began after her second maternity leave.  (Id. ¶ 40.)

[15]    See, e.g., E.E.O.C. v. Bass Pro Outdoor World, LLC, 884 F. Supp. 2d 499, 517 (S.D. Tex. 2012) (dismissing pattern-or-practice claim, where complaint alleged only four instances of discrimination); Rubinow v. Ingelheim, No. CIVA 3:08-CV-1697VLB, 2010 WL 1882320, at *4 (D. Conn. May 10, 2010) (concluding that an allegation that defendant fired six older workers, "out of a workforce of several thousand," did not state a plausible pattern-or-practice claim); Krish v. Connecticut Ear, Nose & Throat, Sinus & Allergy Specialists, P.C., 607 F. Supp. 2d 324, 332 (D. Conn. 2009) (concluding that three instances of discrimination were insufficient to state a plausible pattern-or-practice claim).

[16]    (SAC ¶¶ 30 (Barrett), 63 (Houser), 106 (Jones), 156 (Clinton), 198 (Eckenrode), 228 (Smyth), 263 (Avila), 293 (Harley), 315 (Lowder), 349 (Le).)

reasons, but which did not result in decreased bonuses or annual raises;[17] and allegations of discriminatory comments by managers[18] and inaction by Company officials once complaints of discrimination were made.[19]  These allegations of discrimination in bonuses and annual raises shall thus be considered as part of a broader pattern or practice of gender-based pay discrimination.

**Disparate Impact Claim**:  Although several of the policies the SAC alleges have a disparate impact are more appropriately construed as allegations of disparate treatment, one such policy is properly considered under a disparate impact theory: Forest's alleged policy "of refusing to pay earned bonuses to employees on leave for six weeks or more," which, according to the SAC, "disproportionately disqualifies women from receiving bonuses earned prior to their maternity leave."  (SAC ¶ 381.)

Plaintiff Houser alleges that "[a]ccording to Forest's pay policies, representatives who are on leave for a period of more than six weeks are not entitled to collect bonuses distributed during the leave period even though bonuses are paid out based on performance during the preceding quarter."  (Id. ¶ 84.)  Houser further alleges that "[a]s a result of this policy," she "was not eligible to receive bonus payments when she went out on maternity leave" from July to November 2009.  (Id. ¶¶ 80, 84.)  Plaintiff Seard alleges that she "was denied bonus compensation during her two maternity leaves—from March to June 2007 and from March to June 2009—based on Forest's policy of denying bonuses to representatives on leave, even for

---

[17]     Plaintiff Harley alleges that she received low scores, which rendered her ineligible for a promotion (SAC ¶¶ 295-305), and Avila similarly alleges that her manager's discriminatory decision to extend her probation ultimately precluded her from applying for a promotion (id. ¶¶ 267-85).  Clinton alleges that her low scores placed her "at risk for further disciplinary action" (id. ¶¶ 188-89), while Smyth alleges that on one instance she received a low score but does not specify any consequences resulting from that rating (id. ¶ 238).

[18]     (See SAC ¶¶ 53, 192, 245.)

[19]     (See SAC ¶¶ 50-51, 214, 309.)

commissions earned before the period of leave." (Id. ¶ 126.)

Defendants assert that "the SAC simply does not support a plausible finding that this purported policy of denying earned bonuses to employees on leaves of absence for more than six weeks actually exists" because four Plaintiffs—Barrett (id. ¶ 33), Eckenrode (id. ¶ 195), Smyth (id. ¶¶ 246, 254), and Lowder (id. ¶¶ 335-36)—also took leaves of absence but do not allege that they were denied earned bonuses during their leave periods (Defs.' Mem. of Law at 23).

There is an important difference, however, between an employee failing to allege that she was denied a bonus while on leave and affirmatively alleging that she was paid a bonus while on leave. If the four Plaintiffs' allegations fell into the latter category, Defendants' argument would have more force, and the Court would need to resolve whether the existence of such a policy is plausible in the face of contradictory allegations. Here, although one might have expected Barrett, Eckenrode, Smyth, and Lowder to allege that they were denied an earned bonus while on leave if in fact their bonuses were withheld, nothing in their allegations contradicts the allegations of Houser and Seard.

Both Houser and Seard allege that they were denied their earned bonuses while on leave pursuant to a Company policy that precludes payment of bonuses even for work performed prior to leave. (Id. ¶¶ 84, 126.) The Court credits those nonconclusory factual allegations, as it must on a motion to dismiss. See Iqbal, 556 U.S. at 678. The SAC also alleges the existence of a significant disparity caused by this policy. (See SAC ¶ 381 ("Because maternity or parental leave taken by women is normally greater than six weeks, the policy disproportionately disqualifies women from receiving bonuses earned prior to their maternity leave.").) From these allegations, the Court concludes that the SAC plausibly states a claim that the Company's policy of not paying earned bonuses to employees on leave for greater than six weeks has a disparate

impact on women.

**Individual Claims**:  Plaintiffs Barrett, Houser, Seard, Le, and Jones allege that they received reduced bonuses, raises, or other compensation as a result of unjustifiably low performance evaluations or extended probation—Barrett and Houser after they returned from maternity leave (SAC ¶¶ 40, 94), Seard after she inquired into job-sharing opportunities (id. ¶ 137), and Le and Jones after they complained about sexual harassment (id. ¶¶ 121, 358).

The Court has already concluded that Barrett, Houser, Le, and Jones stated plausible pay discrimination claims with respect to their base salary.  With these allegations, Seard—the only Plaintiff who did not allege that she received a lower base salary than a male comparator—has plausibly alleged a pay discrimination claim based on her allegation that discriminatorily low ratings caused her to receive a reduced annual salary increase.[20]  (See id. ¶ 137.)

To summarize: Plaintiffs have plausibly alleged (1) a pattern or practice of pay discrimination (both with respect to base salaries as well as bonuses and annual raises), (2) a disparate impact claim, based on the method by which Defendants set base salaries and the alleged policy of denying earned bonuses to employees on leave for greater than six weeks; and (3) eleven individual disparate treatment Title VII pay claims.

**C.     Count II: Title VII Promotion Discrimination**

In addition to asserting individual promotion discrimination claims, the SAC articulates several companywide practices that it alleges gives rise to pattern-or-practice disparate treatment or disparate impact claims.  (SAC ¶¶ 383-89.)

---

[20]     Seard alleges that after inquiring into job share opportunities with her manager, he began giving her low ratings, culminating in the lowest rating she had received since her first year at the Company (at the time, she had been an employee for over six years).  (SAC ¶¶ 135-40.)  Seard further alleges that she received these low rankings despite placing first in sales on her team and in the top twenty-five percent of sales representatives nationwide, and that the low rankings caused her to received "a reduced annual salary increase as compared to her male colleagues who worked the same territory."  (Id. ¶ 141.)

Although Defendants reiterate, by way of a footnote, their arguments from Count I that Plaintiffs' allegations are insufficient to form a pattern or practice (see Defs.' Mem. of Law at 40 n.62), their primary argument with respect to Count II focuses on Plaintiffs' individual claims. Specifically, Defendants assert that several of the Plaintiffs "fail to allege *any* open position in which they were even interested," and that those Plaintiffs who do identify such a position "fail to allege the requirements for any of these positions, let alone *facts* about their own background and qualifications demonstrating that they satisfied those requirements." (Id. at 39-40.)

The Court therefore begins by considering whether Plaintiffs have plausibly alleged any individual failure-to-promote claims.

### 1.   Individual Claims

Ten of the eleven Plaintiffs allege that gender-based discrimination precluded them, in some way, from being promoted.[21] Of these ten Plaintiffs, three—Le, Jones, and Harley—allege that, under circumstances suggesting discrimination, their managers gave them low scores or extended their probation, thereby rendering them ineligible to apply for promotions. (SAC ¶¶ 121 (Jones), 296, 305 (Harley), 359, 375 (Le).) Although Jones and Le allege that their probation prohibited them from applying for promotions or receiving merit increases and bonuses that they "would have otherwise been likely to receive due to [their] excellent sales performance" (id. ¶¶ 121 (Jones), 359 (Le)), none of the three Plaintiffs alleges that there was an open position to which they could have been promoted or that they would have had any interest in such a position. These omissions are fatal to their claims.

To establish a prima facie Title VII failure-to-promote claim, a plaintiff must show: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the

---

[21]     Plaintiff Seard does not allege any way in which gender-based discrimination interfered with an attempt at promotion; in fact, the SAC states that she was promoted from Territory Representative to Specialty Sales Representative. (SAC ¶ 124.)

employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004). In Brown v. Coach Stores, Inc., 163 F.3d 706, 709-11 (2d Cir. 1998), the Second Circuit affirmed the dismissal of a plaintiff's complaint because she failed to allege "that she made some specific effort to apply for a particular position or positions." Id. at 710. The Circuit noted that even if plaintiff had adequately alleged that the defendant employer's discriminatory practices would have made an application futile, plaintiff's complaint would still be dismissed because she "failed to allege the specific positions to which she would have applied had the alleged discriminatory practices not existed." Id. at 711.

Brown was decided before the Supreme Court's decision in Swierkiewicz, which held that a complaint "need not plead a prima facie case of discrimination" to survive a motion to dismiss. 534 U.S. at 515. At a minimum, Swierkiewicz calls into question the reasoning in Brown, if it does not abrogate that case's holding entirely.[22] Although the Second Circuit does not appear to have addressed the post-Swierkiewicz pleading standard for failure-to-promote claims,[23] several courts in this District—while recognizing Swierkiewicz—have nonetheless relied on Brown to dismiss failure-to-promote claims where plaintiff failed to allege that he or she applied for an open position. Williams v. City of New York, No. 11 Civ. 9679(CM), 2012

---

[22]    For example, the majority in Brown explained that it "read" McDonnell Douglas as "requir[ing] a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom," and elsewhere in its discussion refers to the "the general rule of McDonnell Douglas." 163 F.3d at 710. The Brown case thus seems to assume that plaintiffs must plead the elements of a prima facie case under McDonnell Douglas to survive a motion to dismiss, which the Supreme Court in Swierkiewicz held was incorrect.

[23]    The Circuit in Quarless v. Bronx Lebanon Hosp. Ctr., 75 F. App'x 846 (2d Cir. 2003), affirmed the dismissal of a failure-to-promote claim as time-barred and suggested, in a single sentence, that plaintiffs are required to plead certain elements of a prima facie case. See id. at 848 ("We also agree with the district court's dismissal of plaintiff's state failure to promote claim based on its determination . . . that plaintiff had failed to allege that the position plaintiff sought was one that remained open and for which the [defendant] continued to seek applicants.").

WL 3245448, at *6 (S.D.N.Y. Aug. 8, 2012); Anderson v. Davis Polk & Wardwell LLP, 850 F.

Supp. 2d 392, 414 (S.D.N.Y. 2012).

Although this Court need not determine the precise relationship between Brown and

Swierkiewicz, the Court concludes that these three Plaintiffs' general assertions that they were

ineligible to apply for promotions are insufficient to state plausible failure-to-promote claims.

Plaintiffs have not alleged that they were interested in a promotion or that there was an open

position to which they could have (or would have) applied.[24]  While it is true that an employee

who is ineligible to be promoted is less likely to be aware of which positions are open, two

competing considerations outweigh this concern.  The first—which relates to "standing-like

concerns," Loyd v. Phillips Bros., Inc., 25 F.3d 518, 523 (7th Cir. 1994)—is that it is difficult to

say that a plaintiff was injured with respect to a promotion if there were not any open positions to

which she could have been promoted or in which she would have been interested.  Second, the

Supreme Court in Swierkiewicz, 534 U.S. at 512, emphasized Rule 8's requirement that a

defendant be given notice of plaintiff's claims.  If a defendant's theory is that a more qualified

individual was awarded the promotion, must it be prepared to offer evidence with respect to

every open position in plaintiff's territory, in neighboring territories, or in any position in which

plaintiff could conceivably have been interested?  These concerns lead the Court to dismiss the

failure-to-promote claims of Le, Jones, and Harley.

Plaintiff Barrett also alleges that her low scores rendered her ineligible for promotions,

but adds that on one occasion a Regional Sales Trainer ("RST") told Barrett and her manager

that Barrett would perform the RST job well.  (SAC ¶ 45.)  Her manager later stated to Barrett

"while rolling his eyes and shaking his head, 'You're not interested in becoming an RST, are

you?'"  (Id.)  According to Barrett, "[b]y his words and actions," her manager "clearly expressed

---

[24]     Nor do any of these Plaintiffs allege that the Company failed to advertise open positions.

to Ms. Barrett that he would not approve nor support her in seeking a promotion at Forest." (Id.)

The addition of this incident does not save Barrett's claim: she does not allege that she would

have been interested in an RST (or any other) position or that the position was open between the

time her manager made this comment and the time Barrett left the Company.

By contrast, four other Plaintiffs identify a particular opening and allege either that they

applied for that position and were rejected (id. ¶¶ 202-03 (Eckenrode), 232-34 (Smyth)), or that

they would have applied for the position but were precluded from doing so (id. ¶¶ 284 (Avila),

327 (Lowder)). Another Plaintiff, Clinton, alleges that she discussed a particular opening with

her manager, that he emphasized that she was competing against "two very well qualified

candidates" who were both male, and that, based on his statements, she "understood" that he

"was clearly advising her not to apply." (Id. ¶ 161.)[25]

As noted above, Defendants assert that these Plaintiffs' claims must be dismissed because

they "fail to allege the requirements for any of these positions, let alone *facts* about their own

background and qualifications demonstrating that they satisfied these requirements." (Defs.'

Mem. of Law at 39.) They rely principally on then-Judge Sotomayor's decision in Cruz v.

Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000). In that case, Plaintiff, who was a secretary

for the leather goods company, alleged that she was promised that she would be promoted to a

new "coordinator" position which the company was to create, that she never received this

promotion, and that the company instead hired two non-minority individuals as "financial

analysts" and gave them many of the analytical responsibilities the company had previously

entrusted to her. Id. at 565. In affirming the District Court's dismissal for failure to state a

---

[25]     Clinton's failure to apply for the job is not fatal to her claim. "[T]he rule is that a plaintiff's failure to apply
for a position is not a bar to relief when an employer's discriminatory practices deter application or make application
a futile endeavor." Malarkey v. Texaco, Inc., 983 F.2d 1204, 1213 (2d Cir. 1993). Here, Clinton's allegations raise
a plausible inference that an application would have been futile.

claim, the Circuit concluded that the allegations in the complaint failed to support "the inference

that Cruz was fit for the position" because the complaint "contain[ed] no information about

either the responsibilities of a financial analyst or Cruz's employment skills." Cruz v. Coach

Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). Absent an allegation that plaintiff "was qualified

for the job," and "absent any claim that she applied for the financial analyst position," the Circuit

continued, plaintiff's complaint "fail[ed] to state a prima facie case for failure to promote." Id.

As with the Circuit's decision in Brown, Cruz must be considered in light of

Swierkiewicz, which held that plaintiffs were not required to plead a prima facie case in order to

survive a motion to dismiss. Even assuming that the holding of Cruz remains fully intact,

however, the allegations of the five Plaintiffs described above satisfy any requirements Cruz

imposes. Three of the Plaintiffs describe why they were more qualified than the male who

received the promotion, by reference to prior experience, length of service at the Company, sales

performance, or some combination of the three. (SAC ¶¶ 201-02 (Eckenrode), 234 (Smyth), 285

(Avila).) Plaintiff Lowder alleges that "[w]ith more than eight years in the field, including

relevant experience training representatives when she worked at pharmaceutical companies

Schering Plough and Abbot Laboratory, Ms. Lowder believed she was a qualified candidate" for

the Regional Sales Trainer position for which she applied. (Id. ¶ 326.) In Cruz, the Second

Circuit emphasized that a plaintiff in a failure-to-promote claim must allege "either directly or

indirectly[ ] that [she] was qualified for the job." 202 F.3d at 566. By describing ways in which

they were more qualified than the male employees who received the promotions, or by

explaining their own relevant experience, these four Plaintiffs have plausibly alleged that they

were qualified for the job.

Plaintiff Clinton describes the duties of the Field Sales Trainer position she sought, notes

46

that she worked as a sales representative for a different pharmaceutical company for two-and-a-half years, explains that she joined Forest "with the intention of using her past experience in the industry to advance into management," and then states that "[a]ccordingly, Ms. Clinton expressed interest in the Field Sales Trainer position" to her manager. (SAC ¶ 161.)  Although a closer question, these allegations also permit the inference that Clinton was qualified for the position.

The final Plaintiff, Houser, alleges that she applied for a promotion for which she was well qualified; that she "was and appeared eight months pregnant" during the interview; and that the interviewers "asked her a number of probing questions regarding her pregnancy" but "did not ask her any questions about her presentation or business strategy." (Id. ¶¶ 73-76.)  Houser then alleges that another female employee was selected for the position who "was also pregnant" but "did not appear to be pregnant at the time of the interview." (Id. ¶ 77.)  Under the principles discussed above, these allegations are sufficient to state a claim for discrimination.  This claim, however, is appropriately considered under Count III, which alleges pregnancy discrimination.

To summarize: ten of the eleven Plaintiffs allege that, under circumstances suggesting discrimination, they did not receive a promotion.  Four of those ten claims are dismissed because Plaintiffs do not identify a specific position or state that they were even interested in such a position.  Of the remaining six Plaintiffs, five state plausible gender-based failure-to-promote claims, and the sixth is addressed under the SAC's pregnancy discrimination claims.

## 2.    Pattern-or-Practice Claim

The next question is whether, in addition to these individual claims, Plaintiffs have plausibly alleged that it was Defendants' "standard operating procedure" to discriminate on the basis of gender with respect to promotions. Teamsters, 431 U.S. at 336.  At this pre-discovery

stage, Plaintiffs' allegations are sufficient to state a plausible pattern-or-practice claim.

The SAC plausibly alleges that managers effected this discrimination by "disproportionately pre-select[ing] men to approve and support for promotion" and by "disproportionately" rating women "lower than men on manager-supplied performance assessments and FTEs," thereby rendering them ineligible for promotions.  (SAC ¶¶ 382-83.)[26] The allegations of nine Plaintiffs are consistent with these assertions, and a tenth alleges that she was the victim of pregnancy-based promotion discrimination.  Although only two Plaintiffs allege any statistics about the underrepresentation of women in management in their territories (see ¶¶ 46 (Barrett), 324 (Lowder)), the SAC's anecdotal allegations of discrimination are sufficient to state a pattern-or-practice claim.

In particular, five Plaintiffs allege that they applied for a promotion but were rejected in favor of a less-qualified male, or that they expressed interest in a specific opening but were prohibited from or warned against applying.  Plaintiff Lowder alleges that her manager told her she was ineligible to apply for a certain promotion because she was on probation "for having too much alcohol on the receipt for a work function with doctors."  (Id. ¶ 327.)  She further alleges that two male employees were also on probation "for this infraction but were permitted to apply," and that one of these employees received the promotion.  (Id.)  According to Lowder, an HR director later told her that she should not have been precluded from applying for this promotion.  (Id. ¶ 341).

Plaintiff Eckenrode, meanwhile, alleges that a less-qualified male employee was awarded

---

26      The SAC also asserts that "the inclusion or weight given by Forest policy to manager-supplied performance assessment in comparison to objective sales performance, coupled with the minimum required scores, has a disparate impact on women being disqualified from eligibility for promotions."  (Id. ¶ 384.)  Similarly, the SAC alleges that Defendants' policy of "prohibit[ing] sales representatives who are on probation from applying for promotions or lateral moves ha[s] a disparate impact on women."  (Id. ¶ 385.)  Although these claims are styled as disparate impact claims, for the reasons described with respect to pay discrimination, these claims are more appropriately considered under a disparate treatment theory.

a promotion to which she applied, and that she later learned from a colleague "that it was well known at Forest that the hiring manager" had "already decided" to promote the male employee "even before Ms. Eckenrode interviewed." (Id. ¶¶ 202-03.) Plaintiff Smyth alleges that shortly before she was to interview for a promotion, her manager told her that the "timing was not right" for her to seek the position. (Id. ¶ 233.) The position was awarded to one of Smyth's male colleagues, who allegedly "had inferior sales performance to Ms. Smyth the year prior to the interview, as well as a shorter tenure as a specialty representative." (Id.) Plaintiff Clinton alleges that, notwithstanding her qualifications, her manager indirectly "advis[ed] her not to apply" for a promotion, for which two male employees had also applied. (Id. ¶ 161.) Plaintiff Avila alleges that, despite being informed by one of her managers that she "was performing according to Company standards," another manager placed her on probation, which rendered her ineligible to apply for a Specialty Representative position that had opened in her territory. (Id. ¶¶ 281, 284.) A male coworker, allegedly less qualified, received the promotion instead. (Id. ¶ 285.)

In addition to these five Plaintiffs who allege that they applied for or expressed interest in a specific promotion, four other Plaintiffs allege that they were prohibited generally from applying for promotions. ((SAC ¶¶ 53 (Barrett), 121 (Jones), 296, 305 (Harley), 359, 375 (Le).) For the reasons described above, the Court construes Second Circuit law as requiring a plaintiff to allege a specific opening in order to state a plausible individual failure-to-promote claim, and therefore concludes that these individuals have not stated individual claims.

These four Plaintiffs' allegations are nonetheless relevant to assessing whether Defendants engaged in a pattern or practice of promotion discrimination. As the Second Circuit explained in City of New York, 717 F.3d at 84, the focus in pattern-or-practice cases is on

49

whether there existed "a pervasive policy of intentional discrimination"—not on whether an individual employee in fact faced discriminatory treatment.  Moreover, the Supreme Court in Teamsters described a process where, after plaintiffs show the existence of a companywide pattern of discrimination, individual class members who did not apply for a promotion could shoulder "the not always easy burden of proving that [s]he would have applied for the job had it not been for those practices."  Teamsters, 431 U.S. at 368.  Although the individual claims of Barrett, Jones, Harley, and Le must be dismissed because they have failed to allege any facts that would allow them to satisfy that burden, their allegations reinforce an inference that any gender-based discrimination was intentional.  With at least nine allegations of discrimination with respect to promotions, the SAC states a plausible pattern-or-practice claim of promotion discrimination.

### 3.    Disparate Impact

The SAC also alleges that Defendants have a policy of limiting job-sharing to "the lowest sales representative position—Territory Sales Representative"—and that this policy has a disparate impact on women because it requires "women in higher level positions to abandon" those positions "and be demoted to that lower position as a precondition to participate" in the job-sharing program.  (Id. ¶ 389.)[27]

Plaintiff Smyth and Seard allege that they voluntarily agreed to be demoted to the Territory Representative position in order to be eligible for job-shares.[28]  (Id. ¶¶ 132-33 (Seard), 247-48 (Smyth).)  With these allegations, they have articulated a facially-neutral employment

---

[27]    The Court notes that this policy could also be considered with respect to Plaintiffs' pay discrimination claim.

[28]    Although Plaintiff Seard does not specifically allege that she stepped down from her position to pursue a job-sharing opportunity, she alleges that she accepted a voluntary demotion and, the same month, asked her manager about job-sharing.  (Id. ¶¶ 132-33.)  Drawing all inferences in her favor, the Court infers that these statements amount to an allegation that Seard stepped down because of the Company's policy.

policy—the first requirement of a disparate impact claim. See Brown, 163 F.3d at 712. Additionally, in light of the Court's conclusion that Plaintiffs have plausibly alleged that gender-based promotion discrimination was Defendants' "standard operating procedure," Plaintiffs have plausibly alleged the second element, that a "significant" disparate impact exists. See id.

Finally, Plaintiffs have plausibly alleged the third element of a disparate impact claim: that a "causal connection" exists between the employer's policy and the disparity, see id. Drawing on "judicial reasoning and common sense," Iqbal, 556 U.S. at 679, it is plausible— indeed, much more than just plausible—that women are more likely to assume childcare duties, and thus that they will be disproportionately less likely to obtain management positions as a result of this policy, which requires them to take a demotion to be eligible for job-sharing.

To survive later stages of the litigation, Plaintiffs will of course be required to provide more compelling proof that (1) a disparity exists and (2) this job-sharing policy is the cause. If Plaintiffs are able to make out this prima facie case, Defendants will have the opportunity to show that this policy is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); see also Andrews v. State of Ohio, 104 F.3d 803, 807 (6th Cir. 1997) (concluding that a district court erred by assessing, on a motion to dismiss, whether certain requirements were job-related or justified by business necessity). At this stage of the litigation, however, Plaintiffs have made out a plausible claim that this policy has a disparate impact with respect to promotions.

To summarize: Plaintiffs Harley, Jones, Le, and Barrett have failed to state individual promotion discrimination claims, because they have not identified a job opening or alleged that they were even interested in a promotion. Plaintiffs Eckenrode, Smith, Avila, Lowder, and Clinton plausibly allege failure-to-promote claims, and Plaintiff Houser's claim is construed as

one for pregnancy-based promotion discrimination and is considered in the following section.

Additionally, Plaintiffs have plausibly alleged that Defendants engaged in a pattern or practice or promotion discrimination, and that Defendants' policy of limiting job-sharing to the "lowest" sales representative position has a disparate impact on women with respect to promotions.

## C.    Count III: Pregnancy Discrimination

Title VII makes clear that "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 684 (1983). Specifically, the Pregnancy Discrimination Act clarified that discrimination "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

The SAC asserts five individual claims of pregnancy discrimination, as well as a pattern-or-practice claim and disparate impact claim based on pregnancy.

### 1.    Individual Claims

Plaintiffs Barrett and Houser allege that after they returned from maternity leave, their managers began to give them low FTE scores, resulting in a reduction in their bonus compensation and annual salary increase. (SAC ¶¶ 41 (Barrett), 94-95 (Houser).) Additionally, Houser alleges that when she was eight months pregnant, she was passed over for a promotion, in favor of a less-qualified female employee (who also happened to be pregnant, but who "did not appear to be pregnant at the time of the interview"). (Id. ¶¶ 73-78.) Houser further alleges

that her manager remarked "that he was not going to hire women anymore because they all get pregnant and go on maternity leave" (id. ¶ 83), and Barrett alleges that she was treated differently from similarly-situated male employees with respect to disciplinary actions (id. ¶ 53). By identifying an adverse action taken in relationship to their pregnancy, these Plaintiffs have provided "a short and plain statement of the claim showing that the pleader is entitled to relief" and given Defendants "fair notice" of their claim "and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). Their managers' reasons for taking these actions—legitimate or otherwise—are appropriately addressed after discovery. Both Plaintiffs state plausible pregnancy discrimination claims.

Similarly, Plaintiff Eckenrode alleges that, while pregnant, she applied and was passed over for a promotion in favor of a less-qualified female employee who was not pregnant. (Id. ¶¶ 205-06.) She also states a plausible pregnancy discrimination claim under Swierkiewicz.

The two remaining Plaintiffs, Smyth and Harley, do not state plausible pregnancy discrimination claims. Smyth alleges that, shortly after returning from a two-to-three-month maternity leave, she accepted a voluntary demotion to a Territory Sales Representative position, based on her manager's representation that doing so would permit her to participate in the Company's job-sharing program. (Id. ¶¶ 247-48.) This move, she asserts, resulted in decreased quarterly bonuses and annual raises. (Id. ¶¶ 248, 252-53.) Although, as explained in the following sections, Plaintiffs have stated a disparate impact claim based on this job-sharing policy, nothing in Smyth's allegations supports a disparate treatment claim—that is, that she was treated differently because of her pregnancy. [29]

---

[29] Smyth also alleges that the Company ultimately denied her the opportunity to participate in the job-sharing program, notwithstanding her voluntary demotion. (SAC ¶ 257.) Even assuming that the denial of a job-sharing position is actionable under the Pregnancy Discrimination Act, Smyth has not alleged any facts from which the Court can plausibly infer that the denial was related to her pregnancy (or her gender).

Plaintiff Harley alleges that she began receiving low FTE scores after she disclosed her pregnancy to her manager, and that she was ultimately placed on probation as a result, rendering her ineligible for a promotion. (SAC ¶¶ 296-99, 305.) Because she does not identify any opening or allege that she expressed interest in a promotion, however, she fails to state a plausible failure-to-promote claim.

## 2.    Pattern or Practice Claim

Plaintiffs allege that Defendants have "a practice of discriminating against women who become pregnant and have children in the administration and scoring of performance reviews, and, as a result, in annual merit increases and decisions to place employees on probation." (SAC ¶ 379.) This "practice," the SAC continues, "disproportionately disqualifies or disadvantages women interested in promotions." (Id. ¶ 386.)

As discussed with respect to the pattern-or-practice claim of discrimination with respect to bonuses and annual raises, see supra Section B.2, standing alone these instances of discrimination would likely be insufficient to state a plausible pregnancy discrimination claim. These allegations must be considered, however, in connection with the SAC's broader claims of gender-based pay and promotion discrimination—each of which the Court has concluded is plausible. Construed in this fashion, discrimination against pregnant women may plausibly be one more way in which Defendants carried out the broader practice of gender-based discrimination.

## 3.    Disparate Impact Claim

The SAC also alleges that "Forest uses President's Club rankings—a quarterly, nationwide classification system that ranks sales representatives according to the percentage of sales quotes they meet—to determine a sales representative's eligibility for payouts, bonuses,

salary increases, promotions, and transfers." (SAC ¶ 86.) The President's Club rankings are also used "to justify disciplinary action leading to termination." (Id.)

Plaintiffs Barrett and Houser allege that, consistent with Forest policy, their President's Club rankings were not adjusted for the time they spent on maternity leave, which resulted in decreased bonus compensation and annual raises. (Id. ¶¶ 36-38 (Barrett), 87-88 (Houser).) Plaintiffs argue that this policy has a disparate impact on pregnant women—the set of employees most likely to take extended leave and thus most likely to be affected by the policy. (Pls.' Opp. at 30.)

Defendants respond by asserting that Plaintiffs' disparate impact claim fails because they have not alleged that pregnant women were treated differently from non-pregnant employees who took comparable time off.

The parties' competing arguments highlight a tension between the language of the Pregnancy Discrimination Act ("PDA") and well-established Title VII principles—a tension that, in the words of one commentator, has created "unrest, and even some outright conflict, in the case law." Christine Jolls, Antidiscrimination and Accommodation, 115 Harv. L. Rev. 642, 663 (2001).

On the one hand, the PDA requires only that "women affected by pregnancy" be treated the same "as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). Consistent with this language, a number of courts have concluded that, to show a violation of the PDA, a plaintiff must show "that she was treated differently from others who took leave or were otherwise unable or unwilling to perform their duties for reasons unrelated to pregnancy or that she simply was treated differently because of her pregnancy." E.E.O.C. v. Bloomberg L.P., 778 F. Supp. 2d 458, 468 (S.D.N.Y. 2011); see Dormeyer v.

55

Comerica Bank-Illinois, 223 F.3d 579, 584 (7th Cir. 2000) ("[T]he Pregnancy Discrimination Act does not protect a pregnant employee from being discharged for being absent from work even if her absence is due to pregnancy or to complications of pregnancy, unless the absences of nonpregnant employees are overlooked."); Urbano v. Cont'l Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998) ("Continental treated Urbano in exactly the same manner as it would have treated any other worker who was injured off the job."); Velez v. Novartis Pharm. Corp., 244 F.R.D. 243, 264 (S.D.N.Y. 2007) (Lynch, J.) ("It has been repeatedly affirmed that the PDA does not require the creation of special programs for pregnant women; nor does it mandate any special treatment. To the contrary, the statute specifically requires that pregnant women be treated the same as all other employees with similar disabilities."); Gratton v. JetBlue Airways, 04-cv-7561(DLC), 2006 WL 2037912 (S.D.N.Y. July 21, 2006) ("[T]he issue presented by Gratton's claims is whether JetBlue failed to give Gratton the same opportunity to remain at work that it gave to other employees who temporarily could not perform all of their job functions."); Minott v. Port Auth. of N.Y. & N.J., 116 F. Supp. 2d 513, 521 (S.D.N.Y. 2000) ("Title VII and the Pregnancy Discrimination Act do not protect a pregnant employee from being discharged for absenteeism even if her absence was due to pregnancy or complications of pregnancy, unless other employees are not held to the same attendance standards."); see also Fisher v. Vassar Coll., 70 F.3d 1420, 1448 (2d Cir. 1995), aff'd on other grounds on reh'g in banc, 114 F.3d 1332 (2d Cir. 1997), abrogated on other grounds by Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) (citing with approval Troupe v. May Department Stores, 20 F.3d 734, 738 (7th Cir. 1994), and parenthetically describing the case as holding that "an employer is required to ignore an employee's pregnancy, but not her absence from work, unless the employer overlooks the comparable absences of non-pregnant employees").

At the same time, however, nothing in the PDA precludes plaintiffs from bringing claims under a disparate impact theory.  Indeed, the Seventh Circuit has so held.  See Scherr v. Woodland Sch. Cmty. Consol. Dist. No. 50, 867 F.2d 974, 979 (7th Cir. 1988) ("Because the PDA is part of Title VII and derives its substance and procedures from the Act as a whole, a claim of pregnancy discrimination, like any other claim of discrimination under Title VII, may be based either on a theory of disparate treatment or a theory of disparate impact."); see also Jolls, 115 Harv. L. Rev. at 662 (dismissing as "quite puzzling" the views of commentators who construe the PDA as requiring "employers [to] make available to pregnant women only what they make available to men for other conditions," and noting that "[i]t is almost as if the very existence of the disparate impact branch of liability under Title VII is being ignored").

Consistent with this reasoning, courts have affirmed disparate impact claims under the PDA—even though those claims (by definition) necessarily involve a policy that is applied equally to pregnant women and men who take comparable leave or have similar physical restrictions.  In Abraham v. Graphic Arts Int'l Union, 660 F.2d 811 (D.C. Cir. 1981), for example, the defendant-employer limited employees' disability leave to ten days.  In reversing the district court's grant of summary judgment to defendant, the Circuit concluded: "the ten-day absolute ceiling on disability leave portended a drastic effect on women employees of childbearing age[,] an impact no male would ever encounter"; because the policy "affected women employed in [Defendant's] program much more severely than any male engaged therein," plaintiff had made out a prima facie case under Title VII. Id. at 819.

Similarly, in United States E.E.O.C. v. Warshawsky & Co., 768 F. Supp. 647 (N.D. Ill. 1991), the Court confronted a policy in which first-year employees who required sick leave were discharged.  The Court explained that "pregnant first-year employees are discharged at a

significantly higher rate than non-pregnant first-year employees. This occurs *because* pregnant employees need more time off from work than non-pregnant employees. Because only women can get pregnant, if an employer denies adequate disability leave across the board, women will be disproportionately affected." Id. at 650. Concluding that the employer had not shown that the policy "serve[d], in a significant way, any legitimate employment goal," the Court granted plaintiff summary judgment on her disparate impact claim. Id. at 655.

And in Germain v. County. of Suffolk, 07-CV-2523, 2009 WL 1514513, at *4 (E.D.N.Y. May 29, 2009), the municipal employer offered law enforcement officers light duty assignments only for injuries occurred while on the job; because pregnancy was not considered an injury or disability incurred on the job, pregnant women were not entitled to light-duty assignments. The defendant contended "that the policy does not offend the PDA because [defendant] has applied the policy consistently to all officers, whether pregnant or not, who have sought light-duty assignments because of non-occupational injuries." Id. at *4. The Court rejected this argument, concluding that plaintiff had established a prima facie case of disparate impact. Id.

The Seventh Circuit confronted this tension in Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579 (7th Cir. 2000), in which the plaintiff was terminated from her job because her pregnancy caused her to be absent. Judge Posner, writing for the Court, affirmed the dismissal of the claim, and recognized that "[i]t might seem that a company's policy on absenteeism might be attacked from the direction of disparate impact, a permissible theory of liability under the Pregnancy Discrimination Act." Id. at 583. He reasoned that a disparate impact theory was inappropriate: "The argument here is not that the employer has adopted rules or practices that arbitrarily exclude pregnant women, but that the employer should be required to excuse pregnant employees from having to satisfy the *legitimate* requirements of their job. It is an argument for

subsidizing a class of workers, and the concept of disparate impact does not stretch that far." Id. at 584.

Judge Posner's reasoning in Dormeyer, which is echoed in other decisions, see, e.g., Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir. 1994), appears to resort to the second stage of the disparate impact inquiry, in which the employer may "demonstrate[e] that the challenged practice is job related for the position in question and consistent with business necessity." Gulino v. New York State Educ. Dep't, 460 F.3d 361, 382 (2d Cir. 2006). Indeed, Dormeyer addressed a grant of summary judgment, as do virtually all of the cases Defendants cite in support of their position in the instant motion—including Judge Preska's decision in E.E.O.C. v. Bloomberg L.P., 778 F. Supp. 2d 458 (S.D.N.Y. 2011), on which Defendants rely heavily.[30]

Absent further guidance from the Second Circuit, the Court treats this disparate impact claim the way it would any other: it will determine whether Plaintiff has identified a facially-neutral policy and plausibly alleged that it causes a significant disparity and, if so, give Defendants the opportunity to demonstrate business necessity. See, e.g., Gulino, 460 F.3d at 382. Here, the SAC plausibly alleges that this policy has a disparate impact on women, because women are more likely to take extended periods of leave.[31] Defendants will have the opportunity, after discovery, to demonstrate business necessity.

Accordingly, the Court concludes that Barrett, Houser, Eckenrode, and Smyth have stated pregnancy discrimination claims. It also concludes that the SAC plausibly alleges a pattern or

---

[30]   Indeed, in the only case Defendants cite in the relevant section of their brief (pages 26-28) that addressed a 12(b)(6) motion, the Court denied the motion to dismiss. (See Defs.' Mem. of Law at 27 (citing Briggs v. Women in Need, Inc., 819 F. Supp. 2d 119, 127 (E.D.N.Y. 2011).)

[31]   One might argue that this claim is more properly considered as one of pay discrimination on the basis of gender more generally, and not discrimination on the basis of pregnancy. At this juncture, such a distinction is immaterial.

practice of pregnancy discrimination, and a disparate impact claim based on Defendants' alleged policy of not adjusting President's Club rankings for time employees spend on leave.

**D.     Count IV: Equal Pay Act Claims**

The Equal Pay Act prohibits an employer from "paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

"The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies." Lavin-McEleney v. Marist Coll., 239 F.3d 476, 483 (2d Cir. 2001). One "key difference between them, of course, is that a Title VII disparate treatment claim requires a showing of discriminatory intent, while an Equal Pay Act claim does not." Id. An Equal Pay Act plaintiff, however, must demonstrate that she received less pay than a male who performed a "substantially similar" job. Gibson v. Jacob K. Javits Convention Ctr. of New York, 95 Civ. 9728 (LAP), 1998 WL 132796, at *4 (S.D.N.Y. Mar. 23, 1998). Put differently, a Title VII plaintiff could succeed by showing that her employer intentionally depressed her wages, even if the employer did not employ any similarly-situated males. See id.; 58 Causes of Action 2d 335 § 3; see also Washington Cnty. v. Gunther, 452 U.S. 161, 178 (1981) (explaining that "a woman who is discriminatorily underpaid" cannot obtain relief under the Equal Pay Act—"no matter how egregious the discrimination might be—unless her employer also employ[s] a man in an equal job in the same establishment, at a higher rate of pay").

Here, ten of the eleven Plaintiffs have alleged that male employees who performed

60

similar work were paid higher base salaries. (SAC ¶¶ 30 (Barrett), 63 (Houser), 106 (Jones), 156

(Clinton), 198 (Eckenrode), 228 (Smyth), 263 (Avila), 293 (Harley), 315 (Lowder), 349 (Le).)

Defendants argue that their allegations are insufficient because they merely plead "upon

information and belief" that they received lower salaries and because they do not allege facts

supporting the inference that the jobs were equal. (Defs.' Mem. of Law at 9-11.) For the reasons

described above, the Court rejects these arguments and concludes that these ten Plaintiffs have

plausibly stated Equal Pay Act claims.

The remaining Plaintiff, Seard, does not allege that she was paid a lower base salary than

a male comparator. Instead, she alleges that her manager gave her intentionally low performance

assessment scores after she asked about job sharing, which resulted in her receiving "a reduced

annual salary increase as compared to her male colleagues who worked the same territory,

including her territory partner Doug McLean." (SAC ¶ 141.)

Although these allegations state a plausible Title VII claim, the Court agrees with

Defendants that they are insufficient to state an Equal Pay Act claim. Seard simply references

her "territory partner," without attempting to allege that she and McLean performed "equal work

on jobs the performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions." 29 U.S.C. § 206(d)(1). Even assuming this

passing reference is sufficient to plead "equal work," Seard does not allege any facts showing

that she was paid "at a rate less than the rate at which [Defendants] pa[id] wages to employees of

the opposite sex." 29 U.S.C. § 206(d)(1). Her allegations are consistent with a scenario in which

she was paid more than McLean both before and after the salary increases—but that she simply

received a lower raise. Because she does not allege that she received lower "wages"—which

"include all payments made to or on behalf of an employee as remuneration for employment," 29

C.F.R. § 1620.10—than McLean, Seard has failed to state an Equal Pay Act claim. See Mitchell v. Developers Diversified Reality Corp., No. 4:09-CV-224, 2010 WL 3855547, at *5 (E.D. Tex. Sept. 8, 2010), report and recommendation adopted, 2010 WL 3860500 (E.D. Tex. Sept. 30, 2010) (explaining that the Equal Pay Act "does not regulate raises or bonuses directly. The statute merely requires that Plaintiff receive total compensation at least equal to male employees with equal performance.").

Defendants also assert that Plaintiffs' collective action claim must be dismissed because they have failed to provide "a modest *factual* showing sufficient to demonstrate that they and potential plaintiffs were victims of a *common policy or plan* that violated the law." (Defs.' Mem. of Law at 12 (quoting Zhong v. August August Corp., 498 F. Supp. 2d 625, 630 (S.D.N.Y. 2007).)

The Second Circuit has explained that "district courts have discretion, in appropriate cases" to implement Section 216(b) of the Fair Labor Standards Act (which includes the Equal Pay Act), "by facilitating notice to potential plaintiffs of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." Myers v. Hertz Corp., 624 F.3d 537, 554 (2d Cir. 2010). This process proceeds in two steps. "The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." Id. at 555. To be entitled to court-facilitated notice, Plaintiffs must make a "modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." Id. This "'modest factual showing' cannot be satisfied simply by 'unsupported assertions.'" Id. At the second stage, "the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs

who have opted in are in fact 'similarly situated' to the named plaintiffs." Id.

In the Court's view, Defendants' motion is premature.  Plaintiffs have not yet moved for conditional collective certification, and the Second Circuit's decision in Myers—which requires at the "first stage" a "modest factual *showing*" that cannot be satisfied by "unsupported assertions," id. (emphasis added)—appears to contemplate that courts will not address collective certification until after Plaintiffs have had the opportunity to present materials outside the pleadings.  See also Lang v. DirecTV, Inc., 735 F. Supp. 2d 421, 435 (E.D. La. 2010) ("This case has not yet reached the first, conditional certification stage of the process . . . . Plaintiffs have not moved for certification, and they have not proposed that specific notices be distributed. The Court finds that defendants' motion to dismiss is premature because plaintiffs have not moved for certification and have had no opportunity to develop a record.").  Defendants are, of course, free to make these arguments once Plaintiffs move for certification.

**E.      Count V: Violation of the Family Medical Leave Act**

Plaintiffs Barrett, Houser, and Smyth allege that Defendants violated the Family Medical Leave Act by interfering with their "taking of protected maternity leave, and discriminated against them for the taking of such leave." (SAC ¶ 475.)  Defendants do not challenge Count V in their motion.

**F.      Count VI: Retaliation**

Plaintiffs Jones, Seard, Eckenrode, Lowder, and Le allege that Defendants retaliated against them for complaining about gender discrimination. (SAC ¶ 481.)  Defendants argue that the claims of Eckenrode, Lowder, and Le should be dismissed because they have not exhausted their administrative remedies.  In any event, they continue, Eckenrode's claim should be dismissed for failure to state a claim.

*Administrative Exhaustion*:  An employment discrimination plaintiff may bring a claim

only after filing a charge with the Equal Employment Opportunity Commission (EEOC) or

appropriate state agency.  42 U.S.C. § 2000e-5(e).  "Exhaustion of remedies is a precondition to

suit, and a plaintiff typically may raise in a district court complaint only those claims that either

were included in or are 'reasonably related to' the allegations contained in her EEOC charge."

Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 83 (2d Cir. 2001) (citation omitted).  A claim is

"reasonably related" to those in an EEOC charge when "the conduct complained of would fall

within the scope of the EEOC investigation which can reasonably be expected to grow out of the

charge of discrimination."  Id.  The "reasonably related" standard is "essentially an allowance of

loose pleading."  Id.

This "loose pleading" standard does not apply only to claims brought by a single

plaintiff.  The Second Circuit has adopted the "single filing rule"—also known as

"piggybacking"— "which provides that where one plaintiff has filed a timely EEOC complaint,

other non-filing plaintiffs may join in the action if their individual claims arise out of similar

discriminatory treatment in the same time frame."  Snell v. Suffolk Cnty., 782 F.2d 1094, 1100

(2d Cir. 1986) (alteration omitted).  When applying this rule to a large group of employees, the

Second Circuit has explained, the initial EEOC charge need not "specify that the claimant

purports to represent a class or others similarly situated," but "there must be some indication that

the grievance affects a group of individuals defined broadly enough to include those who seek to

piggyback on the claim."  Tolliver v. Xerox Corp., 918 F.2d 1052, 1058 (2d Cir. 1990).

Providing such an indication "alerts the EEOC that more is alleged than an isolated act of

discrimination and affords sufficient notice to the employer to explore conciliation with the

affected group."  Id.

Here, Defendants do not dispute that Plaintiff Seard filed a timely EEOC charge alleging retaliation. (Defs.' Mem. of Law at 47.) They argue, however, that because Seard complained about retaliation "with respect to a specific manager in Texas in 2010," the claims of Eckenrode, Lowder, and Le—which, respectively, allege retaliation by individuals in Pennsylvania in 2011, Illinois in 2012, and California in 2012 (see SAC ¶¶ 193, 213 (Eckenrode), 312, 336 (Lowder), 347, 358 (Le))—are not sufficiently similar to permit "piggybacking."

Courts in this District have adopted a relaxed view of the requirements that the events occurred within the same time period: "Exact duplication of a time frame is unnecessary to satisfy the single-filing rule; instead, mere similarity of grievances within the same *general* time frame suffices to permit operation of the single filing rule." Cronas v. Willis Grp. Holdings Ltd., No. 06 CIV. 15295 (GEL), 2007 WL 2739769, *8 (S.D.N.Y. Sept. 17, 2007) (Lynch, *J.*); accord E.E.O.C. v. Mavis Disc. Tire, No. 12 CIV 0741 KPF, 2013 WL 5434155, at *4 (S.D.N.Y. Sept. 30, 2013). Permitting "piggybacking" where claims are filed within a several-year period makes sense, because discrimination typically "is not a discrete, isolated event," and because the very nature of "piggybacking" implies that one plaintiff is bringing suit at a later date. Cronas, 2007 WL 2739769, at *8.

The closer question is whether an allegation of retaliation in Texas is sufficiently similar to allegations in other office locations across the country. Although allegations of discrimination against a large employer necessarily involve a fact-intensive inquiry, the Second Circuit has set a "loose pleading" standard. Holtz, 258 F.3d at 83. When applied to the facts of this case, the Court concludes that Seard's allegations are sufficiently similar to those of Eckenrode, Lowder, and Le.

In particular, the Circuit in Tolliver explained that "there must be *some indication* that the

grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim." 918 F.2d at 1058 (emphasis added). Here, Seard's EEOC complaint states "I believe that Forest's actions are part of a continuing pattern and practice of discrimination against similar employees generally, and the ways in which Forest has discriminated against me are similar to the ways it discriminates against similarly-situated employees"; "It is widely understood at Forest that once someone files a formal complaint, HR will begin interrogating the person about his or her performance"; and "I believe that Forest has engaged and continues to engage in a pattern and practice of discrimination against its female employees and denies them equal employment opportunities in ways including, but not limited to . . . retaliation . . . . I believe that these discriminatory patterns and practices occur throughout Forest. I make this charge on behalf of all similarly situated female employees and myself." (Declaration of Gary D. Friedman, Apr. 29, 2013 ("Friedman Decl.") Ex. H at 1-4.)[32]

This complaint gives at least "some indication" that its allegations affect a group of individuals that would include Plaintiffs Eckenrode, Lowder, and Le. All four of these Plaintiffs allege that they faced retaliation after they complained about gender-based discrimination (not racial or age discrimination). That this conduct occurred at different offices does not make the claims so dissimilar as to preclude "piggybacking." See Mavis Disc. Tire, 2013 WL 5434155, at *4 ("EEOC actions may be maintained against multiple business locations, even though the charge of discrimination was limited to a single location."); Bethea v. Equinox Fitness Club, No. 07 CIV 2018(JSR), 2007 WL 1821103, at *4 (S.D.N.Y. June 21, 2007) (permitting piggybacking where plaintiffs complained of similar treatment at different locations).

*Sufficiency of Eckenrode's Claim*: Although Eckenrode's claim is not procedurally

---

[32]     Neither party has raised an objection to the Court considering EEOC complaints filed by various Plaintiffs, which Defendants have submitted in support of their motion to dismiss.

barred, the Court agrees with Defendants that she has failed to state a plausible retaliation claim.

To establish a retaliation claim, a plaintiff must show (1) [s]he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014). Although Swierkiewicz does not require a plaintiff to plead a prima facie case, the complaint must provide defendant with notice of the adverse action. See, e.g., Cruz v. New York State Dep't of Corr. & Cmty. Supervision, No. 13 CIV. 1335(AJN), 2014 WL 2547541, at *6 (S.D.N.Y. June 4, 2014) (dismissing retaliation complaint on 12(b)(6) motion for failure to allege an adverse action). In this context, a materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Here, Eckenrode alleges that she complained to human resources about her manager's "discriminatory behavior and comments." (SAC ¶ 214.) She does not, however, identify any adverse action she suffered after she made this complaint. In fact, the SAC alleges that she was promoted. (Id.) Although she alleges that she was subjected to three "additional rounds of gender-based interrogations"—telephone conversations in which the hiring manager asked her why she wished to pursue a promotion when she had previously inquired about a job share, and remarked "everybody who works for me gets pregnant" (id. ¶ 217)—the Court concludes that requiring the additional telephone conversations does not rise to the level of a "materially adverse action."[33] Delay in a promotion could constitute such an adverse action, of course, but

---

[33]     Eckenrode also alleges that she was paid less than similarly-situated male employees. (SAC ¶ 221.) She has not, however, alleged any facts from which the Court could infer that this disparity was related to her complaint; indeed, she alleges that she received lower base pay than similarly-situated males from the time she began working at the Company (id. ¶ 198), as do nine other Plaintiffs. Without additional facts supporting a causal connection

here, Eckenrode alleges that she was hired in the same month in which she applied for the promotion. (Id. ¶¶ 193, 215.)  Absent a plausible allegation of an adverse action, her claim must be dismissed.

Defendants have not otherwise challenged the retaliation claims of Jones, Seard, Lowder, and Le.  The Court thus concludes they have stated plausible retaliation claims, but dismisses Eckenrode's retaliation claim.

## G.    Count VII: Sexual Harassment

Plaintiffs Jones and Lowder assert claims of sexual harassment.  In response, Defendants argue that Jones's claim is time-barred and Lowder's claim must be dismissed for failure to exhaust administrative remedies. (Defs.' Mem. of Law at 44-46.)

*Jones*:  Jones's sexual harassment complaint was timely filed with the EEOC only if it was filed within 300 days of the alleged harassment.  See 42 U.S.C. § 2000e-5(e)(1).  Because it "is defendant's burden to prove that plaintiff did not exhaust [her] administrative remedies in a timely manner," Simmons v. Heyman, No. 97 CIV. 0434 (NRB), 2000 WL 520664, at *3 (S.D.N.Y. May 1, 2000), district courts typically dismiss a Title VII complaint on timeliness grounds only if it is apparently from the face of the complaint that the EEOC charge was not timely filed, see Brundage v. U.S. Dep't of Veterans Affairs, No. 06 CIV 6613 RJH, 2010 WL 3632705, at *3 (S.D.N.Y. Sept. 16, 2010); Jones v. City of New York Dep't of Hous., Pres. & Dev., No. 01 CIV. 10619 (AKH), 2002 WL 1339099, at *1 (S.D.N.Y. June 18, 2002).  Under the doctrine of equitable estoppel, the limitations period is tolled if "the victim of harassment is reasonably induced by the defendant or others to believe that the situation has been or is in reasonable course of being resolved."  Frazier v. Delco Electronics Corp., 263 F.3d 663, 666 (7th

---

between Eckenrode's EEOC complaint and this pay disparity, the Court concludes that she must rely on her Title VII disparate pay claim.

Cir. 2001); see Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363, 1368 (D.C. Cir. 1998).

Jones alleges that on one night "shortly after" she began working at Forest in January 2008 (SAC ¶¶ 104, 108), her manager, Austin Wighaman, made a string of sexually explicit comments to other employees about her and (unsuccessfully) propositioned her at her condominium after a work function (id. ¶¶ 108-110). The following morning, Jones alleges, Wighaman told her not to tell anyone about his behavior, and continued "[o]ver the next few months" to confirm that she "had not reported his harassment." (Id. ¶ 111.) Jones further alleges that this harassment continued into 2009, when Wighaman became her direct supervisor. (Id. ¶ 114.) She recounts how her colleagues informed her that Wighaman asked other employees about her relationship status and dates and paid "inappropriate attention to Ms. Jones' body in ways that made Ms. Jones and even her male colleagues uncomfortable," noting that on one occasion in spring 2009 another employee noticed Wighaman "leering at Ms. Jones so noticeably that [the employee] drew Ms. Jones' attention to the problem." (Id. ¶ 113.) Jones alleges that she spoke out about this harassment in June 16, 2010, but was largely ignored, until she resigned on September 27, 2010. (Id. ¶¶ 115-23.) She filed her EEOC complaint on December 3, 2010. (Id. ¶ 10.)

The Court cannot say from the face of the SAC that Jones's sexual harassment complaint was untimely. Jones has a plausible argument that some, or all, of the time between her initial report to Forest's HR on June 16, 2010 and her resignation on September 27, 2010 should be tolled under the doctrine of equitable estoppel.[34] If so, the 300-day period could stretch as far

---

[34]    The DC Circuit has explained that a promise of a "fair and impartial investigation" is insufficient to invoke equitable tolling, but that "an employer's affirmatively misleading statements that a grievance will be resolved *in the employee's favor* can establish an equitable estoppel." Currier v. Radio Free Europe/Radio Liberty, Inc., 159 F.3d 1363, 1368 (D.C. Cir. 1998). Whether some, or any, of the statements to Jones from Forest's HR department fell

back as at least early 2010. Although Jones gives an example from the "spring of 2009" in which Wighaman was seen "leering" at her, in the same paragraph she asserts more generally that Wighaman "frequently asked the other members of the team questions about Ms. Jones' personal life, including questions about her relationship status and dates. He also paid inappropriate attention to Ms. Jones' body in ways that made Ms. Jones and even her male colleagues uncomfortable." (Id. ¶ 113.) The SAC does not specify a time period during which these events occurred, but does allege that Wighaman supervised Jones throughout 2009 and 2010. (Id. ¶¶ 114, 120.) At this stage of the litigation, the Court cannot conclude that Jones's sexual harassment claim is untimely. Defendants will be free to revisit the defense once the record is more developed.

*Lowder*: Defendants assert that Plaintiff Lowder—who did not file an EEOC complaint—should not be permitted to "piggyback" on Plaintiff Jones's EEOC complaint because the two Plaintiffs are not "similarly situated." (Defs.' Mem. of Law at 46.)

Jones's EEOC complaint, however, provided "some indication" that her grievance "affect[ed] a group of individuals defined broadly enough to include those who seek to piggyback on the claim." Tolliver, 918 F.2d at 1058. In particular, Jones stated that "Forest has engaged and continues to engage in a pattern and practice of discrimination against its female employees," denying them "equal employment opportunities in ways including . . . a hostile work environment." (Friedman Decl. Ex. G at 4.) She continued by asserting that she "believe[d] that these discriminatory patters and practices occur throughout Forest" and that she was making "this charge on behalf of all similarly situated female employees." (Id.)

Lowder alleges that she was also subjected to a hostile work environment, including

---

into the former or latter category is a question not well-suited for disposition on a 12(b)(6) motion.

"lewd" text messages from coworkers and sexual harassment by clients that went unheeded. (See, e.g., SAC ¶¶ 323, 330.) Although these events occurred in Illinois in 2010-2011—whereas Jones's harassment occurred in Texas in 2008-2009—and although Jones's EEOC complaint is somewhat conclusory, the Court concludes that Lowder may take advantage of the "single filing rule" in light of Jones's allegations that other female employees were facing similar harassment and in light of the Second Circuit's instruction that such claims be held to a standard of "loose pleading." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 83 (2d Cir. 2001).

## H.   Scope of the Putative Class

Finally, Defendants ask the Court to strike Plaintiffs' Title VII class definitions "because they are clearly overbroad in temporal scope." (Defs.' Mem. of Law at 40.) The Court largely agrees with Defendants.

Under Fed. R. Civ. P. 23(d)(1)(D), the Court may "require that the pleadings be amended to eliminate allegations about representation of absent persons." This rule permits courts to "order deletion of portions [of] a complaint's class claims once it becomes clear that the plaintiffs cannot possibly prove the deleted portion of those claims," 5 Moore's Federal Practice § 23.145 (3d ed. 2007), at least where "the basis for the motion to strike is distinct" from the factors the Court would consider on a motion for class certification, see Rahman v. Smith & Wollensky Rest. Grp., Inc., No. 06cv6198(LAK)(JCF), 2008 WL 161230, at *3 (S.D.N.Y. Jan. 16, 2008). In Rahman, for instance, this Court on defendant's motion to dismiss narrowed the scope of a Title VII plaintiff's class claims. See id.

As described above, as a prerequisite to filing a lawsuit, Title VII requires plaintiffs to file a charge with the EEOC or appropriate state agency within a certain time period. In "deferral states"—those with their own anti-discrimination laws and enforcement agencies—

plaintiffs must file within 300 days, whereas plaintiffs not in "deferral states" have 180 days. See 42 U.S.C. § 2000e-5(e). Although similarly-situated plaintiffs may "piggyback" off other plaintiffs' EEOC charges, individuals may only "piggyback" if they could have filed a timely charge at the time of the earliest class representative's charge. See Velez v. Novartis Pharm. Corp., 244 F.R.D. 243, 255 (S.D.N.Y. 2007) (Lynch, J.); Avagliano v. Sumitomo Shoji Am., Inc., 103 F.R.D. 562, 578 (S.D.N.Y. 1984). Stated differently, the putative class should be restricted to those individuals employed by Defendants within 300 days (for those in deferral states) or 180 days (for non-deferral states) of the earliest-filed representative claim. If a Forest employee in a deferral state left the Company over 300 days before the earliest-filed class EEOC charge, then that employee could not be part of the class because any claims would be time-barred.

Here, Plaintiffs argue that Jones's EEOC charge was the first-filed (Pls.' Opp. at 42); Defendants' claim to the contrary (see Defs.' Reply at 15-16) is unavailing. The Court thus concludes that Jones's charge, which was filed on December 3, 2010 (Friedman Decl. Ex. G at 2), is the first-filed charge. Individuals who left Defendants' employment before June 6, 2010, in non-deferral states (180 days before Jones's EEOC charge) or February 6, 2010, in deferral states (300 days before Jones's charge) could not have experienced discrimination within the statutory limitation period.

Plaintiffs argue, however, that instead of beginning in 2010, the putative class period should begin in 2008. (See SAC ¶ 402, Pls.' Mem. of Law at 47.) They rest their argument on the "continuing violation" doctrine, which provides that "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they

would be untimely standing alone." Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 155-56 (2d Cir. 2012). Plaintiffs thus argue that the discrimination in pay and promotion that Jones allegedly suffered was maintained pursuant to a policy or practice reaching back to at least 2008.

Under controlling Supreme Court and Second Circuit law, however, the continuing violation doctrine is inapplicable to this case. In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), the Supreme Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." The Court noted specifically that a "discrete discriminatory act" would include a "failure to promote," id. at 114; although discriminatory pay was not directly at issue in the case, the Court suggested that discrimination in salary would also constitute a "discrete discriminatory act," because "[e]ach week's paycheck that deliver[s] less" to a member of a protected class "is a wrong actionable under Title VII." Id. at 112 (quoting Bazemore v. Friday, 478 U.S. 385, 395 (1986)); see also 42 U.S.C. § 2000e-5(e)(3)(A) (providing that discrimination in compensation occurs "when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid"). The Court in Morgan drew a distinction between related "discrete discriminatory acts," such as failure-to-promote claims—which are not subject to the continuing violation doctrine—and hostile work environment claims, which are subject to the doctrine. Morgan, 536 U.S. at 115.

Although the Supreme Court in Morgan explicitly reserved the question of whether its conclusion would apply to pattern-or-practice cases, see id. at n.9, the Second Circuit's reasoning in Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 157 (2d Cir. 2012), appears to resolve the question. Plaintiffs in Chin alleged that the defendant's hiring practices created a

disparate impact with respect to promotions.  Addressing the defendant's assertion that certain claims were untimely, the Circuit explained: "Discrete acts of this sort [i.e., an employer's failure to promote], which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period . . . . [A]n allegation of an ongoing discriminatory policy does not extend the statute of limitations where the individual effects of the policy that give rise to the claim are merely discrete acts."  Id. at 157.

Here, there is no class claim of a hostile work environment; rather, the class claims assert discrete discriminatory acts.  Under Chin, a plaintiff may recover for such a discrete harm—"regardless whether it was caused by an ongoing discriminatory policy—only if [s]he files an EEOC charge within 180 or 300 days of that decision."  Id.; see also E.E.O.C. v. Bloomberg L.P., 751 F. Supp. 2d 628, 649 (S.D.N.Y. 2010) ("[T]his case is not one that involves claims that by [t]heir very nature involve repeated conduct.  The EEOC makes allegations of demotions, reductions in pay and responsibility, and other specific negative employment actions following the claimants' return from maternity leave.  These are paradigmatic 'discrete acts' that are subject to the charge-filing requirement."  (citation and quotation marks omitted)); 4 Larson on Employment Discrimination § 72.08[6] ("The limitation referenced with respect to pattern and practice cases is applicable to class actions as well: the continuing violation theory cannot be used to bring in class members who were not affected by the discrimination during the filing period.  Therefore, employees who ended their employment prior to the filing period may not use the continuing violation theory to make their claim timely.").

Therefore, the putative class shall include only those individuals employed by Defendants after June 6, 2010 (180 days before Jones's EEOC charge) in non-deferral states or February 6,

74

2010 (300 days before Jones's charge) in deferral states.

## CONCLUSION

Defendants' motion is granted in part and denied in part. The Court concludes as follows:

- With respect to Count One, Title VII pay discrimination, all eleven Plaintiffs have stated individual claims. Plaintiffs have also alleged a plausible pattern-or-practice claim (based on discrimination in base salaries and in bonuses and annual raises), as well as a disparate impact claim, based on the method by which Defendants set base salaries and the alleged policy of denying earned bonuses to employees on leave for greater than six weeks.

- With respect to Count Two, Title VII promotion discrimination, the individual claims of Plaintiffs Harley, Jones, Le, and Barrett are dismissed, as is the claim of Plaintiff Houser (because her claim is one of pregnancy-based discrimination, considered in Count Three). Plaintiffs Eckenrode, Smith, Avila, Lowder, and Clinton plausibly allege failure-to-promote claims. Additionally, Plaintiffs have plausibly alleged that Defendants engaged in a pattern or practice or promotion discrimination, and that Defendants' policy of limiting job-sharing to the "lowest" sales representative position has a disparate impact on women with respect to promotions.

- With respect to Count Three, pregnancy discrimination, Plaintiffs Barrett, Houser, and Eckenrode have stated plausible claims. The SAC also states a plausible pattern-or-practice claim, and a disparate impact claim based on Defendants' alleged policy of not adjusting employees' President's Club rankings for time spent on leave. Plaintiff Smyth's and Harley's individual pregnancy discrimination claims are dismissed.

- With respect to Count Four, violation of the Equal Pay Act, Plaintiff Seard's claim is dismissed, but the other ten Plaintiffs have stated plausible claims. The Court declines to dismiss Plaintiffs' collective certification claim at this stage of the litigation.

- With respect to Count Five, violation of the Family Medical Leave Act, Defendants have not challenged the sufficiency of the allegations of Plaintiffs Barrett, Houser, and Smyth.

- With respect to Count Six, retaliation, Plaintiff Eckenrode's claim is dismissed. Plaintiffs Jones, Seard, Lowder, and Le have stated plausible claims.

- With respect to Count Seven, sexual harassment, Plaintiffs Jones and Lowder have stated plausible claims.

- The Court grants Defendants' request to narrow the putative class definition to individuals employed by Defendants on or after February 6, 2010 (for putative plaintiffs in "deferral" states) or June 6, 2010 (for those in "non-deferral" states).

The parties shall confer and submit a joint status letter within thirty days of this Order, outlining how they propose to proceed.

The Clerk of Court is respectfully requested to terminate the motion pending at docket number 37.

SO ORDERED.

Dated:     August 14, 2014
           New York, New York

Ronnie Abrams
United States District Judge